RECEIVED

OCT 2 9 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

PHI, INC.                                              CIVIL ACTION NO. 06-1469 (LEAD)
                                                                      06-2243 (MEMBER)

VERSUS                                              JUDGE DOHERTY

OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION AND                    MAGISTRATE JUDGE HILL
OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION LOCAL 108

## MEMORANDUM RULING

Pending before this Court is PHI, Inc.'s ("PHI") Motion to Dismiss Count II of the Unions'

Second Amended Counterclaim in the "Bad Faith Bargaining Case"[1] [Doc. 86]. The motion is

opposed by the Office of Professional Employees International Union ("OPEIU") and its Local

Union 108 ("Local 108") (collectively, "the Unions") [Doc. 99]. For the following reasons, PHI's

motion is DENIED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In March 2000, OPEIU was certified by the National Mediation Board ("NMB") as the

collective bargaining representative of the flight deck crewmembers ("pilots") employed by PHI.

Shortly after the NMB certification, OPEIU entered into negotiations with PHI in an attempt to reach

an initial collective bargaining agreement ("CBA"). As a result of these negotiations, a CBA was

confected between PHI and the Unions on July 12, 2001, which was effective June 1, 2001 through

May 31, 2004.

On or about February 19, 2004, negotiations between PHI and the Unions began in an effort

_____

[1] Civil Action No. 06-1469.

to reach a successor CBA.  After approximately 39 days of direct bargaining and more than 38 additional bargaining sessions mediated by the NMB, no successor CBA was reached.  On July 28, 2006, the NMB issued a letter advising PHI and the Unions that as of 12:01 a.m. EDT on August 28, 2006, the parties would be free to engage in economic self-help.

On August 28, 2006, PHI filed suit in this court, seeking a declaratory judgment and permanent injunctive relief against the Unions under the Railway Labor Act, 45 U.S.C. §151, *et seq.* ("RLA"), on grounds that the Unions violated Section 2, First of the RLA by bargaining in bad faith and failing to exert reasonable efforts to reach an agreement with the Company (the "Bad Faith Bargaining Case").  PHI also seeks to enjoin the Unions from further bargaining in bad faith and require them, henceforth, to bargain in good faith with the intent of reaching an agreement.

On September 20, 2006, the Unions instituted a strike of PHI's pilots.  On the same day, PHI sent several communications to its pilots in response to the strike, including the following:

- PHI's September 20, 2006 letter to the pilots advising them that they were being "permanently replaced" and that their "final paycheck including earnings due for bonuses, accrued vacation or earned time off" would be put in the mail within the next 24 hours.  This letter also advised the pilots that all company benefits were being discontinued as of that date.[2]

- PHI's September 20, 2006 memorandum to all pilots advising the pilots of their alleged duty to report for work.  This memorandum advised the striking pilots that "[p]ilot(s) not in contact with their supervisor and/or who do not provide an acceptable (non-strike related) reason for their absence, will, after three days, be considered to have abandoned their job/responsibilities.  The memorandum also advised that pilots not in contact with their supervisors within the three-day time period would be discharged.[3]

- PHI's September 20, 2006 letter to the pilots attaching COBRA notices and advising the pilots of their right to elect to self-pay in order to continue their health insurance

---

[2] See Doc. 99, Exhibit 1 to Exhibit A, "Declaration of Paul Bohelski."

[3] *Id.*, Exh. 2 to Exhibit A.

coverage previously provided by PHI. These notices advise the pilots that continuing coverage was being offered "[b]ecause of the above event [i.e., permanent replacement] that will end your coverage under the plan, . . . ."[4]

- PHI's September 21, 2006 letter to each striking pilot, attaching a pay check and advising each pilot that "your employment status with PHI, Inc. has now been coded as 'Permanently Replaced Due To Job Actions.'" The letter advised the pilots that "enclosed herein is your last pay check, including any bonuses and accrued vacation due you" and further stated that "your PHI benefits cease as of this date . . . ."[5]

- PHI's September 25, 2006 letter to OPEIU international representative Paul Bohelski, in which PHI confirmed the contents of it September 20, 2006 memorandum that all pilots who fail to advise PHI of their job status faced discharge for job abandonment.[6]

