RECEIVED

SEP 3 0 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

PHI, INC.                                          CIVIL ACTION NO. 06-1469 (LEAD)
                                                   Consol. w/ 06-2243 & 08-0762

VERSUS                                             JUDGE DOHERTY

OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION , THE                          MAGISTRATE JUDGE HILL
OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION LOCAL 108, AND
THE INDIVIDUAL PILOTS

## MEMORANDUM RULING

Pending before this Court is a "Motion for Partial Summary Judgment on Various Claims in the "Return to Work" Case"[1] filed by PHI, Inc. ("PHI") [Doc. 218] asking this Court to dismiss "various claims" made by the Unions. PHI argues the Unions' November 22, 2006 offer to return to work was rife with conditions, chief among them the return to work of the pilots being based on seniority recall alone, and argues PHI, therefore, was not obligated to reinstate the pilots pursuant to the Unions conditional offer and, therefore, cannot be found to have violated "the RLA, §§ 151-188." The Office of Professional Employees International Union ("OPEIU"), OPEIU Local Union 108 ("Local 108"), and the individual pilot plaintiffs ("the Individual Pilots") (collectively, "the Unions") filed a response [Doc. 231], arguing their offer to return to work was unconditional and PHI was thereby obligated by Section 2, Third and Fourth of the RLA, 45 U.S.C. § 152 (3) & (4) to return the pilots to work based upon legal, neutral criteria, and PHI did not do so, therefore, PHI is in violation of the RLA Section 2, Third and Fourth. For the following reasons, the motion is DENIED.

---

[1] Civil Action No. 06-2243.

## I. Factual and Procedural Background

The general facts and procedural history of this case have been set forth in considerable detail in previous rulings issued by this Court and will not be restated here. Despite the foregoing, the following facts are particular to the instant motion.

In the "Return to Work Lawsuit," the Unions allege that on November 10, 2006, the Unions on behalf of the pilots made an unconditional offer to PHI to return to work, as contained in a communication from OPEIU International Representative Paul Bohelski to Richard Rovinelli, PHI's Chief Administrative Officer and Director of Human Resources, as follows:

> Please be advised that the Office and Professional Employees International Union ("OPEIU") and Office and Professional Employees International Union Local 108 ("Local 108"), as the representative of and on behalf of all flight deck crew members employed in the Oil and Gas or Air Medical Divisions, or otherwise employed by PHI Inc., who have not already returned to work hereby end their strike and unconditionally offer to return to work effective immediately.[2]

In their Complaint in the "Return to Work Lawsuit," the Unions make the following allegations in connection with their offer to return to work:

23. Despite the Unions' November 10, 2006 unconditional ending of the strike and unconditional offer to return work, as of this writing, PHI has not returned to work a single striking pilot in response to the Unions' unconditional offer.

24. On November 13, 2006, PHI requested that OPEIU confirm that Bohelski had authority to make the November 10, 2006 unconditional offer to return to work and that the unconditional offer to return to work was properly ratified.

25. Despite having no legal obligation to provide the information requested by PHI, on November 14, 2006, OPEIU confirmed to PHI in writing that Bohelski was authorized to make the November 10, 2006 unconditional offer to return to work and that the unconditional offer to return to work was

---

[2] *See* Doc. 1, Complaint, Civil Action No. 06-2243, ¶21.

properly ratified. A true and accurate copy of OPEIU's written confirmation to PHI is attached hereto as Exhibit B.

26. Despite the Unions' November 14, 2006 provision of the information requested by PHI, as of this writing, PHI has not returned to work a single striking pilot in response to the Unions' November 10, 2006 unconditional offer.

27. Since the Unions' November 10, 2006 unconditional offer to return to work, PHI has solicited and/or accepted unconditional offers to return to work made by individual pilots represented by the Unions.

28. Since the Unions' November 10, 2006 unconditional offer to return to work, PHI has returned individual pilots to work out of seniority order.

29. Prior to and since the Unions' November 10, 2006 unconditional offer to return to work, PHI has required individual pilots who have offered to return to work to sign an "Individual Unconditional Return to Work Agreement" in which the individual pilot is forced to give up his/her right to engage in a strike or any "other self-help measures". A true and accurate copy of that document is attached as Exhibit C.

30. On November 22, 2006, still not having returned to work a single striking pilot in response to the Unions' November 10, 2006 unconditional offer, PHI provided OPEIU with a "Preliminary Unconditional Return To Work Agreement" which imposes illegal conditions upon the Unions' November 10, 2006 unconditional offer to return to work. A true and accurate copy of PHI's "Preliminary Unconditional Return To Work Agreement" and the e-mail to which it was attached is attached hereto as Exhibit D.

31. As a result of PHI's failure to accept the Union's November 10, 2006 unconditional offer to return to work, the Unions have been damaged monetarily by having to continue to pay out strike and defense fund benefit payments that would not have otherwise been necessary.[3]

In their First Cause of Action in the "Return to Work Lawsuit," the Unions allege PHI

willfully breached its obligations under Section 2, Third and Fourth of the RLA, 45 U.S.C. §152 (3)

---

[3] *Id.*

& (4),[4] by unlawfully refusing to reinstate pilots who made unconditional offers to return to work at the conclusion of a work stoppage. The Unions, also, allege PHI willfully breached its obligations under the RLA, Section 2, Third and Fourth by proposing its "Preliminary Unconditional Return To Work Agreement" to the Unions, which imposes illegal conditions upon the Unions' unconditional offer to return to work in violation of "the RLA."

In their prayer for relief, the Unions request this Court:

A.      Issue a preliminary and permanent injunction enjoining PHI from violating

---

[4] Section 2, Third of the RLA states:

**Third. Designation of representatives**

Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

Section 2, Fourth of the RLA states:

**Fourth. Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction of dues from wages forbidden**

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: *Provided,* That nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

45 U.S.C.A. §152 Third, Fourth.

the RLA and from interfering with the RLA protected rights of the Unions and the pilots they represent;

B. Order PHI to immediately reinstate to employment retroactive to November 10, 2006, in bidding seniority order. all pilots who did not return to work prior to the making of the unconditional offer to return to work on November 10, 2006, except for those positions which have been filled by "permanent replacements" as specified in paragraph F of this Request for Relief;

C. Order PHI to make whole in all ways, including but not limited to back pay and benefits, all pilots who it has illegally refused to return to work despite the Unions' November 10, 2006 unconditional offer to return to work;

D. Enjoin PHI from refusing to immediately reinstate all PHI pilots who engage in or have engaged in protected activity and have offered to unconditionally return to work;

E. Enjoin PHI from imposing illegal conditions upon the Unions' November 10, 2006 unconditional offer to return to work;

F. Enjoin PHI from purporting to "permanently replace" employees who have engaged in protected strike activity unless such "replacements" were in fact lawfully working in a pilots' job when the Unions and pilots made their unconditional offer to return to work on November 10, 2006 and were not otherwise already employed by PHI in another capacity, were not trainees, were not temporary replacements or were not contract employees;

G. Enjoin PHI from failing to recall in seniority order striking pilots who were actually permanently replaced prior to the November 10, 2006 unconditional offer to return to work when a pilot vacancy occurs;

H. Enjoin PHI from threatening pilots in an effort to discourage protected concerted activity;

I. Enjoin PHI from interfering with the concerted activity of the Unions and the pilots they represent in any other manner prohibited by the RLA;

J. Enjoin PHI from violating La. R.S. 23:822 in its process of returning pilots to employment;[5]

---

[5] This claim was dismissed by the Court in its Memorandum Ruling and Order dated October 29, 2007 [Docs. 139 & 140].