On November 10, 2006, the Unions advised PHI that the pilots were ending the strike and making an unconditional offer to return to work. On November 27, 2006, the Unions filed a complaint for preliminary and permanent injunctive relief, declaratory judgment, damages, and other relief under the Railway Labor Act, 45 U.S.C. §151, *et seq.* and 28 U.S.C. §2201 against PHI (the "Return to Work Case").[7] In the "Return to Work Case," the Unions allege that PHI has ignored the unconditional return to work offer and/or placed illegal conditions on the offer, in violation of the RLA and La. Rev. Stat. §23:822. The Unions seek a preliminary injunction directing PHI to immediately reinstate with full back pay and benefits those flight deck crew members ("pilots") employed by PHI and represented by the Unions who engaged in a protected work stoppage and made an unconditional offer to return to work at the conclusion of the work stoppage on November 10, 2006.

---

[4] *Id.*, Exh. 3 to Exhibit A.

[5] *Id.*, Exh. 6 to Exhibit A.

[6] *Id.*, Exh. 9 to Exhibit A.

[7] Civil Action No. 06-2243.

On April 17, 2007, the Unions filed a second amended answer to PHI's complaint in the "Bad Faith Bargaining Case," as well as a second amended counterclaim, wherein the Unions allege that PHI's "final paychecks" to the pilots deemed "permanently replaced" contain deductions not authorized by the pilots, in violation of La. Rev. Stat. §23:631 [Doc. 63]. The Unions contend that amicable demand has been made by the Unions on behalf of the affected pilots, requesting that the deductions be rescinded and that the pilots be paid the full amounts due, but that PHI has refused to pay these amounts. PHI seeks liquidated damages for PHI's refusal to pay.

On May 29, 2007, PHI filed the instant motion to dismiss the Unions' wage deduction claim [Doc. 86]. The Unions filed their opposition brief on July 3, 2007 [Doc. 99].

## II.    LAW AND ANALYSIS

### A.    Procedural Posture

PHI's motion was filed as a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[8] By the express language of the rule, however, a Rule 12(b)(6) motion "shall be made before pleading if a further pleading is permitted." Fed.R.Civ.P. 12(b)(6). In the instant

---

[8] Rule 12(b) states:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, the adverse party may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P.12(b).

matter, PHI filed its answer to the Unions' wage deduction claim on April 25, 2007 [Doc. 66], and filed the instant motion to dismiss on May 29, 2007 [Doc. 86]. Therefore, PHI's motion to dismiss is untimely pursuant to Rule 12(b)(6).

In *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999), the Fifth Circuit explained that an untimely-filed 12(b)(6) motion to dismiss should be treated as a motion for judgment on the pleadings pursuant to Rule 12(c), to wit:

> Because a rule 12(b) motion must be filed before responsive pleadings, the appellees' motion was untimely. Rule 12(c) motions, however, may be filed after the pleadings are closed. Such motions will be treated as a motion for judgment on the pleadings based on a failure to state a claim on which relief may be granted. Thus, the district court did not err when it construed the defendants' motion as one for judgment on the pleadings.

Accordingly, PHI's 12(b)(6) motion would ordinarily be treated as one for judgment on the pleadings pursuant to Rule 12(c).[9] Despite the foregoing, this Court is unable to treat the instant motion as a Rule 12(c) motion to dismiss, because the Unions state in their opposition brief that they rely on materials outside the pleadings in support of their arguments. Accordingly, the Unions urge this Court to consider the attached materials and consider the instant motion as a motion for summary judgment.

This Court has reviewed the documents attached by the Unions to their opposition brief and agrees that the documents are material to the issues before the Court. Accordingly, on October 9,

---

[9] Rule 12(c) states:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c).

2007, this Court notified the parties that it intended to treat the instant motion to dismiss as a motion for summary judgment [Doc. 135]. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 195 (5th Cir.1988). *See also Clark v. Tarrant County, Texas*, 798 F.2d 736, 745 (5th Cir. 1986).[10] Considering the foregoing, the instant motion is hereby considered, and will be adjudicated as, a motion for summary judgment.