K.     Issue a judgment at the conclusion of the trial of this action declaring the rights of the Unions, the pilots they represent, and PHI under the RLA;

L.     Issue a judgment at the conclusion of the trial of this action awarding damages to the Unions and the pilots they represent in an amount to be determined by the Court;

M.     Issue such other relief as the Court deems just and proper;

N.     Issue an award of attorneys' fees and costs to the Unions for pursuit of this action; and

O.     Retain jurisdiction to ensure that PHI fully complies with any and all orders of the Court.[6]

In the instant motion for partial summary judgment, PHI argues "various claims" made by the Unions should be dismissed because the Unions' offer to return the pilots to work was not unconditional, thus, PHI cannot be in violation of "the RLA's" argued requirement that PHI respond to the unconditional offer in a certain fashion and not in others. PHI contends the Unions' offer to return to work was "rife with conditions," including:

(1)     that PHI return strikers to work based on seniority alone, despite PHI's right to use other neutral criteria to determine return order;

(2)     that PHI return strikers who had been terminated during the strike for cause under the parties' collective bargaining agreement; and

(3)     that the strikers retain their right to engage in selective work stoppages against PHI, despite a previously agreed-upon no-strike/no-lockout clause and such conduct being unprotected by the law.

PHI argues that because the Unions' offer was conditional, it is entitled to "partial summary judgment on the claims of the [Unions] in the 'Return to Work' suit that PHI violated the Railway Labor Act, 45 U.S.C. §§ 151-188, in the manner in which it responded to the Unions' offer to return to work after their strike against PHI," **without specifying which specific claims or remedies plead**

---

[6] See Complaint, Doc. 1, Civil Action No. 06-2243, ¶21.

by the Unions in the Return to Work Lawsuit, and generically referenced *by PHI* as "various claims" and "45 U.S.C. §§ 151-188," might be the subject of its motion for summary judgment. Although in th opening paragraph of their Complaint in the Return to Work lawsuit, the Unions state they bring this action under the RLA, "45 U.S.C. Section 151, et seq.," the Unions seek specific relief pursuant to Section 2, Third and Fourth of the RLA. Thus, it is not clear to this Court which of the "various claims" which might be implicated by the Unions' pleadings and PHI's generic references might be the subject of PHI's motion. Indeed, the motion is styled a "Motion for Partial Summary Judgment on *Various Claims* in the Return to Work Case" (emphasis added), and PHI's reference to which specific statute those "various claims" might lie and which claims plead by the Unions are intended to be included in the prayer to dismiss "various claims," and thus is being addressed by the motion, is unknown.

The generic, broad brush approach employed by PHI in seeking dismissal of "various claims" made by the Unions is neither proper nor helpful to the Court in resolving the issues. However, PHI does not carry the complete burden of fault in this matter. The Unions' delineation within its pleading and briefs, as to what portions of the RLA might have been violated by PHI is also painted with a broad brush and is itself, neither proper nor helpful. Additionally, the relief prayed for by the Unions is so broad in scope and nature, as to raise the question of whether any or all of the relief requested is available pursuant to the actual aspects of the statute plead. As best this Court can discern, presumably, PHI seeks summary judgment on "various claims" presumably made by the Unions, presumably having a factual basis somewhere within 45 U.S.C. §§ 151-188. Arguably PHI, presumably, violated certain portions of "45 U.S.C. §§ 151-188" or "the RLA Section 2, Third and Fourth" as generically identified by the parties. Neither party addresses what request for relief, if

any, would be appropriate for such a violation, of what particular portion of the statute or which claims or prayers for relief should fall as the unidentified "various claims," should this Court determine the unidentified "various claims" somewhere couched within the Unions' equally generic unidentified claims should be dismissed.

Nonetheless, it would seem the Unions' allege, without providing a proper statutory basis, that PHI violated the RLA Section 2, Third and Fourth, in the way PHI "mishandled" its response to the Unions' unconditional offer to return to work by failing to immediately reinstate the pilots; PHI argues, without establishing a proper statutory basis, that it could not have violated "45 U.S.C. §§ 151-188" because no obligation to reinstate arises until or unless an unconditional offer is received, and no unconditional offer was, in fact, received. Consequently, PHI's present motion and briefing are of limited benefit in the quest for resolution of the legal issues presented, as is the Unions' response, but both will play a role in the quest for efficient adjudication by forcing a clarification of the claims made, applicable law, defenses plead and issues inherent in both.

As noted, the Unions' claims made and remedies prayed for, as contained in their pleadings, also, are of limited merit in the quest for true resolution of actual claims *grounded in fact and law*. Beyond the inadequate generic references to the *statutory basis* of their claims, i.e., Section 2, Third and Fourth of the RLA, 45 U.S.C. § 152 (Third) & (Fourth), *the factual basis of the claims* made by the Unions in its complaint to support these allegations -- that no pilots have been returned to work since the November 10, 2006 offer – it would seem, is no longer accurate or applicable, as many of the striking pilots have, in fact, returned to work at PHI by virtue of a January 11, 2007 protocol adopted with benefit of this Court. Therefore, this Court has question whether any or all of the "claims" as enumerated in the Unions' "Return to Work" lawsuit are still viable, and if so, which

ones, and if so, on what basis and what remedy can, pursuant to the statutory base plead, flow from those specific claims, as the pilots have returned to work. However, neither party has addressed these glaring factual and legal issues and no amendment has been forthcoming. Relatedly, again, this Court has serious question as to which of the plethora of *remedies* prayed for are available and can flow pursuant to which provisions of the RLA, and of those remedies, which remain available to the Unions in light of the adopted January 11, 2007 protocol for the return to work, and, of those remedies, which the Unions are still pursuing and pursuant to what legal authority and upon what factual basis. However, neither the Unions nor PHI has addressed these *relevant* core issues in any fashion, rather each persists in engaging in *broad acrimonious rhetoric* as to the others' complained-of and greatly disputed behavior, to the detriment of the quest for true legal and factual resolution, resulting in waste of extensive judicial resource.

The foregoing might ordinarily render it difficult, if not impossible, for the Court to rule on the instant motion, as it is not clear to the Court *which "various claims" PHI is seeking to have the Court dismiss* or *which claims have actually been plead by the Unions and pursuant to which particular statutory authority* and, of those, *what remedies are allowed for pursuant to the particular statute plead* and of those *which would remain viable*. However, because this Court concludes under *any* of the "various claims" presumed to have been alleged by the Unions, to the extent PHI seeks relief on the basis the Unions' offer to return to work was conditional or unconditional, there are genuine issues of material fact that preclude the entry of summary judgment on that basis, therefore, the motions must fail, as will be more fully explained hereinbelow.