### B.    Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or declaratory judgment is sought may, at any time, move with or without supporting affidavits for summary judgment in the parties favor as to all or any part thereof." Fed. R. Civ. Pro. 56(b).  Summary judgement is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or is otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. Pro. 56(e)

As summarized by the Fifth Circuit in <u>Lindsey v. Sears Roebuck and Co.</u>, 16 F.3d 616, 618

---

[10] Rule 56(c) states that a motion for summary judgment "shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits." Fed.R.Civ.P.56(c).  In *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 195 (5th Cir.1988), the Fifth Circuit stated that the notice requirement of Rule 56(c) does not require that a party is "entitled to notice that the court *would,* as opposed to *could,* treat the motion as one for summary judgment." *Id.* at 195.  Rather, the court found that "[t]he proper question ... is whether the plaintiffs had ten days' notice after the court accepted for consideration matters outside the pleadings." *Id.* at 196. Finding that the plaintiff in *Isquith* had well over ten days' notice after the district court accepted for consideration the materials outside the pleadings, the court held that Rule 56(c)'s notice requirement was satisfied.  Given the contentious nature of this proceeding and out of an abundance of caution, this Court notified the parties in writing on October 9, 2007 that the instant motion would be treated as a motion for summary judgment.

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; see also, Moody v. Jefferson Parish School Board, 2 F.3d 604, 606 (5th Cir.1993); Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

> [. . . .]
> . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.*

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)(emphasis added)).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.* To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

## C.    The Unions' Wage Deduction Claim

PHI seeks dismissal of the Unions' wage deduction claims on grounds that the Unions are not entitled to relief on the face of the statute. Section 23:631 states in pertinent part:

> A. (1)(a) *Upon the <u>discharge</u> of any laborer or other employee* of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

> (b) *Upon the <u>resignation</u> of any laborer or other employee* of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle

-8-

during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.

La.Rev.Stat. §23:631(A)(1)(a) & (b) (emphasis added).  PHI argues that, pursuant to Louisiana jurisprudence, Section 23:631 contains a preliminary threshold, that is, an employee must have been either *actually discharged* or must have *actually resigned* in order to obtain relief under the statute. PHI argues that, because the Unions cannot show that the pilots in question either actually resigned or were actually discharged by PHI, they cannot obtain relief under the statute.  In fact, PHI argues that, because the pilots are strikers, they remain employees of PHI.  See *National Labor Relations Board v. Mackay Radio*, 304 U.S. 333, 335 (1938) ("The strikers remained employees under Section 2(3) of the [National Labor Relations] Act, 29 U.S.C.A. 152 (3) . . .").  PHI also argues that the Unions' wage deduction claim is preempted by federal law.

### 1.      The Wage Deduction Claim is Not Preempted

Putting aside for a moment the issue of whether Section 23:631 is applicable in this case as a matter of law, PHI argues that, even if the Court determines that Section 23:631 is applicable to the Unions' wage deduction claim, such claim is preempted by the RLA pursuant to the principles set forth in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959), otherwise known as *Garmon* preemption.

In *Garmon*, an employer sued the Union in state court to recover damages from picketing that allegedly violated the National Labor Relations Act. The United States Supreme Court held that this state remedy was preempted by federal law because the state courts must yield to the exclusive jurisdiction of the NLRB, even when the NLRB has declined to take jurisdiction. *Garmon*, 359 U.S. at 238, 79 S.Ct. 773. The *Garmon* court further stated that preemption is necessary because "the exercise of state power over a particular area of activity threatens interference with the clearly

indicated policy of industrial relations. . ." *Id.* at 243. Concerned with "conflict in its broadest sense," the *Garmon* court eschewed a focus on the type of state regulation or claim, and adopted an approach that "looks to the nature of the activities which the states have sought to regulate." *Id.* *Garmon* requires federal preemption of state causes of action "if they attach liability to conduct that is arguably protected . . . or arguably prohibited by federal labor relations law." *Id.* at 245.

*Garmon* recognized two exceptions to preemption. First, some conduct will "touch interests so deeply rooted in local feeling and responsibility that . . . [the Court] could not infer Congress had deprived the states of the power to act." *Id.* at 244. The classic example of this exception, provided by the court in *Garmon* itself, is that of union activities involving violence. *See also Youngdahl v. Rainfare, Inc.*, 355 U.S. 131, 139-40, 78 S.Ct. 206, 2L.Ed. 2d 151 (1957) (upholding state court injunction against violent picketing). The second exception is for matters only of "peripheral concern" to federal labor relations law. *Garmon*, 359 U.S. at 243.