## II.    Law and Analysis

### A.    Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or declaratory judgment is sought may, at any time, move with or without supporting affidavits for summary judgment in the parties favor as to all or any part thereof." Fed. R. Civ. Pro. 56(b). Summary judgement is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or is otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. Pro. 56(e)

As summarized by the Fifth Circuit in <u>Lindsey v. Sears Roebuck and Co.</u>, 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also*, <u>Moody v. Jefferson Parish School Board</u>, 2 F.3d 604, 606 (5th Cir.1993); <u>Duplantis v. Shell Offshore, Inc.</u>, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

[. . . .]

. . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.*

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-23 (1986)(emphasis added)).

The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal

quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.* To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### B. Motion for Summary Judgment

PHI argues "various claims" made by the Unions in this suit should be dismissed because those "various claims" have as their foundation the fact that the Union made an unconditional offer to return to work. PHI argues the Unions' offer was not unconditional, thus, the Unions' "various claims," noted by PHI as claims made pursuant to 45 U.S.C. §§ 151-188, that PHI responded to the unconditional offer in violation of "the RLA Section 2, Third and Fourth" must fall. The Unions however, argue the offer was, in fact, unconditional or that there exist genuine issues of material fact as to that issue and thus, summary judgment is not appropriate.

In their Counterclaim in the Return to Work Lawsuit, the Unions allege PHI violated Section 2, Third and Fourth of the RLA, which are as follows:

**Third. Designation of representatives**

Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

**Fourth. Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction**

12

**of dues from wages forbidden**

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: *Provided,* That nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

45 U.S.C.A. §152(3) & (4).

It is unclear to this Court which facts alleged by the Unions might support the Unions' claim that PHI violated Section 2, *Third* of the RLA. Indeed, Section 2, *Third* appears to address *the designation of* Union representatives. The Unions do not appear to allege PHI interfered in the pilots' *designation of* their Union representative. Furthermore, it is unclear whether any or all, or which, of the plethora of remedies requested by the Unions would flow from a violation of Section 2, Third. Also, again, it is unclear which of the "various claims" allegedly flowing from Section 2, Third of the RLA, PHI is arguing should be dismissed, as PHI has not addressed what actual claims made by the Unions they urge should be dismissed, the requirements and elements of those claims, the remedies allowed pursuant to the applicable law for the alleged violation, or the absence of specific facts which would be necessary or relevant to prove an alleged violation of Section 2, Third of the RLA, when asking this Court merely to dismiss "*various claims*" of PHI, because the offer

13

was not unconditional.

Again, PHI has filed the instant "Motion for Partial Summary Judgment on *Various Claims in the "Return to Work" Case*" (emphasis added) seeking "partial summary judgment on the claims of the [Unions] in the 'Return to Work' suit that PHI violated the Railway Labor Act, *45 U.S.C. §§ 151-188* in the manner in which it responded to the Unions' offer to return to work after their strike against PHI." Again, PHI does not specify what aspects of the RLA 45 U.S.C. §§ 151-188 it suggests the Unions allege PHI violated, i.e., which claims alleged by the Unions in their Complaint – either for violation of Section 2, Third of the RLA or Section 2, Fourth of the RLA – or the specific statutory application of 45 U.S.C. §§ 151-188. Rather, PHI moves directly to the *factual dispute* surrounding the offer to return to work and argues because the Unions predicated their offer to return to work on certain conditions, the offer was not "unconditional," thus, whatever "various claims" might have been made by the Union must fall as PHI was not obligated, by any law, to reinstate the strikers at all or upon a "strict seniority" basis, or any basis whatsoever, and thus, PHI cannot be found in violation of any aspect of the RLA. PHI argues, as there was no unconditional offer to return to work, there can be no statutory obligation to direct PHI's conduct when returning strikers to work and thus, there can be no violation of any statute, generic or otherwise. In so doing, PHI argues the return to work protocol adopted on January 11, 2007, a protocol with which PHI alleges it has fully complied, fixed the rights and obligations of the parties in these circumstances, thus PHI could not have violated any applicable statutory provision and thus "various claims" must be dismissed. PHI, however, does not address the time between receipt of the offer to return to work and this Court's involvement which led to the January 11, 2007 protocol, nor any conduct of PHI which might have necessitated this Court's involvement whether that period of time or alleged

14

conduct could, by law, bear any consequence under the RLA. PHI, rather, argues that because the Unions allege no breach of the January 11, 2007 protocol, PHI is entitled to judgment *as a matter of law* on "various claims in the Return to Work Case."

In response, the Unions contend their offer was unconditional and, thus, certain amorphous obligations vested with PHI, which PHI breached and, thus, PHI violated the "RLA Section 2, Third and Fourth." The Unions argue they were in full compliance under applicable law and it was *PHI* that placed illegal conditions and other objectionable conditions upon the returning employees, i.e., requiring the pilots to relinquish their statutorily-protected right to strike. Thus, it appears the Unions argue the pilots *were precluded* from returning to work by *PHI's illegal conduct*. Thus, PHI argues the Unions conditioned their offer by requiring the pilots return to work on "seniority basis only;" the Unions argue there is at least "a genuine issue of material fact as to whether the Unions conditioned the pilots' return to work on recall in seniority order," and as to "what the Unions' intentions were regarding what criteria would be used to determine how pilots would be returned to work." Thus, the Unions argue summary judgment is inappropriate.

### 1.     Standards for Determining Whether Offer is Unconditional

Notwithstanding the lack of clarity in the Unions' pleadings and lack of particularity in PHI's motion, in an effort to promote judicial efficiency, this Court will attempt to address the focused-upon threshold issue of whether the Unions' offer to return to work was unconditional and thus, whether PHI prevails on this factual determination. Although each party cites to cases that address the issue of interpretation of offers to return to work, neither party sets forth a succinct framework for the analysis of that issue. What this Court has discerned, in general, from the applicable and

related jurisprudence cited by the parties and its own research is the following:[7]

During an economic strike, a returning striker is not entitled to an offer of reinstatement if the employer has hired replacement workers. However, if and when a job for which the striker is qualified becomes available, the returning striker is entitled to an offer of reinstatement. *NLRB v. Fleetwood Trailer*, 389 U.S. 375, 381, 88 S.Ct. 543 (1967). However, in order to be entitled to reinstatement, the conclusion of the strike must have been signaled by the striker's *unconditional* offer to return to work. *See, e.g., Swearingen Aviation Corp. v. N.L.R.B.*, 568 F.2d 458, 463 (5th Cir. 1978) (finding it was unnecessary to determine whether the strike was an economic strike or an unfair labor practices strike, as no permanent replacements had been hired; thus, court held workers were entitled to immediate reinstatement upon their unconditional application to return to work."); *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379, 88 S.Ct. 543, 19 L.Ed.2d 614, 618 (1967); *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345-46, 58 S.Ct. 904, 82 L.Ed. 1381, 1390 (1938); *Wilkinson Manufacturing Co. v. NLRB*, 456 F.2d 298, 305-06 (8th Cir. 1972).