The Fifth Circuit applied the doctrine of *Garmon* preemption in *Kaufman v. Allied Pilots Ass'n*, 274 F.3d 197 (5th Cir. 2001). In *Kaufman*, airline passengers brought a class action in which they asserted state law claims against an airline pilots union, seeking to recover for economic damages caused when the union staged a sick-out in violation of a federal temporary restraining order. Plaintiffs originally asserted both federal and state claims, and the district court dismissed all claims with prejudice except a state claim of tortious interference with contract arising from post-TRO conduct of the Union. The only issue on appeal was whether the state law claim was preempted by federal law.

On appeal, plaintiffs averred that the federal and state legal regimes were not in conflict inasmuch as a violation of a TRO is a violation of federal law, and further argued that if the two

regimes were not contradictory, there could be no preemption. *Kaufman*, 274 F.3d at 202. The Fifth

Circuit rejected this argument, finding that it could not stand in light of the United States Supreme

Court's decision in *Wisconsin Department of Industry, Labor & Human Relations v. Gould, Inc.*, 475

U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). *See Kaufman*, 274 F.3d at 202. The *Kaufman*

court noted that in *Gould*, the Supreme Court reaffirmed the *Garmon* preemption principle as

"prevent[ing] states not only from setting forth *standards of conduct* inconsistent with the

substantive requirements of the NLRA, but also from providing their own regulatory or judicial

remedies for conduct prohibited or arguably prohibited by the Act." *Id.* (emphasis in original), citing

*Gould*, 475 U.S. at 286.

     The *Kaufman* court reiterated that "*Garmon* preemption is required when a state cause of

action poses 'a serious risk of conflict with national labor policy,' noting that

> The [Supreme] Court has directed that we look not to the effect on labor-management
> relations of allowing a particular claim to proceed, but rather to conflict in the "broadest
> sense." *Gould* reminds us that adding state remedies or penalties to the mix would be a
> "conflict" necessitating preemption. . . *The concern of Garmon is not so much with the
> righting of labor wrongs, the concern of the labor relations laws themselves, as with the
> uniformity and singularity of remedy provided by federal law. It is a national labor policy-
> as this case makes vivid.*

274 F.3d at 202-03 (emphasis added). See also *Garner v. Teamsters*, 346 U.S. 485, 498-499, 74

S.Ct. 161, 170, 98 L.Ed. 228 (1953) ("The conflict lies in remedies . . . . [W]hen two separate

remedies are brought to bear on the same activity, a conflict is imminent.").

     The Unions argue that the first exception to *Garmon* preemption – that involving deeply

rooted state law interests – is applicable here and relies on *Butler v. Fidelity Technologies Corp.*, 685

So.2d 676 (La.App. 3rd Cir. 1996), *cert. denied*, 691 So.2d 84 (La.) and *cert. denied*, 522 U.S. 821

(1997), in support of its position. In *Butler*, plaintiffs brought claims pursuant to Section 23:631 for

unpaid vacation time.  685 So.2d at 678.  The defendant employer asserted lack of subject matter jurisdiction, claiming preemption pursuant to the Federal Service Contract Act ("SCA").  *Id.*  In deciding that the wage deduction claim was not preempted, the court stated that "the historic police powers of the States are not to be superceded by . . . federal act unless that is the clear and manifest purpose of Congress."  *Id.*, quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992).  The *Butler* court further stated:

> To determine whether a state statute is preempted by federal statute, the court must first determine the construction of the two statutes and then resolve the question of whether the state statute interferes with the accomplishment and execution of the full purposes and objectives of Congress.

*Id.* at 678, citing *Tenneco, Inc. v. Sutton*, 530 F.Supp. 411 (M.D.La. 1981).