Neither party has cited, nor does there appear to exist in the jurisprudence, a precise, accepted standard unique to the particular area of law for determining whether an offer to return to work is unconditional. However, certain standards can be gleaned from the jurisprudence of the various

---

[7] As PHI notes in its brief, because the RLA governs only rail and air carriers, determinations of post-impasse self-help rights and obligations arise far more frequently under the National Labor Relations Act, as amended, 29 U.S.C. §§151-183 ("NLRA"), which governs labor relations affecting commerce in other segments of the national economy. Thus, courts have held that "carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA." *See, e.g., Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 439, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989); *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344 (1969). *See also Horizon Air*, 976 F.2d at 544. Nevertheless, the NLRA "cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes." *See Trans World Airlines*, 489 U.S. at 439, citing *Trainmen*, 394 U.S., at 383.

16

circuits.[8] First, pursuant to the Seventh Circuit, if the offer, on its face, appears unconditional, the *employer* – not the Union – has the burden of demonstrating the offer to return to work was *not* unconditional. *See Dilling Mechanical Contractors, Inc. v. NLRB,* 107 F.3d 521, 524 (7th Cir.), *cert. denied,* 522 U.S. 862, 118 S.Ct. 165, 139 L.Ed.2d 108 (1997), *citing NLRB v. Augusta Bakery Corp.,* 957 F.2d 1467, 1472 (7th Cir. 1992). Additionally, the Second Circuit has held "[o]ffers are usually considered unconditional as long as they do not include demands for specific wages or working conditions." *Proxy Communications of Manhattan, Inc. v. N.L.R.B.,* 873 F.2d 552, 555 (2nd Cir. 1989) (holding an offer to return to work contingent on the start of bargaining can still be considered unconditional), *citing Richmond Recording Corp. v. NLRB,* 836 F.2d 289, 294 (7th Cir.1987) (union's rejection of piecemeal reinstatement plan did not make offer to return conditional because it reasonably demanded union's legal rights); *Serv-Air Inc. v. NLRB,* 395 F.2d 557, 561-62 (10th Cir.) (union's demand that employer cease unfair practices did not make offer to return conditional because union did not request any specific major concession), *cert. denied,* 393 U.S. 840, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968); *Consolidated Dress Carriers, Inc.,* 259 N.L.R.B. 627, 636 (1981) (examples of conditional offers include demands for wages, benefits, or other improvements in working conditions), *enforced,* 693 F.2d 277 (2nd Cir.1982); *but see Local No. 380, Int'l Union, Allied Indus. Workers of Am. v. NLRB,* 411 F.2d 249, 250-51 (7th Cir.1969) (union's demand that employer agree to bargain did make offer to return conditional), *cert. denied,* 396 U.S. 1003, 90 S.Ct. 553, 24 L.Ed.2d 495 (1970).

While it appears courts may look to statements made prior to the offer in order to determine

---

[8] Due to the nature of labor law and the lack of any uniform standard for certain issues within labor law found within the Fifth Circuit, this Court will consider cases from other circuits, as well as district court cases that, although not binding on this court, are instructive in resolving the issues in this case.

whether an offer is unconditional, *Swearingen Aviation*, 568 F.2d at 463-64 (5th Cir.) (court looked to union's prior statement in determining offer was not unconditional), there is indication within the jurisprudence surrounding the NLRB, that communications made *subsequent* to the unconditional offer to return to work may be "insufficient to indicate that the Union never intended to make an unconditional offer of return to work, or that its initial unconditional offer later became conditional." *Home Insulation Service, a Division of Sunstate Wholesalers v. International Association of Heat and Frost Insulators and Asbestos Workers. AFL-CIO ("Home Insulation")*. 255 NLRB 311, 312 (March 26, 1981). A close reading of these cases highlights the fact-intensive nature of the inquiry when the issue is in true dispute.

Furthermore, "where reinstatement offers are made regarding 'all striking employees,' 'the members,' and similar collective designations or lists of employees," the NLRB *generally* does not infer that the reinstatement of one is conditional on the reinstatement of all. *See, e.g., Home Insulation*, 255 NLRB at 315, *citing Pepsi-Cola Bottling Company of Mason City, Iowa*, 251 NLRB 187 (1980); *Richard C Knight Insurance Agency, Inc.*, 243 NLRB 604 (1979); *Woodlawn Hospital*, 233 NLRB 782 (1977); *Coca Cola Bottling Works, Inc.*, 186 NLRB 1050 (1970), *modified on other grounds*, 466 F.2d 380 (D.C. Cir. 1972). *But see Times Herald Printing Company*. 221 NLRB 225 (1975) (where offer to return was expressly conditioned on reinstatement of all strikers).

Finally, under the statutory and jurisprudential construct, an employer may seek clarification of an offer to return to work to determine whether the offer is, in fact, conditional. Indeed, the jurisprudence holds that where any such ambiguity remains unclarified due to an employer's decision to ignore an offer and not seek clarification, the employer may not be heard to complain if such uncertainty is resolved against its interest. *See, e.g., Home Insulation Service*, 255 NLRB at 312,

*citing Haddon House Food Products, Inc. and Flavor Delight, Inc.*, 242 NLRB 1057, fn. 6 (1979).

The offer to return to work contemplated by the statute, although contained within a very specialized area of the law, is nonetheless, an offer and as such is not wholly exempt from the accepted general legal principles governing interpretation of offers, contracts, and similar writings, unless otherwise provided for by jurisprudence or statute. The general rules of contracts are instructive, however, not necessarily controlling, and state that with an offer, one first looks to the language of the offer itself to determine its nature. If clear and unambiguous, the inquiry is generally limited to the four corners of the document; if ambiguity exists, the inquiry can proceed outside the four corners and look to the intent of the parties. *See, e.g., Dean v. City of Shreveport*, 438 F.3d 448, 460-61 (5th Cir. 2006) (applying general principles of contract interpretation to another specialized area of law, a consent decree, Fifth Circuit noted courts are to "begin by looking to the 'four corners' of the decree" and then "look to extrinsic evidence if the decree is ambiguous[,]" stating a decree "is ambiguous when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of construction.").

The foregoing are only general legal principles, and this Court is fully cognizant that the particular statutes involved and the jurisprudence interpreting those statutes will dictate the governing legal analysis, as the facts and law of each case will dictate whether the general rules apply or whether a more nuanced interpretation of the general principles is applicable. However, the Court notes the general framework as a starting point to address the nature of the offer to return to work in the instant case.