Noting that the SCA does not explicitly nor implicitly address the issue of nonpayment of wages, the court found that the "main thrust" of the SCA is to ensure that employees of contractors or subcontractors furnishing services for federal agencies are paid no less than the prevailing rate in the locality, including fringe benefits, and that the work will not be performed under unsafe or unsanitary conditions.  *Butler*, 685 So. 2d at 678-79.  The court then found that the purpose of Section 23:631 is to "compel the employer to pay the earned wages of an employee promptly after his dismissal or resignation."  *Id.* at 680.  The *Butler* court specifically found that Section 23:631 does not prevent or interfere with the attainment of the federal goals set forth in the SCA.  *Id.*  Thus, the court held that the SCA does not preempt claims alleged under Section 23:631.  *Id.*  See also *Gibbons v. Kansas City Southern Ry. Co.*, 100 So.2d 319 (La.App. 2nd Cir. 1958) (court held that RLA did not preempt the application of Section 23:631, rejecting employer's argument that plaintiff's claim under Section 23:631 was barred because plaintiff had not pursued a grievance under the grievance/arbitration machinery of the RLA).

This Court concludes that *Kaufman*, which was decided after *Butler*, is consistent with *Butler*. In *Kaufman*, the Fifth Circuit specifically indicated that certain types of state law claims can survive federal preemption, as follows:

> *While courts have refused to apply Garmon preemption to state tort claims that served substantial state interests and did not threaten interference with the federal regulatory scheme*, [internal citations omitted], this is not our case. Slicing the claim into before and after the TRO does not change the reality that the state law is being asked to take hold of the same controversy as the federal labor laws.

*Kaufman*, 274 F.3d at 203 (emphasis added).

Applying the principles set forth in *Butler* and *Kaufman* to the instant case, this Court concludes that the purpose of Section 23:631 is to compel an employer to pay the earned wages of an employee promptly after his dismissal or resignation. This Court further concludes that Section 23:631 protects Louisiana's deeply rooted local interests in protecting the state's employees from forfeiting their hard-earned wages. The purpose of the RLA is "to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization. 45 U.S.C. § 151(a); *see also Johnson v. Express One Intern., Inc.*, 944 F.2d 247 (5th Cir. 1991). This Court finds that Section 23:631 does not prevent or interfere with the attainment of the RLA's goals, and there does not appear to be a threat of conflicting remedies under the two legal schemes. Indeed, PHI does not argue that permitting the affected pilots to be paid the wages they have already earned would frustrate the purpose and intent of the RLA.

Considering the foregoing, this Court concludes that Section 23:631 serves substantial state interests that do not threaten interference with, or remedies that conflict with, the federal regulatory scheme. Considering the foregoing, this Court finds that the RLA does not preempt

-13-

the Unions' claims under Section 23:631.

> **2.     PHI fails to carry burden of establishing that Section 23:631 is not applicable as a matter of law**

PHI argues that, absent either actual discharge or resignation, the affected pilots are not entitled to relief under Section 23:631. On the other hand, the Unions argue Louisiana law does not require that Section 23:631 be so narrowly construed and cites the Louisiana Supreme Court decision in *Beard v. Summit Institute for Pulmonary Medicine and Rehabilitation, Inc.*, 707 So.2d 1233 (La. 1998), in support of its position. In *Beard*, plaintiff worked for a company that had a personnel policy that stated when an employee walked off the job without cause or voluntarily resigned without notice, the employee was deemed to have abandoned his or her position. The policy further stated any employee who abandoned his or her position forfeited all accrued benefits. Beard walked off her job at the beginning of a shift and never returned to work. When Beard requested her accrued vacation pay, the company refused, claiming that Beard had abandoned her position and forfeited her right to vacation pay under the company's policy. Beard sued for unpaid wages under La. Rev. Stat. §§23:631, 632,[11] and 634.[12]

---

[11] Section 632 states:

> Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.

La. Rev. Stat. §23:632.