### 2.    Legal Analysis

Review of the written offer made and the argument submitted shows the Unions' *written*

19

*offer* to return to work was unconditional on its face. On November 10, 2006, OPEIU International

Representative Paul Bohelski wrote to Richard Rovinelli, PHI's Chief Administrative Officer and

Director of Human Resources, and stated:

> Please be advised that the Office and Professional Employees International Union ("OPEIU") and Office and Professional Employees International Union Local 108 ("Local 108"), as the representative of and on behalf of all flight deck crew members *employed* in the Oil and Gas or Air Medical Divisions, or *otherwise employed* by PHI Inc., who have not already returned to work hereby end their strike and unconditionally offer to return to work effective immediately.[9]

Thus, the offer states "all flight deck crew members *employed* in the Oil and Gas or Air

Medical Divisions, or *otherwise employed* by PHI Inc., who have not already returned to work

hereby end their strike and *unconditionally offer to return to work effective immediately.*" This

language is clear and unambiguous. It identifies the employees to whom the offer relates, declares

their intention to "end their strike," "unconditionally," submits their offer to return to work, and

gives the time frame: immediately.

PHI, nonetheless, argues the offer was made with several conditions, including a return of

pilots who had been terminated for cause, and a return to work based on seniority alone. Nowhere

within the language of the written offer are these conditions found.

### a.     The Return of Pilots Terminated for Cause

PHI contends the offer to return to work was made "on behalf of all" employees – thus, it

included pilots who had been terminated for cause, pilots PHI argues would not be due the

opportunity to return to work -- and thereby contained a condition, or at least an ambiguity. PHI

contends it attempted to clarify the offer and possible ambiguity on November 16, 2006 by

requesting a list of all individuals on whose behalf the offer was made. PHI argues it, again,

---

[9] See Complaint, Doc. 1, Civil Action No. 06-2243, ¶21.   (emphasis added)

requested such a list from the Unions in the November 22, 2006 draft of the "Preliminary Unconditional Return to Work Agreement," submitted by PHI to the Unions, and which PHI describes as follows:

> On November 22, 2006, PHI counsel [Peter] Kiefer sent OPEIU General Counsel Schwarzwald a draft "Preliminary Unconditional Return to Work Agreement," *expressly seeking to resolve ambiguities in the Unions' offer* to return to work. *On its face the document invited discussion between PHI and the Unions as to the order of recall*, indicating that strict seniority would not be the basis for recall, rather, that recall would be based on terms and conditions to be established that are consistent with business and operational needs and safety concerns." (emphasis added)

Nowhere within the *November 10, 2006 written offer* of the Unions does it "on its face" "invite discussion" "as to the order of recall" or indicate "strict seniority would be the basis for recall," or address or mention seniority or terminated pilots in any fashion. These aspects were, it would seem *from the face of the documents argued*, introduced *with PHI's draft of the "Preliminary Unconditional Return to Work Agreement."* Nowhere within the *November 10, 2006 Union* offer is the order of recall referenced or seniority mentioned; PHI introduced those issues *into the documents* argued, with its November 22, 2006 documents.

The Unions argue their offer of November 10, 2006 was unconditional and challenge PHI's characterization of PHI's November 22, 2006 document as an attempt to "clarify" alleged ambiguities found within the Unions' offer. Rather, the Unions argue PHI's November 22, 2006 document is evidence of PHI's bad faith and is an attempt to place "several illegal conditions on the return to work process and was never intended to merely 'inquire' into an ambiguity found within the Unions' offer." To support their argument, the Unions cite to the introductory paragraph of the PHI document, which states as follows:

> PHI, Inc. has received the OPEIU's correspondence notifying PHI that it is 'ending' its recent strike activities and **offering the 'unconditional' return to work** of

remaining strikers. *By signing below, the parties understand and acknowledge that this notification includes five (5) preconditions in order for it to be unconditional and in order for the strike to be considered terminated[.]*

*See* Exhibit D to Unions' Complaint in the Return to Work Lawsuit, Civil Action No. 06-2243 (all emphasis added).

The Unions argue one of the five preconditions contained within the PHI November 22, 2006 was blatantly illegal as it required the pilots to relinquish their fundamental right to strike:

> The OPEIU International, Local 108 and the returning pilots will not call for, sanction, condone, participate in, or otherwise engage in any strike, work-stoppage, slow-down, sick-out, picketing, corporate campaign activities, or other self-help measures, either individually or collectively following such unconditional return to work, it being understood that these requirements will continue in full force until the effective date of the no-strike provision of a ratified and renewed labor agreement.

*Id.* The Unions argue this condition is wholly contrary to law and thus, precluded the pilots' return to work.

In response to PHI's two requests, the Unions on December 11, 2006, sent PHI a list of the pilots who wished to return to work. In that communication, Union representative Melvin Schwarzwald stated:

> In regard to this list, it should be understood that the Unions are not sure that this list contains all of the pilots who wish to return to work. As you know these pilots are scattered all over the country and the Unions' ability to communicate with all of them on a constant basis is somewhat limited. The Unions have included and will continue to include within the offer of unconditional return to work that they have made any other pilot who is not on the list who indicates the desire to return.

> We understand that PHI claims that two pilots on the list, Johnny E. Strickland and William D. Sorensen **have been terminated**. Those **terminations** have been challenged in a grievance and in a lawsuit to be shortly filed in the United States District Court for the District of Arizona. Those pilots have sought and do seek to return to work and so their names are on the list. *Inclusion of these pilots is not to be construed nor is it meant in any way as making the November 10[th] offer*

***anything but unconditional.*** (emphasis added)[10]

PHI, however, contends that, notwithstanding the Unions' express statement to the contrary, pilots such as Sorensen and Strickland, and perhaps others who PHI argues were terminated for cause and who might be argued to have been contained in the Union's identification of pilots, were included in the November 10, 2006 offer and, thus, the Unions conditioned the offer upon the return of these two, and perhaps other, legally discharged pilots. This Court disagrees. First, it is unclear to this Court that the Unions' written offer actually contains an ambiguity with respect to its offer to return "all **employees**" to work. Indeed, on its face, the offer identifies "**employees**" as "all flight deck crew members ***employed*** in the Oil and Gas or Air Medical Divisions, or ***otherwise employed*** by PHI Inc., *who have not already returned to work.*" (emphasis added) The language used specifically references **employees** who desired to return to work and contains no reference to terminated pilots; those pilots who have or had been legally terminated would, by definition, no longer be *employees* of PHI or enjoy the status of *employee*. Additionally, to the extent PHI might have believed there was an ambiguity as to this issue, that argued ambiguity was referenced and clarified by the Unions in their response to PHI's inquiry.

This Court, also, has question as to whether PHI's November 22, 2006 "Preliminary Unconditional Return to Work Agreement" was, as PHI argues, a request for "clarification" of the argued, specific ambiguity noted, i.e., the narrow question of the identities of the returning pilots included within this offer. A list of all pilots intended to be included had been requested by PHI and was given by the Unions along with clarification as to any possible ambiguity as to the Unions' intent as to terminated pilots. The November 22, 2006 "Preliminary Unconditional Return to Work

---

[10] See Exhibit 24, attached to Deposition of Michael Goodwin, which is attached as an exhibit to PHI's Motion for Partial Summary Judgment on Various Claims in the "Return to Work" Case" [Doc. 218].