[12] Section 634 states:

> A. No person, acting either for himself or as agent or otherwise, shall require any of his employees to sign contracts by which the employees shall forfeit their

-14-

In considering whether the company violated Louisiana law, the Louisiana Supreme Court first noted the lower courts had framed the issue only in terms of whether the company violated Section 23:634, which states that an employer cannot require an employee to sign a *contract* providing that the employee will forfeit wages if the employee resigns before the end of the contract period. *Beard*, 707 So. 2d at 1235. The company had argued that Beard had not signed such a contract, and therefore, Section 23:634 did not apply. However, the Louisiana Supreme Court reasoned that, "clearly if an employer may not require an employee to sign a contract providing for forfeiture of wages upon termination or resignation, an employer cannot require an employee to forfeit wages simply by enacting a policy to that effect." *Id.* at 1235. Therefore, the *Beard* court held that the provisions of Sections 23:631 and 23:632, as well as Section 23:634, were applicable in the case. *Id.*

The court then turned its attention to the nature of the benefit at issue and concluded that "accrued vacation pay" qualifies as "wages" -- and, therefore, an "amount then due" -- under Section 23:631. *Beard*, 707 So.2d at 1234, citing *Boudreaux v. Hamilton Medical Group, Inc.*, 644 So. 2d

---

wages if discharged before the contract is completed or if the employees resign their employment before the contract is completed; but in all such cases the employees shall be entitled to the wages actually earned up to the time of their discharge or resignation.

B. Nothing in Subsection A of this Section or in R.S. 23:631(A) shall prohibit an employer from requiring an applicant for employment who becomes an employee or an employee, provided the employee is compensated at a rate equivalent to not less than one dollar above the existing federal minimum wage and is not a part-time or seasonal employee as defined in R.S. 23:1021, to sign a contract providing that the costs of such individual's preemployment medical examination or drug test may be withheld from his wages if he resigns within ninety working days from his first day of work, and, upon resignation, withholding such costs, unless such resignation is attributable to a substantial change made to the employment by the employer as applied in the Louisiana Employment Security Law.

La. Rev. Stat. §23:634.

619, 622 (La. 1994).  After considering the facts of the case, the *Beard* stated:

> Summit argues that since its personnel policy provides that vacation pay is forfeited
> when an employee abandons his or her position, which Beard did, that the vacation
> pay is not due under the terms of employment. However, La. R.S. 23:634 strictly
> forbids an employer from requiring an employee to forfeit her "wages" upon
> resignation and provides that the employee shall be entitled to the wages actually
> earned up to the time of their discharge or resignation. The terms of Beard's
> employment were that she would be compensated for any unused vacation time.
> Because accrued vacation time is "wages," La. R.S. 23:634 prohibits an employment
> policy or a signed employment contract which requires its forfeiture.

707 So.2d at 1235-1236.

Thus, the *Beard* court held that the company's *policy* of requiring employees to forfeit wages

*and* its failure to pay Beard her wages violated Sections 23:631, 632, and 634.  In so holding, the

court noted that the dissenting judge distinguished between an employee who "resigns" and one who

"abandons her position," and argued that Sections 632 and 634 are only applicable to an employee

who resigns.  However, the majority stated *"this view is contrary to the personnel policy itself which*

*states that 'abandonment of position is considered a voluntary resignation without notice.'"* *Id.* at

1236, n.1 (emphasis added).  See also *Wyatt v. Avoyelles Parish School Bd.*, 831 So. 2d 906 (La.

2002) (holding that School Board violated Section 23:631 where it failed to pay amounts actually

accrued and not lost by retired employees pursuant to School Board's "use it or lose it" accrued

benefits policy).

This Court acknowledges that the Unions do not seek relief pursuant to Section 23:364.

Nevertheless, with respect to Sections 23:631 and 632, this Court concludes that *Beard* stands for

two principles: (1) depending upon the company's personnel policies, under certain circumstances,

an employer cannot maintain a policy that requires an employee who abandons his or her job to

forfeit wages; and (2) an employee who "abandons" or "voluntarily leaves" a job without notice

-16-

depending upon the company's personnel policies, *may* be considered as having voluntarily resigned and thus may be entitled to relief for a violation of Section 23:631.  Pursuant to *Beard, if an employer's policy so provides*, an employee who is not *actually discharged* or who has not *actually resigned* may be considered as having voluntarily resigned and thus entitled to possible relief under Section 23:631.  Considering the foregoing, on the facts presented to this Court, this Court cannot conclude that Section 23:631 does not apply to this case *as a matter of law*.