Agreement" includes a plethora of issues and conditions beyond the narrow issue of inclusion of legally terminated pilots and thus, clearly went beyond requesting clarification of that narrow issue. The ambiguities now argued by PHI to exist "on their face" **do not exist on the face of or within the language of the written November 10, 2006 offer**. Thus, PHI's November 22, 2006 "Preliminary Unconditional Return to Work Agreement," it would seem, is more an attempt to place *its own* conditions on the return to work than it is a request for clarification of a narrow ambiguity which itself, is not borne out in the actual language of the written offer made. However, for purposes of this motion only, if the Court were to assume the November 22, 2006 document's purpose was indeed to request clarification, the Unions clarified the issue argued as flowing from *the language of November 10, 2006 offer*, i.e., which pilots were seeking a return to work and whether the offer was conditioned upon legally terminated pilots being included, by providing the list, stating their intention to supplement the list, expressly addressing two pilots who had been terminated for cause but who had challenged that termination, and declaring *"[i]nclusion of [Sorensen and Strickland] is not to be construed nor is it meant in any way as making the November 10th offer anything but unconditional."* Thus, this Court concludes, to the extent there might have been an ambiguity in the November 10, 2006 written offer to return to work – which this Court does not find – any such ambiguity was clarified by the Unions in their December 11, 2006 response.

Additionally, PHI's argument the Unions' written offer was conditional because it included other pilots who had been terminated for cause during the strike for working for competitors, is similarly unpersuasive. The offer to return to work states, on its face, that the offer is made "on behalf of all flight deck crews member **employees in the Oil and Gas or Air Medical Divisions**, or otherwise **employed by PHI Inc.** *who have not already returned to work.*" Those pilots who had

sought and obtained other permanent employment with competitors, and thus, had returned to work, albeit with competitors, *were no longer employees of PHI*. However, again, to the extent the language used raised an issue of ambiguity, the Unions clarified their intention with their December 11, 2006 response. The Unions argue pilots terminated by PHI prior to November 10 were no longer *employed by* PHI and thus, the offer to return to work was not conditioned on the return of those terminated strikers.[11] This Court agrees. The language of the offer, on its face, addresses only "**employees;**" *those pilots who had been terminated for cause are, by definition, no longer employees of PHI*. Furthermore, to the extent one could argue ambiguity, that ambiguity was addressed by the Unions' December 11, 2006 clarifications.

Considering the foregoing, this Court concludes the Unions' *written offer* to return to work was, on its face, unconditional, i.e., not conditioned upon a legally terminated pilot's return, and to the extent there could have been an argued ambiguity on this narrow issue, any possible ambiguity was clarified by the Unions' response addressing such "employees" i.e., *Strickland* and *Sorensen*. Thus, at that point, PHI had received an offer from the Unions, unconditional on its face and, thus, *arguably* had a statutorily or contractually imposed obligation to immediately reinstate, using neutral, legal criteria, the pilots who could and wished to be reinstated.

However, the record reflects *the pilots did not immediately return to work as their unconditional written offer suggested*. Many of the pilots did not return to work until January 11, 2007, and even then only with the assistance of this Court. *Whether the pilots' failure to return was*

---

[11] The Unions contend at least eleven pilots were terminated for engaging in competitive employment. Of those eleven, the Unions allege the earliest termination occurred on November 3, 2006, one occurred on November 6, two occurred on November 9, and the remaining seven did not occur until after the Unions' had made their unconditional offer on November 10. The Unions argue the testimony of Union representative Paul Bohelski confirms as of November 10, Mr. Bohelski knew of only one pilot who had been terminated for accepting employment with a competitor of PHI and this pilot was not included in the return to work offer.

*the result, as the Unions argue, of PHI's placing illegal conditions upon the return, or, as PHI argues, of the Unions, in fact, placing conditions upon their return not reflected in their written offer, is unknown to this Court and hotly disputed,* as is discussed in more detail hereinbelow. Although this Court finds the Unions' *written offer* to return to work immediately, dated November 10, 2006, was unconditional on its face, and unambiguous, the reality is the pilots did not immediately return to work pursuant to that written offer, i.e., *the Unions failed to perform pursuant to that written offer or were precluded from performing. Whether that failure was the result of the Unions insisting on conditions not contained in their written offer, or of PHI's having placed legally objectionable conditions on the return, thus blocking the pilots' return, is in great dispute.*

Indeed, even assuming all the arguments made by PHI as to why the Unions' offer to return to work was conditional, had the pilots, in fact, *actually returned to work,* but continued to argue the same matters raised by PHI – such rhetoric would have been mere posturing – as the pilots, notwithstanding their rhetoric, would have honored their written unconditional offer. The rhetoric and posturing as to the manner by which that return would have been effected, i.e., arguing seniority should be the only criteria, and jockeying for rights for terminated employees, would have been merely empty rhetoric, and the unambiguous written offer honored and controlling. Thus, the rhetoric would have been irrelevant to the offer to return and to their return, **inasmuch as the pilots would have gone back to work without those argued "conditions" first having been met** – placing the rhetoric firmly within the context of posturing. However, *the pilots did not return to work,* therefore this Court cannot know whether the rhetoric was mere posturing or true conditions. Thus, the subsequent actions of *both parties* become relevant as to *why the pilots did not actually return to work,* and thus, to whether the Unions presented an unconditional **written offer** to return

to work, but insisted upon conditions nonetheless, or whether the Unions' offer, written and otherwise, was actually unconditional and PHI blocked that return.

### b.    The Return of Pilots Based on Seniority

PHI, also, contends the Unions in reality, conditioned their return to work offer upon returning the pilots in order of seniority alone. PHI bases this argument not on the November 10, 2006 written offer, but on events that transpired both before and after November 10, 2006.

Again, pursuant to general rules of contract law and interpretation, one looks to the document itself to determine its nature. Only if the document contains an ambiguity does one look outside the four corners of the document itself. *See, e.g., Dean v. City of Shreveport*, 438 F.3d 448, 460-61 (5th Cir. 2006). The Unions' offer was made in the November 10, 2006 correspondence and is unambiguous on its face; to the extent one could argue the language contained an ambiguity, that ambiguity was as to whether pilots who were no longer employees of PHI because they had been legally terminated were included, that argued ambiguity was clarified by the Unions. Thus, there is no basis to look outside the four corners of the written offer itself. *PHI, however, argues the offer cannot be found to have been unconditional because the pilots, in actuality, did not return to work unconditionally and immediately as offered.* Thus, PHI argues notwithstanding the *written* offer, the true offer, in fact, as is illustrated by the Unions' conduct, was conditional because the pilots refused to actually return to work unless certain conditions not contained in their written offer were met. However, again, *why* the Unions failed to perform is in great dispute. PHI argues:

- prior to making their November 10, 2006 offer to return, the Unions received a legal opinion that "the law required the employer to take the pilots back to open positions for which they are qualified in order of their seniority," (SUMF ¶ 10).[12]

---

[12] The references to "SUMF" are PHI's references to its "Statement of Uncontested Material Facts."

- before or during the meetings to discuss offering to return to work, the Unions distributed a document to their membership ("the FAQs"), providing the following answer to the question "Once the strike ends, how are strikers brought back to work?":

  > "In order of their seniority under the Collective Bargaining Agreement for all positions not filled by "crossover" pilots (pilots who never honored our picket line or who abandoned the strike previously) or permanent replacements." (SUMF ¶ 14).