Notwithstanding the foregoing, this Court has not been presented with sufficient facts to conclude *whether* the affected pilots are *actually* entitled to relief under Section 23:631 and, if so, the nature of that relief.  Neither party has addressed PHI's policies at the pertinent time regarding (1) the nature of the benefits that accrue to pilots employed by PHI during their employment, such that the Court could determine whether such benefits qualify as "amounts then due" under Section 23:631; and/or (2) the nature of PHI's policy regarding payment of accrued benefits to pilots who have been terminated and/or discharged; and/or (3) the personnel policies in effect at the time as they relate to "voluntary resignation" and, thus, the policies which might apply to pilots who have resigned, "abandoned their positions," or "voluntarily left without notice."[13]  Thus, the Court makes

---

[13] Although the Unions argue that the letters sent by PHI to the affected pilots between September 20, 2006 and September 25, 2006 establish that the pilots were, in fact, terminated, neither party sets forth for this Court what PHI's benefits/accrued vacation policies were at the time the pilots went on strike, or PHI's personnel policies as to what could constitute a "voluntary resignation."

Notwithstanding the foregoing, it appears that the materials the Unions attach to their opposition brief may contain some of this information.  Article 12 of the parties' expired CBA provides that "[i]n the event a pilot *voluntarily leaves the Employer (including retirement or permanent disability)* he will be paid for his accrued [vacation and scheduled time off] days *provided he has given the Employer two weeks notice of his departure.*" (emphasis added).  Alternatively, under the terms and conditions of employment that PHI proposed to implement on August 28, 2006, the payment of accrued vacation pay is called for *any time a pilot's employment with PHI ceases.* Thus, in Article 12, Section E of the Green Book, PHI's policy states: "*In the event a pilot's employment ceases*, he will be paid for his earned [vacation and scheduled time off] hours." (emphasis added).

Because the parties have not adequately briefed these issues, this Court cannot determine whether the

no ruling with respect to these issues at this time.[14]

Furthermore, this Court concludes that there are genuine issues of material fact as to whether the amounts that PHI withheld from the affected pilots' paychecks were properly withheld.  PHI argues that "the deductions stem from the pilots' failure to return Company property, such as expensive helmets and flight equipment."  However, the Unions argue that deductions were made for equipment that had been returned prior to the strike and for equipment that had never been issued to the pilots.  The Unions further argue that at no time prior to the deductions being made did PHI prepare an inventory of equipment allegedly in the possession of the striking pilots, nor did PHI respond to certain pilots' requests for information as to how the  pilots could return equipment that *was* in their possession to PHI at PHI's expense.  Considering the foregoing, this Court concludes that there are genuine issues of material fact as to whether the amounts that were withheld from the affected pilots' paychecks were properly withheld by PHI.

Thus, this Court concludes that (1) PHI has failed to carry its burden of proving that Section 23:631 can provide no relief to the Unions *as a matter of law,* and (2) there are genuine issues of material fact regarding whether the amounts withheld by PHI were properly withheld.  PHI's motion

---

affected pilots are actually entitled to relief under Section 23:631 and the nature of that relief.

[14] Because the Court does not determine at this time whether the affected pilots are actually entitled to relief under Section 23:631, the Court cannot address the issue regarding whether the affected pilots can be legally considered "discharged" pursuant to Section 23:631 while simultaneously being considered employees of PHI under the RLA.  To the extent that the affected pilots *could* be entitled to relief under Section 23:631, this Court notes that, pursuant to the United States Supreme Court's ruling in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), an individual's status under one statute is not necessarily dispositive of that individual's status under another statute (holding that plaintiff's pursuit, and receipt, of social security insurance benefits did not automatically estop her from pursuing an ADA claim).  This issue has not been adequately briefed by the parties, and, again, this Court makes no finding as to *what* the precise status of the pilots was under the particular policy that PHI had in place at the time of the events in question.  For these reasons, this Court makes no finding on this issue at this time.

for summary judgment is, therefore, DENIED.[15]

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___ day of _____, 2007.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[15] This Court makes no finding regarding whether the pilots are entitled to relief under Section 23:631, as this Court has not been provided with sufficient facts to make such a determination.  All this Court decides today is that PHI fails to establish that the pilots can be entitled to no relief under Section 23:631 as a matter of law.