- In a November 11, 2006 press release, the Unions' lawyer stated "'Under the Railway Labor Act, the unconditional offer to return to work requires PHI, Inc. to return striking pilots to work in open positions in order of their seniority under the collective bargaining agreement.'" (SUMF ¶ 11) (emphasis supplied).

- On November 12, 2006, OPEIU International Representative Paul Bohelski wrote: "The recall procedure will be established based upon the recall process of a furlough situation. That means by seniority." In that same email, he also indicated "the return to work procedures is [ sic] the recall procedure set out in the Collective Bargaining Agreement." (SUMF ¶ 18).

- In a November 13, 2006 posting on the Unions' internet bulletin board, Stan Gosnell, a Local 108 Steward, stated: "Everyone who wants to return should be able to. The law requires the company to take everyone back, based on seniority." (SUMF ¶ 19).

- In a November 15, 2006 "Dateline," Bohelski wrote: "Under the provisions of the Railway Labor Act, the pilots' unconditional offer means that PHI....must hire the striking pilots for open positions in order of seniority... ." (SUMF ¶ 20).

- On November 16, 2006, counsel for PHI Peter Kiefer emailed counsel for the Unions, stating "please be advised that PHI disagrees with your legal positions and assertions, but hopes that those issues can be resolved during our discussions without the need for court proceedings." (SUMF ¶ 13).

- In a November 17, 2006 "Dateline," Bohelski wrote: "Your right to return to work to open positions in order of seniority was defined in the FAQs that we discussed at our meeting of November 10, 2006." (SUMF ¶ 21).

- In a November 18, 2006 "Dateline," Bohelski wrote: "As reported to you on several occasions in the past, PHI is required to return you to open positions

in order of your seniority." (SUMF ¶ 22).

- In a November 20, 2006 "Dateline," the Local 108 Executive Board wrote:

  > We are all frustrated by PHI's reluctance to timely honor the
  > law and return striking pilots to work to open positions in
  > order of seniority. This is the law, and this is what they are
  > required to do.
  >
  > Having said that, PHI has not as yet acknowledged or
  > implemented their obligations under the law. As stated in the
  > last update, the firm of OPEIU's General Counsel prepared a
  > Memorandum of Law stating why PHI needs to return all
  > pilots to work in open positions in accord with their seniority.
  > (SUMF ¶ 23).

- In a November 21, 2006 Dateline, the Local 108 Executive Board wrote: "As
  we stated yesterday, if we do not get a prompt resolution of your right to
  return to work to open positions in order of seniority, we will go to court and
  seek an injunction against PHI, and ask the court to make PHI comply with
  the law." (SUMF ¶ 24).

- In a November 22, 2006 email to a member of the Local 108 Executive
  Board, Bohelski wrote:

  > PHI is not complying with the law. We will make sure
  > they do. Our General Counsel and others are working
  > toward that end.
  >
  > PHI's behavior is ludicrous and unacceptable. We
  > believe that pilots returning to work out of seniority
  > order will have to be corrected. In the likely event we
  > end up in court, it will take even more patience, but
  > justice will prevail. (SUMF ¶ 26).

- On November 22, 2006, PHI counsel Kiefer sent OPEIU General Counsel
  Schwarzwald a draft "Preliminary Unconditional Return to Work
  Agreement," expressly seeking to resolve ambiguities in the Unions' offer to
  return to work. (SUMF ¶ 27). On its face the document invited discussion
  between PHI and the Unions as to the order of recall, indicating that strict
  seniority would not be the basis for recall, rather, that recall would be "based
  on terms and conditions to be established that are consistent with business
  and operational needs and safety concerns." (*Id.*). The Unions did not
  respond to PHI in writing regarding this draft agreement until after they filed

suit. (*Id.*).

- On November 27, 2006, the Unions filed suit in this Court claiming that PHI violated the RLA by denying immediate recall, in seniority order, to the striking pilots. (SUMF ¶ 28).

- On November 28, 2006, the Local 108 Executive Board sent a bulletin to pilots stating: "Under the Railway Labor Act, the union's offer of an unconditional to return to work, [sic] requires PHI to return striking pilots to open positions in order of seniority." (SUMF ¶ 29).

Thus, PHI argues, in effect, the pilots' failure to perform pursuant to their written offer to return to work was the result of conditions *not referenced in the written offer, but nonetheless in operation.*

In response, the Unions rely on the November 10, 2006 written offer as unambiguous on its face. The Unions however, do not deny their reliance upon their understanding of how the role of seniority would play, but contend there are genuine issues of material fact as to the import and intention behind that understanding and what the Unions' intent actually was and as to how seniority would be viewed within the acknowledged *total set of criteria* the Unions understood could to be used in recalling pilots. The Unions rely on the following testimony in so arguing:

- OPEIU President Goodwin testified that the return to work process was for PHI to take the pilots back to open positions for which they are qualified in order of their seniority. USDMF at ¶ 16. The statement that pilots were to be returned to work in order of seniority included the requirement that the pilot had to be qualified for the open position at issue. Id. It was not the Unions' intention to have PHI place a more senior pilot qualified to fly a small aircraft into a large aircraft. Id.

- Goodwin further testified that the first item for PHI to identify in the recall process was which positions were open and available. USDMF at ¶ 17. When that was done, the seniority list would be checked to see if there are qualified pilots for those openings. Id. If the most senior pilot is current and qualified for that open position he or she is to be contacted. Id. If that pilot is medically unable to fly, PHI would move to the next most senior pilot who is qualified for the open position. Id. If that pilot was not current in that position (i.e., the pilot needed ground school training and a check ride), PHI

30

would bring the pilot in to regain his or her currency. Id. The pilots were told on November 10th that the use of seniority included issues relating to pilot qualifications. Id.

- OPEIU's General Counsel and designated spokesperson acknowledged to PHI Representative Peter Kiefer that the Unions understood that the meeting of government imposed conditions such as pilots having to re-qualify in their aircraft and meet medical qualifications was part of the recall process. USDMF at ¶ 18.

- Local 108 President Ragin testified as follows regarding how the recall process was to work: if PHI was trying to fill an air medical position in an EC 135 helicopter pursuant to the Unions' unconditional offer, it would first look to returning striker Roy Matthews who was number one on the seniority list (USDMF at ¶ 19) to fill that spot. Id. However, because Matthews was not qualified in that aircraft, PHI would then proceed in seniority order until it found a pilot qualified in that aircraft. Id. Thus, pursuant to the Unions' offer, PHI was entitled to skip over a higher seniority pilot who was not current in the available aircraft and to instead first return to work a less senior pilot who was current in that aircraft until PHI had a chance to make the more senior pilot current. Id.

- OPEIU Representative Bohelski testified that seniority and qualification were the criteria to be applied in the return to work process. USDMF at ¶ 20. Bohelski testified that it would have been illogical for the Unions to insist that a pilot be placed into a position he was not qualified for simply because he or she was the most senior striker to be returned. Id. Such a pilot did not have the right to insist that PHI train him for the position he was not qualified for. Id.

- There was discussion at the November 10th Union meeting where the decision to make the unconditional was made that the return to work recall order would be based on seniority and qualifications. USDMF at ¶ 21. The pilots in attendance at the November 10th meeting were not told that PHI had to take them back by seniority. Id.

Thus, the Unions argue the November 10, 2006 written offer was and is unconditional, to the extent PHI argues otherwise, the Unions argue genuine issues of material fact exist as to what the Unions might have understood and intended as to what the complete criteria would be for the return process. Again, this Court notes, notwithstanding any understanding or posturing as to seniority, or

whether that posturing was correct or incorrect, **had the pilots, nonetheless, returned to work pursuant to the November 10, 2006 offer, any alleged misunderstanding or posturing would have become irrelevant to the present inquiry, as, notwithstanding any alleged misunderstanding or posturing, the pilots nonetheless would have returned to work without those "conditions" first having been met.** However, the pilots did not immediately return and the Unions argue it was not any argued position as to seniority which prevented their return; rather, the Unions argue *PHI blocked that return* by placing unacceptable and illegal conditions upon their return. Thus, again, inherent in this inquiry are genuine issues of material fact as to *why* the pilots did not return to work, which precludes summary judgment.

This Court cannot know at this juncture what the Unions' true intent might have been, however, this Court need not, at this juncture, determine if any or all of the conditions PHI proposed in its November 22, 2006 draft of the "Preliminary Unconditional Return to Work Agreement" were in fact contrary to law. The Unions argue their belief at that time that at least one condition was "illegal" and that belief is not, at this juncture and in this forum, before this Court without factual and legal dispute.

Nonetheless, this Court notes, the Unions' *written* offer was unconditional and unambiguous. However, *as the Unions failed to perform in conformity with their written offer*, PHI argues that failure is evidence of and was prompted by *conditions existing, but not included in the written offer*, i.e., an inaccurate understanding of the applicable law and its interpretation and application to the situation at hand. The Unions argue their rhetoric did not constitute "conditions" which governed their return to work, rather reflected their understandings *of PHI's* limitations in legally returning striking pilots to work and that *PHI* precluded their performance by insisting upon illegal conditions.

The Unions argue, at least, issues of fact as to what their true understanding and intent was, and argue these issues of fact preclude summary judgment on this issue. Again, perhaps more important to the summary proceeding at hand, the Unions argue PHI *prevented their performance, notwithstanding their understanding and intent as to seniority*, by conditioning the return of the pilots *on conditions which the Unions argue were and are contrary to law.* Thus, the Unions argue *PHI prevented* the Unions acting in conformity with their unconditional written offer and all else was merely an attempt by the Unions to act in the best interests of *the returning pilots* by *explaining PHI's limitations and obligations* under applicable law as they understood it to be. Indeed, the Unions contend *PHI* attempted to condition the return to work on an *illegal condition* when PHI attempted to require the pilots to relinquish their statutory right to strike in order to return to work, i.e., but for PHI's illegal actions, the pilots would have returned to work, even if those argued "conditions" were not met. Thus, which came first, "the chicken or the egg" to employ a regrettably trite expression for an equally regrettable set of arguments, becomes the unanswerable question at this juncture.

Clearly, the events that transpired both before and after the tender of the Unions' written offer to return to work do not necessarily change the nature of the written offer itself, or convert it from an unconditional offer to a conditional one *per se.* However, the record shows that subsequent to making the unconditional, written, offer to return to work, the Unions nonetheless, failed to return to work, that is, they did not actually return to work; whether that failure was the result of the Unions' insisting on conditions not contained in their written offer or PHI's prohibiting the pilots from returning by placing its own allegedly illegal conditions upon the return, or whether the failure

33

is a combination of the two, is hotly disputed.[13] The record shows both parties present evidence supporting their arguments that the other was responsible for the pilots' not returning to work. Nonetheless, the fact remains *a written unconditional offer to return to work was made*, and yet *the pilots did not immediately return to work pursuant to that offer*. Had the pilots begun to return to work in conformity with that offer, the inquiry would be over, notwithstanding any rhetoric or posturing to the contrary. However, they did not; thus, the inquiry remains open and the facts are disputed as to why. The pilots did not immediately return to work, *and this Court does not know the reason why*. Indeed, each party argues the other party attempted to impose a[n] [illegal] condition on the pilots' return to work, and that *that* [illegal] condition is the reason why the pilots did not return to work. Thus, there remains a genuine issue of material fact as to why the pilots did not, immediately, return to work; the basis for that failure; and thus, as to whether the Unions insisted upon conditions not contained within their written offer to return to work; or whether PHI failed to accept the offer and reinstate the pilots pursuant to legal, neutral criteria. Therefore, to the extent PHI relies on the offer being or not being unconditional as pivotal to its motion for summary judgment, that motion must fail as genuine issues of material fact exist as to that question.

Considering the foregoing, this Court concludes the Unions' *written offer* to return the pilots

---

[13] It is impossible for this Court to determine at this juncture whether PHI properly attempted to impose a no-strike condition on the pilots return to work, or the Union to impose return pursuant to seniority alone, because this Court concludes each party argues, not without support, the failure was the others. This Court by way of summary judgement cannot determine what actually prompted the failure of the pilots to return and cannot discern what might have been empty rhetoric and posturing, designed to create and gain advantage and explain PHI's "legal" limits and obligations for the membership and what might have been a true condition upon which the return would be conditioned, when both acted in such a way as to grant the other its argument. Under the jurisprudence, employees have no statutory right to recall in order of seniority. *See, e.g., Teamsters Local Union Nos. 822 & 592 v. NLRB*, 956 F.2d 317, 320 (D.C. Cir. 1992), *citing Laidlaw Corp.*, 171 N.L.R.B. 1366 (1968), *enforced*, 414 F.2d 99 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). Rather, an employer can choose to recall strikers in any nondiscriminatory order, including in order of merit. *Sever v. N.L.R.B.*, 231 F.3d 1156, 1168 (9th Cir. 2000), *citing See Lone Star Industries*, 279 NLRB 550, 551 (1986). Pursuant to jurisprudence and the CBA, the question of whether and when the right to strike is allowed, and/or can be limited, is not as clear as it might seem on its face or as argued by the Unions.

to work was unconditional and unambiguous on its face, however, this Court also finds the pilots did not, immediately, return to work in conformity with their written offer. This finding raises the question of whether the Unions, notwithstanding their written offer being unconditional on its face, actually *acted pursuant to a condition or conditions* not referenced in the written offer, or whether the pilots would have, notwithstanding any posturing and rhetoric to the contrary, returned to work, but for PHI's alleged attempt to place illegal conditions upon that return. Thus, this Court finds there exists a genuine issue as to this argued threshold, material fact. Thus, PHI's "Motion for Partial Summary Judgment on Various Claims in the "Return to Work" Case" [Doc. 218] is DENIED.

THUS DONE AND SIGNED in Lafayette, Louisiana, this _30_ day of September, 2008.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE