RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 7 / 9 / 10
     6 b

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION


| | |
|---|---|
| PHI, INC. | CIVIL ACTION NO. 06-1469 |
| VERSUS | JUDGE DOHERTY |
| OFFICE & PROFESSIONAL EMPLOYEES<br>INTERNATIONAL UNION AND<br>OFFICE & PROFESSIONAL EMPLOYEES<br>INTERNATIONAL UNION LOCAL 108 | MAGISTRATE JUDGE HILL |


**MEMORANDUM RULING**

Before the Court are two motions: (1) "PHI, Inc.'s Motion to Dismiss the Unions' RLA-Based Counterclaims in the Bargaining Suit" [Doc. 456] filed by PHI, Inc. ("PHI") and (2) the "Unions' Motion to Dismiss PHI, Inc.'s First Amended Complaint for Declaratory Judgment and Permanent Injunctive Relief in the Bargaining Suit" [Doc. 455] filed by the Office and Professional Employees International Union ("OPEIU) and OPEIU Local 108 ("Local 108" (OPEIU and Local 108 are collectively referred to herein as "the Unions"). The motions are opposed [Docs. 458 & 459]. For the following reasons, both motions are GRANTED.

**I.      Factual and Procedural Background**

The factual history of this case has been set forth in numerous rulings issued by the Court. For the sake of clarity and for ease of consideration of the requests asserted in the instant motions, this Court notes as follows:

PHI is a common carrier by air as defined in 45 U.S.C. § 181, and is a Federal Aviation

Administration-certificated air carrier under Part 135 of the Federal Aviation Regulations ('FARs"), 14 C.F.R. § 135, et seq.  PHI is registered in Louisiana, and the company's business is providing helicopter transportation and related services to the oil and gas industry, including PHI support for companies operating in the Gulf of Mexico, and to Air Medical customers at locations throughout the country.  PHI currently employs approximately 2,500 employees.

OPEIU is an unincorporated association that does business as a labor organization and engages in business in this judicial district.  In March 2000, OPEIU was certified by the National Mediation Board ("NMB") as the collective bargaining representative of the flight deck crewmembers ("pilots") employed by PHI.  Shortly after the NMB certification, OPEIU entered into negotiations with PHI in an attempt to reach an initial collective bargaining agreement ("CBA").  As a result of these negotiations, a CBA was confected between PHI and the Unions on July 12, 2001, which was effective June 1, 2001 through May 31, 2004.

On or about February 19, 2004, negotiations between PHI and the Unions began in an effort to reach a successor CBA.  After approximately 39 days of direct bargaining and more than 38 additional bargaining sessions mediated by the NMB, no successor CBA was reached.  On July 28, 2006, the NMB issued a letter advising PHI and the Unions that as of 12:01 a.m. EDT on August 28, 2006, the parties would be free to engage in economic self-help.

On August 28, 2006, PHI filed suit in this court, seeking a declaratory judgment and permanent injunctive relief against the Unions under the Railway Labor Act, 45 U.S.C. §151, *et seq.* ("RLA"), on grounds the Unions violated Section 2, First of the RLA by bargaining in bad faith and failing to exert reasonable efforts to reach an agreement with the Company (the "Bad Faith

Bargaining Case").[1]  PHI also seeks prohibitory injunctive relief barring the Unions from engaging in further strikes or other self-help until the Unions have satisfied their obligation to exert every reasonable effort to reach an agreement with PHI.

On September 8, 2006, the Unions answered PHI's complaint and asserted counterclaims of their own.  In their first counterclaim against PHI, the Unions allege PHI violated Section 2, First of the RLA by failing to exert every reasonable effort to reach an agreement with the Unions.  With respect to the Unions's Section 2, First claims against PHI, the Unions seek the following relief:

- Mandatory injunctive relief, ordering PHI to resume bargaining in good faith with the Unions over the terms of successor CBA, including NMB process if necessary, with Court retaining jurisdiction to monitor PHI's compliance;

- Mandatory injunctive relief ordering PHI to restore status quo between the parties;

- Prohibitory injunctive relief precluding PHI from engaging in self-help until it bargains in good faith;

- Equitable remedies (sanctions) in the form of costs and attorney's fees; and

- Such further relief as the Court deems just and proper.

In their second counterclaim against PHI, the Unions allege PHI violated Section 2, Seventh and Section 6 of the RLA by changing the rates of pay, rules, or working conditions of its pilot employees before the bargaining "controversy" between PHI & the Unions was finally acted upon by the NMB, thereby changing the status quo, which Section 2, Seventh requires be maintained while the NMB mediation process continues.  The Unions further allege PHI violated Section 2, Seventh and Section 6 of the RLA by changing the rates of pay, rules, or working conditions of its pilot employees since the last bargaining session of August 28, 2006 by implementing higher pay rates it never offered to the Unions during bargaining.  With respect to their Section 2, Seventh and

---

[1] The "Bad Faith Bargaining Case" bears Civil Action No. 06-1469.

Section 6 claims, the Unions seek the following relief against PHI:

- Mandatory injunctive relief ordering PHI to restore the status quo; and

- Prohibitory injunctive relief precluding PHI from engaging in self-help until it bargains in good faith.

On September 20, 2006, during the period of self-help, the Unions instituted a strike of PHI's pilots. On November 10, 2006, the Unions advised PHI the pilots were ending the strike and making an offer to return to work.[2] On November 27, 2006, the Unions filed a complaint for preliminary and permanent injunctive relief, declaratory judgment, damages, and other relief under the Railway Labor Act, 45 U.S.C. §151, *et seq.* and 28 U.S.C. §2201, in connection with the manner in which PHI returned the pilots to work (the "Return to Work Case").[3]

After a lengthy and protracted motion practice, the Bad Faith Bargaining Case and the Return to Work Case were consolidated for trial purposes and set for trial. While reviewing the pre-trial order and other materials submitted by the parties in preparation for the trial, which, at that time, was set to begin on July 6, 2010, this Court realized there remained several issues of law that had not been presented by the parties and remain, therefore, unresolved. After discussions with counsel at pre-trial meetings to address the status of the case, the parties moved to file out-of-time dispositive motions in the Bad Faith Bargaining Suit, motions this Court granted in the interests of streamlining the issues for trial. The pending motions are the results of those conversations with counsel.

---

[2] In the Return to Work Case, Civil Action No. 06-2243, the Unions contend their offer to return to work was "unconditional," a term bearing legal significance. PHI disputes this. This claim is not before the Court at this time.

[3] The claims alleged by the Unions against PHI in the "Return to Work Case" are not the focus of the motions *sub judice*. This Court notes, however, as a general matter, in the "Return to Work Case," the Unions allege that PHI has ignored the unconditional return to work offer and/or placed illegal conditions on the offer, in violation of the RLA and La. Rev. Stat. §23:822.

## II.     Stipulations

The following stipulations have been entered into by the parties and are relevant to the

motions *sub judice*:

(i)      the entirety of the parties' 2001-2004 collective bargaining agreement ("CBA") was opened for modification pursuant to the parties' 2004 Section 6 notices;

(ii)     as of 12:01 a.m. EDT on August 28, 2006, the parties were released to self-help;

(iii)    because the entire CBA had been opened for modification pursuant to the parties' Section 6 notices, PHI was free, as of 12:01 a.m. EDT on August 28, 2006, to implement changes to any articles of the previous CBA, without regard to any business necessity justifying such changes.  However, as described in (iv) and (v) below, the parties *disagree* concerning the scope of changes PHI was free to implement.

The following, although submitted by the parties as stipulations, actually reflect a dispute as

to the applicable law:

(iv)     the Unions assert that, (a) as of 12:01 a.m. EDT on August 28, 2006, the only changes PHI could implement to the terms and conditions of employment of its pilot workforce were those it offered to the Unions in its final pre-self help proposals during the RLA bargaining/mediation process, and (b) that, only during the pendency of the Unions' strike (which did not begin until September 20, 2006 and ended on November 10, 2006), could PHI implement other changes, if such other changes were reasonably necessary for PHI to continue its operations.

(v)      PHI, on the other hand, asserts that, (a) as of 12:01 a.m. EDT on August 28, 2006, it was free to implement any change to the terms and conditions of employment specified by the previous CBA so long as such implementation neither conflicted with any other obligation imposed by federal law, nor struck a fundamental blow to union activity and the collective bargaining process itself, and (b) that such right persists before, during, and after the Unions' strike because the entirety of the parties' CBA was opened for modification pursuant to the parties' 2004 Section 6 notices.

5

### III.    Legal Analysis

#### A.    PHI's Motion to Dismiss [Doc. 456]

##### 1.    Legal Standard

PHI raises its motion pursuant to Rule 12(h)(2) and Rule 12(h)(3) of the Federal Rules of Civil Procedure.  Generally, a party waives any defense listed in Rule 12(b)(2) - (5) of the Federal Rules of Civil Procedure by omitting these defenses in a timely-filed motion or by failing to include such defenses in a responsive pleading or amendment.  *See* Fed. R. Civ. P. 12(h)(1).[4]  However, the defense of failure to state a claim is not thereby waived, pursuant to Rule 12(h)(2).  Additionally, the subject matter jurisdiction of the Court can be raised at any time.  To wit, Rules 12(h)(2) and 12(h)(3) state:

> **(h) Waiving and Preserving Certain Defenses**
>
>> **(2)** *When to Raise Others.* Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:
>>
>>> **(A)** in any pleading allowed or ordered under Rule 7(a);
>>>
>>> **(B)** by a motion under Rule 12(c); or

---

[4] Rule 12(h)(1) states:

**(h) Waiving and Preserving Certain Defenses.**

> **(1)** *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)-(5) by:
>
>> **(A)** omitting it from a motion in the circumstances described in Rule 12(g)(2); or
>>
>> **(B)** failing to either:
>>> **(i)** make it by motion under this rule; or
>>>
>>> **(ii)** include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

Fed. R. Civ P. 12(h)(1).

6

**(C)** at trial.

**(3)** *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

Fed. R. Civ. P. 12(h)(2) & 12(h)(3).

This Court concludes PHI's motion is properly considered pursuant to Rule 12(h)(2) and/or Rule 12(c). The Fifth Circuit applies the same standard for a motion to dismiss under Rules 12(c) as it does for a motion to dismiss under 12(b)(6) of the Federal Rules of Civil Procedure. *Oakville Community Action Group v. Industrial Pipe, Inc.*, 2003 WL 22990719, 1 (E.D. La. 2003), *citing Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.*, 208 F.Supp.2d 719, 725 (S.D. Tex. 2002), *quoting Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999) (relying upon cases that provide the standard for a Rule 12(b)(6) motion in stating the applicable standard for a Rule 12(c) motion)).

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007) (internal quotations omitted), *quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir.2004). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Breaches Litig.*, 495 F.3d at 205, *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id., quoting Bell Atl.*, 127 S.Ct. at 1965. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need *detailed* factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell*

7

*Atl.*, 127 S.Ct. at 1964-65 (citations, quotation marks, and brackets omitted) (emphasis added). *See also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).

Determining whether a complaint states a plausible claim for relief is, therefore, a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Ashcroft*, 129 S.Ct. at 1950. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *Id.* at 1950. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.*

### 2.   Analysis of PHI's Motion to Dismiss

PHI divides its motion into two separate inquiries. In the first segment of PHI's motion, it requests that this Court dismiss all of the Unions' claims that pre-date the parties' exercises of self-help (referred to as the "pre self-help claims"), while in the second portion of the motion, PHI requests that this Court dismiss all of the Unions' claims that post-date PHI's exercise of self-help (referred to as the "post self-help claims").

### a.   The Unions' Pre-Self Help Claims

PHI contends all of the Unions' claims that pre-date the parties' exercises of self-help should be dismissed on grounds this Court does not have jurisdiction to award the Unions the injunctive and equitable relief they seek pursuant to the Norris-Laguardia Act ("NLGA"), 29 U.S.C. §108, and on grounds even if this Court were to have jurisdiction to award the Unions the relief they seek, the Unions fail to state a claim upon which relief can be granted as they did not avail themselves of the Court's remedial powers before engaging in self-help. The claims PHI seeks to dismiss in this regard are the following: (1) the Unions' claim that PHI failed to exert every reasonable effort to reach a

successor CBA with the Unions in violation of Section 2, First of the RLA (45 U.S.C. §152, First);[5]

and (2) the Unions' claims that, around November 30, 1995,[6] PHI made pay adjustments for newly-

hired Air Medical pilots and, around April 19, 2006, PHI changed its mileage reimbursement policy

for Air Medical pilots in violation of Sections 2, Seventh (45 U.S.C. §152, Seventh)[7] and Section

6 of the RLA (45 (45 U.S.C. §156).[8] PHI emphasizes the Unions seek only *injunctive and equitable*

---

[5] Section 2, First of the RLA states:

> First. Duty of carriers and employees to settle disputes
>
> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. §152, First.

[6] The Court assumes this date contains a typographical error, as the Unions were not certified as the collective bargaining representative of the pilots until March 2000.

[7] Section 2, Seventh of the RLA states:

> Seventh. Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden
>
> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. §152, Seventh.

[8] Section 6 of the RLA states:

> **§156. Procedure in changing rates of pay, rules, and working conditions**
>
> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for

9

*relief* to remedy the foregoing alleged violations of the RLA.

### b.       The RLA and the NLGA

This Court cannot address the arguments of the parties without first addressing the overriding policy considerations and legal parameters of the RLA and the NLGA.

The RLA was enacted in 1926 to regulate labor relations on the nation's railroads and airlines. The 1934 amended version of the Act is in effect today. The Act principally seeks to prevent interruptions of service on these vital organs of interstate commerce. *See Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 726, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886, 1896 (1945), *cited in International Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Airline Div.) v. Texas Intern. Airlines, Inc.,* 717 F.2d 157, 158 (5th Cir. 1983). Indeed, in 1937, the Supreme Court stated the principal aim of the RLA is to "*secur[e] settlement* of labor disputes by *inducing* collective bargaining with the true representative of the employees and by preventing such bargaining with any who do not represent them." *Virginian Ry. v. System Federation,* 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937) (emphasis added). *See also Air Line Pilots Ass'n, Intern. v. United Air Lines, Inc.,* 802 F.2d 886 (7th Cir. 1986) ("[t]he RLA was enacted to encourage collective bargaining by the parties 'in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce,' especially in cases where major disputes are involved."). Thus, the primary emphasis of the RLA is on informal, cooperative methods of dispute resolution such as conciliation, mediation, and negotiation; Congress specifically prescribed only a narrow role for the courts. *Texas Intern. Airlines, Inc.,* 717 at 158, *citing Elgin,* 325 U.S. at 727, 65 S.Ct. at 1291, 89 L.Ed. at 1896.

---

or proffer of the services of the Mediation Board.

45 U.S.C. §156.

Under the RLA, the duty to exert *every* reasonable effort to settle *all* disputes in order to avoid *any* interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof is a "core duty" imposed upon employers and employees, as set forth in Section 2, First. *See Consolidated Rail Corp. v. Railway labor Executives' Ass'n*, 491 U.S. 299, 310, 109 S.Ct. 2477, 2484 (1989). Consistent with this duty, the Supreme Court has stated "the obligation under [Section 2, First] is central to the effective working of the Railway Labor Act. The strictest compliance with the formal procedures of the Act is meaningless if one party goes through the motions with 'a desire not to reach an agreement.'" *Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 578, 91 S.Ct. 1731, 1736 (1971).

The NLGA was adopted March 23, 1932. "The oft-stated congressional policy of that act was to *prevent injunctive interference* in labor disputes and to allow such controversies *to be settled* through negotiation and the *free play of economic forces*." *Brotherhood of Locomotive Firemen and Enginemen v. Florida East Coast Ry. Co.*, 346 F.2d 673, 675 (5th Cir.1965)(emphasis added).

Both Sections 1 and 8 of the NLGA are consistent with the foregoing stated policy. Section 1 of the NLGA states:

> No court of the United States, as defined in this chapter, *shall have jurisdiction* to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. §101 (emphasis added).

Section 8 of the NLGA states:

> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery

11

of mediation or voluntary arbitration.

29 U.S.C. §108.

In *Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27, v. Toledo, P. & W. R. R.* (*"Toledo"*), 321 U.S. 50, 58-59, 64 S.Ct. 413, 418 (1944), the United States Supreme Court discussed the interrelation of the two Acts and was one of the first courts to reconcile the Acts' purposes. In *Toledo*, the Court stated:

> The policy of the Railway Labor Act was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes. The over-all policy of the Norris-LaGuardia Act was the same. The latter did not entirely abolish judicial power to impose previous restraint in labor controversies. But its prime purpose was to restrict the federal equity power in such matters within greatly narrower limits than it had come to occupy. It sought to make injunction a last line of defense, available not only after other legally required methods, but after all reasonable methods as well, have been tried and found wanting. This purpose runs throughout the Act's provisions. It is dominant and explicit in Section 8. *In short, the intent evidenced both by words and by policy was to gear the section's requirements squarely into the methods and procedures prescribed by the Railway Labor Act.*

321 U.S. at 58-59 (emphasis added).

The facts of *Toledo* are relevant to this Court's analysis. In *Toledo*, a railroad brought an action against the Union to enjoin the Union from interfering by violence or threats of violence with the railroad's property and railroad operations. The violence in question arose out of a long-standing labor dispute between the railroad and Union members relating to working conditions and rates of pay. A long course of mediation with the NMB ensued, followed by the NMB's proposal that the parties engage in arbitration pursuant to the RLA. Both parties refused, and the Union planned to strike. *Id.* at 51-52.

In the meantime, the bombing of Pearl Harbor occurred, and the NMB intervened, strongly urging the parties to settle the dispute in view of the national emergency at hand. The Union agreed

12

to postpone the strike indefinitely, and negotiations resumed.  After no agreement was reached, the

NMB again proposed that the parties engage in arbitration.  This time, the employees accepted, but

the employer again refused.  *Id.* at 52.  After the expiration of the thirty-day cooling-off period, the

railroad notified the employees it would engage in self-help, and the Unions notified the railroad it

intended to strike.  The strike ultimately ensued, with various incidents of violence taking place,

some resulting in personal attacks, others in damage to property.  *Id.* at 53.  After some period of

time passed, the railroad filed a complaint in federal court seeking a temporary restraining order and,

after hearing, permanent injunctive relief restraining the Union from interfering with its operations

and property.  The district court granted the request for injunctive relief, and the appellate court

affirmed.  *Id.* at 54.

On appeal, the United States Supreme Court **reversed**.  Framing the issue as one involving

**the jurisdiction of the court**, the Court stated:

> The question, broadly stated, is whether [the railroad] made "every reasonable effort
> to settle the dispute, as the section requires.  ***On the facts this narrows to whether
> its steadfast refusal* to agree to arbitration under the [RLA]'s provisions made
> [Section 8] operative.** We think it did, *with the consequence that the federal courts
> were deprived of the power to afford injunctive relief and [the railroad] was
> remitted to other forms of legal remedy which remained available.*

*Id.* at 56 (emphasis added).

> The Court went on to note:

> Section 8 demands [the provisions and machinery of the RLA] be exhausted before
> a complainant to whom it is available may have injunctive relief.  Broadly, the
> section imposes two conditions. *If a complainant has failed* (1) to comply with any
> obligation imposed by law or (2) *to make every reasonable effort to settle the
> dispute, he is forbidden relief.* The latter condition is broader than the former. One
> must not only discharge his legal obligations. He must also go beyond them and
> make all reasonable effort, at the least by the methods specified if they are available,
> though none may involve complying with any legal duty. Any other view would
> make the second condition wholly redundant.

*Id.* at 56-57 (emphasis added).

Subsequent Supreme Court cases note the reconciliation of the NLGA and RLA.  In *Brotherhood of R.R. Trainmen v. Chicago R. & I. R.R.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), the Supreme Court reasoned "there must be an accommodation of the Acts so that the purpose of each is preserved." *See also Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, Intern.*, 416 F.2d 633, 636 (4th Cir. 1969) ("the purposes of the Norris-LaGuardia Act and the Railway Labor Act [are] reconcilable, and . . . there must be an accommodation of the Acts so that the purpose of each is preserved."). In *Piedmont*, the court stated:

> Restraining the parties from self-help, through strikes or otherwise, until they have complied with the duty to bargain in good faith vindicates the congressional purpose of providing machinery to prevent strikes without creating an irreconcilable conflict with the Norris-LaGuardia Act. Restraint conditioned in this respect does not deny the right to strike over a major dispute; but it delays this right until the union satisfies the mandate of the Railway Labor Act.

416 F.2d at 636.

The *Toledo* court went on to note the foreclosure of both legal and equitable relief should a party fail to comply with the provisions of the NLGA:

> [Sec. 8] provides that a complainant shall not be entitled to an injunction if he has not complied with any contract or obligation on his part or has not made every reasonable effort to settle the dispute by the available methods of arbitration or mediation. Surely, this fundamental principle of equity that 'he who seeks justice must do justice' should apply in labor disputes as well as in other judicial controversies.

*Id.* at 59, 60 (noting Section 8 is the "clean hands" provision of the NLGA).

To be sure, *Todelo* makes clear "arbitration under the Railway Labor Act is voluntary." *Id.* at 59.  Nevertheless, *Toledo* clearly holds a party that rejects arbitration is not entitled to *equitable relief* in federal court, to wit:

> [The RLA] merely provides that failure to arbitrate shall not be construed as a

14

violation of any legal obligation imposed upon the party failing by that Act or otherwise. Respondent's failure of refusal to arbitrate has not violated any obligation imposed upon it, whether by the Railway Labor Act or by the Norris-LaGuardia Act. No one has recourse against it by any legal means on account of this failure. ***Respondent is free to arbitrate or not, as it chooses. But if it refuses, it loses the legal right to have an injunction issued by a federal court or, to put the matter more accurately, it fails to perfect the right to such relief. This is not compulsory arbitration. It is compulsory choice between the right to decline arbitration and the right to have the aid of equity in a federal court.***

*Id.* at 62-63 (emphasis added). Thus, while the NLGA speaks only to "injunctive relief," the Supreme Court has made clear the "clean hands" requirements of the Act also bar other forms of equitable relief. *See also Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 794 (5th Cir. 1999) ("It is old hat that a court called upon to do equity should always consider whether the petitioning part has acted . . . with unclean hands" . . . "this consideration is rooted in the maxim that "he who comes into equity must come with clean hands."

For the foregoing reasons, in *Toledo*, the Court concluded the following:

The fact is that respondent complied with the requirements of both Section 8 and the Railway Labor Act in all but the one essential respect. It recognized the employees' designated representatives, negotiated with them, engaged in mediation until it was terminated by the Board as the statute required. ***When it came, however, to the final and crucial step of arbitration, it declined to go forward as Section 8 requires if, later, injunctive relief is to be had.*** Whether the refusal was motivated by distrust of the Board, by a desire to escape the binding effect of an award, by preference for some other possible procedure, or merely by respondent's mistaken view of the section's requirements is not material. ***Arbitration under the Railway Labor Act was available, afforded a method for settlement Congress itself has provided, and until respondent accepted this method it had not made 'every reasonable effort to settle' the dispute, as Section 8 requires.***

*Id.* at 64-65 (emphasis added). Therefore, the Court concluded it was deprived of the power to afford injunctive relief to the carrier. *Id.* at 57.

Despite the ruling in *Toledo*, subsequent cases show "the [NLGA] does not [always] deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor

Act." *Id.* For example, the federal courts have permitted injunctive relief *to stop* illegal, or surprise, strikes. *See, e.g, Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co.*, 353 U.S. 30, 77 S.Ct. 635 (1957); *Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 91 S.Ct. 1731 (U.S.Ill. 1971); *Burlington Northern & Santa Fe Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 286 F.3d 803 (5th Cir. 2002); *Atlanta & West Point R. Co. v. United Transp. Union*, 439 F.2d 73 (5th Cir. 1971).

Nevertheless, it is well settled when considering requests for injunctive relief under the RLA, "courts should hesitate to fix upon the injunctive remedy unless that remedy alone can effectively guard the plaintiff's right." *Chicago & North Western*, 91 S.Ct. 1731. *See also See, e.g., Burlington Northern & Santa Fe Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 286 F.3d 803, 808 (5th Cir. 2002) ("BMWE's strategy of calling numerous surprise strikes is precisely the sort of violation of the RLA for which an injunction "is the only practical, effective" remedy. . . . [p]reemptive injunctive relief is the only available remedy for illegal surprise strikes by the BMWE. **An injunction issued only after an illegal strike has begun cannot undo the damage caused to the carriers from the beginning of the strike to the issuance of the injunction**.") (emphasis added).

The foregoing is consistent with the pronouncement by Judge Brown in *Flight Engineers Int'l Ass'n v. American Airlines, Inc.*, 303 F.2d 5, 11 (5th Cir. 1962), in which the court "defined the classic office of a preliminary injunction:"

> (To) **preserve the status quo pending a judicious, calm and orderly judicial determination** of (a) *justiciable problem* * * * So much so is it that on review of such an interlocutory order, we do not examine into the merits as such. The probable merits are looked to only insofar as they bear on the question whether the trial Court abused its discretion in granting **interim** relief.'

303 F.2d at 11, *cited in Piedmont*, 416 F.2d at 637 (emphasis added).

With the foregoing in mind, this Court will now address the substance of PHI's motion.

### 4.     Legal Analysis of PHI's Motion to Dismiss

In the instant case, the Unions admit they "unconditionally rejected" the NMB's proffer of arbitration in this matter.  In its brief addressing the impact of the NLGA, the Unions state neither party "has accepted" the proffer to arbitrate.[9]  Additionally, in a telephone status conference with the Court conducted on June 16, 2010, counsel for the Unions confirmed the Unions have never accepted the offer to arbitrate.  Consequently, the prohibitions of the NLGA apply to the Unions.

The question, therefore, is whether the Unions nonetheless, are entitled to the injunctive or equitable relief they seek in light of their failure to accept arbitration under the scheme of the RLA.  The first inquiry of the Court in answering this question is to determine what specific *type* of injunctive relief the Unions are requesting and whether that relief should be allowed notwithstanding the fact the Unions did not accept arbitration.  In answering this question, this Court must determine whether the specific remedies sought by the Unions are "preemptive injunction relief" that are the only remedies that "can effectively guard [the Unions'] right[s]" *at this juncture* of the litigation.  *Burlington Northern & Santa Fe Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 286 F.3d 803, 808 (5th Cir. 2002), *Chicago & North Western*, 91 S.Ct. 1731.

In the instant case, with respect to the pre self-help portion of its motion, the Unions contend PHI violated Section 2, First of the RLA when it failed to exert every reasonable effort to reach an agreement with the Unions during the bargaining/mediation process and violated Section 2, Seventh

---

[9] *See* Unions' And Individual Pilots' Brief Regarding Availability Of Injunctive Relief Given The Presence Of The Norris-LaGuardia Act, Doc. 412.

and Section 6 of the RLA when, around November 30, 1995,[10] PHI made pay adjustments for newly-hired Air Medical pilots and, around April 19, 2006, PHI changed its mileage reimbursement policy for Air Medical pilots. With respect to these alleged violations of the RLA – all of which pre-date the parties' release to self-help and allegedly occurred approximately 4 years earlier – the specific injunctive relief the Unions only now, are seeking is: (1) mandatory injunctive relief to order PHI to resume bargaining in good faith, with the court retaining jurisdiction and monitoring the process; (2) mandatory injunctive relief ordering PHI to restore the status quo between the parties; (3) prohibitory injunctive relief precluding PHI from engaging in self-help until it bargains in good faith; and (4) "equitable remedies" – sanctions -- in the form of costs and attorney's fees.

The first three requests for injunctive relief – ordering PHI to resume bargaining in good faith, with the court retaining jurisdiction and monitoring the process; ordering PHI to restore the status quo between the parties; and precluding PHI from engaging in self-help until it bargains in good faith – are no longer justiciable controversies for this Court to adjudicate. Indeed, the RLA is no longer being violated in the fashion alleged by the Unions, because the parties are no longer bargaining, the strike has already happened, and the complained-of changes have already been implemented and operated under for four years. As noted in *Burlington Northern & Santa Fe Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 286 F.3d 803, 808 (5th Cir. 2002), as to a strike, "An injunction issued *only after* an illegal strike has begun cannot undo the damage caused to the carrier from the beginning of the strike to the issuance of the subpoena." (emphasis added) The same principle applies to changes implemented in response to a strike and operated under from that time forward, here, for some four years. **In essence, the Unions are asking this Court to force**

_____

[10] *See* footnote 6, *infra*.

18

**PHI to do something PHI has already done or not done – at a time when** *the Unions* **have already availed themselves of the self-help remedy of striking, and PHI has already availed itself of its self-help options**. Once within self-help, "economic warfare" has been declared and in this case, deliberately chosen by both parties. The Unions' request for an injunction ordering PHI to restore the status quo at this juncture is similarly misplaced. The status quo cannot be restored at this point, both parties are years into self-help and once within self-help the "status quo" is, again, "economic warfare." Indeed, the Unions are, in fact, not requesting that all pre-self help wages be restored (as doing so *would result in the lowering of wages for certain pilots*). In point of fact, the Unions' strike cannot be undone; the wage changes instituted once into self-help and operated under for many years cannot effectively be undone, and the request for **interim relief** in order to allow judicial determination of a justiciable issue is wholly misplaced under the facts of this case.

If the Unions had believed they required injunctive relief based upon PHI's now complained of pre self-help actions, this court suggests they knew, pre self-help, of the conduct they now complain of, and the proper time to have raised their complaints as to the pre self help conduct of PHI was *before the Unions themselves rushed to self-help*. At that time, the remedy sought – an order prohibiting PHI from engaging in self-help until PHI bargained in good faith, or an order prohibiting PHI from changing the status quo while bargaining – may have "effectively guarded" the Unions' rights under the RLA, and indeed, such an action arguably could have fostered the dual purposes of the RLA and the NLGA, if, indeed, PHI were found to have been violating the RLA by refusing to make every reasonable effort. Had the Unions asked this Court for an interim injunction prohibiting PHI from changing the status quo until a judicial determination could be made as to whether PHI's complained of conduct violated the RLA, the Court would have been presented with

19

an actual justiciable controversy at that time and could have, perhaps, timely granted effective relief. However, *the Unions chose not to so avail themselves of that opportunity*, rather chose to move into self-help, and ultimately to strike. Had the Unions, opted to request relief, pre self-help, perhaps the strike could have been averted and no changes to the status quo ensued, and this Court would not now be faced with a misplaced request to *restore* a status quo long since destroyed.

In this manner, the Unions chose to turn a blind eye to the very conduct it now complains of, chose not to avail itself of the very remedy it now seeks, and chose to *move into its own self-help* action. The Unions **chose to** take advantage of their right to engage in self-help – *i.e.*, went on strike – rather than to seek relief when relief might have "effectively guarded" the Unions' rights under the RLA, and now seek to go back in time, so to speak, and request this Court to enter injunctions against PHI to stop PHI from doing that which, if done, has already been done, and order PHI to bargain in good faith some four years into self-help – a time when there is no obligation to bargain, whether in good faith or otherwise. This Court suggests any request for injunctive relief to stop changes and preserve the status quo until PHI bargained in good faith should have been made *during the bargaining period* as set up by the RLA, and is wholly misplaced within the period of self-help, under the undisputed facts of this matter.

The final request for injunctive relief is prohibitory injunctive relief precluding PHI from engaging in self-help until it bargains in good faith. **Again, PHI has already engaged in self-help – as have the Unions**, therefore the now requested injunctive relief asks this Court, again to re-write history and turn back the hands of time, which this Court cannot do. Furthermore, at this juncture, some four years into self-help, an interim injunction can afford no effective relief and this Court lacks the power to afford such relief under the facts presented. The requested relief is not the "only

remedy that "can effectively guard [the Unions'] rights."  Once in self-help, the "rights" of a party, have – by the choices of that party – been reduced to those of "economic warfare."  Here, both parties chose self-help; neither party chose to request injunctive relief when such injunctive relief might have been the "only remedy" "that can effectively guard *their* rights under the RLA."  To grant the Unions' request for injunctive relief at this juncture – **four years after the end of bargaining and four years into self-help** – not only would not support the clear policy of the RLA's promoting private resolution of disputes within the context afforded by the RLA and avoiding disruptions to commerce resulting from self-help, it would do true violence to that policy by encouraging parties to attempt to operate outside the context of the RLA during the Congressionally mandated process in an attempt to gain possible advantage, and later run to the courts to cry "foul" if their gambit does not bring the desired result.  The Unions, rather than promptly and perhaps properly, seeking injunctive relief from a court to enjoin PHI's sojourn into self-help illegally at the time when the bargaining broke down and the Unions believed PHI was failing to make every reasonable effort, chose to opt into self-help themselves, and now some four years into self-help, wish to cry foul and ask this Court to undo that which has already been done.

As noted, this Court may only enter injunctive relief in the face of prohibition of the NLGA, if doing so would promote the stated policies of the RLA, or, more specifically, stop a violation of the RLA, which cannot be the case here, either as to the Unions' request for injunctive relief, or as to the final remedy requested by the Unions, *i.e.*, the request for equitable remedies in the form of sanctions, as the complained of violations occurred approximately four years ago – pre self-help.  Furthermore, the Court again notes the Unions come to this Court with unclean hands, having unconditionally rejected the NMB's proffer of arbitration and failure to request the relief now

requested, at a time when it might have been effective.  Stated another way, the Unions chose not to seek interim relief when it might have prohibited the very condition of which it now complains, and might not have resulted in the disruption to commerce which resulted from the operation of self-help.  To award equitable relief to the Unions at this juncture, would reward the Unions for striking and then when that gambit did not grant the desired result, only then cry foul, rushing to the courthouse rather than attempting to settle their disputes within the framework provided by the Congress within the RLA, pursuant to the stated policy of the statute.  This Court believes rewarding the Unions by awarding it equitable relief given the undisputed facts and circumstances of this case would undermine the stated objective and purposes of the RLA and the NLGA.  The Unions did not accept arbitration, for whatever reason, and thus injunctive relief is not allowed except under narrow circumstances.  Those narrow circumstances do not exist in this matter; the Unions chose NOT to guard its rights under the RLA at the point when those rights could have been effectively guarded, but rather chose to move directly into self-help, and only after self-help did not render the desired result ask this Court to, in effect, sanction PHI for past conduct.  Congress was clear in the NLGA when it stated: "nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." 29 U.S.C. § 101.  Thus, the Court finds to grant the Unions' requests for relief would do violence to and clearly be "contrary to the public policy" pronounced by the NLGA.  Therefore, this Court finds the Unions are barred from the remedies sought for the reasons noted above.  Thus, this Court concludes the Unions are not entitled to the injunctive and/or equitable relief they seek as a remedy for PHI's alleged **pre self-help** violations of Section 2, First, Section 2, Seventh, and Section 6 of the RLA, and this portion of PHI's motion, requesting dismissal of the Unions' pre self-help claims, is GRANTED.

22

### b.     The Unions' Post Self-Help Claims

PHI contends all of the Unions' claims that post-date the parties' exercises of self-help should be dismissed on grounds the Unions fail to state a claim as a matter of law under Section 2, Seventh and Section 6 of the RLA.

The parties in this matter became free to engage in self-help as of 12:01 a.m. on August 28, 2006.  As soon as the "cooling off" period had ended and self-help has begun, PHI contends it exercised its right to implement new terms of employment in a document now commonly referred to by the parties and this Court as the "Green Book."  In their second counterclaim in the Bad Faith Bargaining Suit, the Unions contend PHI violated Section 2, Seventh and Section 6 of the RLA when PHI implemented terms and conditions of employment that differed from what PHI had offered to the Unions during bargaining.  Specifically, the Unions allege PHI violated the RLA by paying Air Medical pilots at rates not offered to the Unions during negotiations or mediation, by placing some Air Medical pilots on higher Oil & Gas pay scales, and by implementing the new pilot pay scales retroactive to August 21, 2006, the beginning of the pay period encompassing the date of the release to self-help.[11]  PHI points out the Unions seek *only injunctive and equitable relief* to remedy the foregoing alleged violations of the RLA.[12]

With regard to the Unions' Section 2, Seventh and Section 6 claims, this Court notes the

---

[11] To clarify, although the actual pay period of August 21, 2006 pre-dates the period of self-help, the implementation made by PHI, in fact, post-dates self-help, because the changes in pay were made once self-help had begun, yet were made retroactive to the cooling-off period.

[12] PHI also contends the Unions' claim (1) that PHI's Green Book implementation and (b) PHI's declining the NMB's post self-help offer to discuss resumption of negotiations also violated Section 2, First.  The foregoing claims, to the extent they exist, in theory would constitute post-self help claims.  However, it is unclear to this Court whether these claims are asserted in the most recent pre-trial order/outlines the parties submitted, and, therefore, whether these claims survive or have been abandoned and/or narrowed by the Unions.  To the extent the claims have survived, this Court concludes the Unions would not be entitled to injunctive and/or equitable relief in connection with those claims, for the reasons discussed in the body of this Ruling.

parties agree the entirety of the 2001-2004 CBA was opened for modification pursuant to the parties' 2004 Section 6 Notices.  The parties also agree, because the entire CBA had been opened for modification, PHI was free, as of 12:01 a.m. EDT on August 28, 2006, to implement changes to any articles of the previous CBA, without regard to any business necessity justifying such changes. However, the parties *disagree* concerning the scope of changes PHI was free to implement.  The Unions assert as of 12:01 a.m. EDT on August 28, 2006, the only changes PHI could implement to the terms and conditions of employment of its pilot workforce were those it offered to the Unions in its final pre-self help proposals during the RLA bargaining/mediation process.  Furthermore, the Unions contend that only during the pendency of the Unions' strike (which did not begin until September 20, 2006 and ended on November 10, 2006), could PHI implement other changes, if such other changes were reasonably necessary for PHI to continue its operations.

On the other hand, PHI contends as of 12:01 a.m. EDT on August 28, 2006, it was free to implement *any* change to the terms and conditions of employment specified by the previous CBA, so long as such implementation neither conflicted with any other obligation imposed by federal law, nor struck a fundamental blow to union activity and the collective bargaining process itself.  PHI contends this right existed before, during, and after the Unions' strike because the entirety of the parties' CBA was opened for modification pursuant to the parties' 2004 Section 6 Notices.

Section 6 of the RLA states, in pertinent part:

> In every case where . . . notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has finally been acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

45 U.S.C. §156 (emphasis added).

Section 2, Seventh of the RLA states:

**Seventh. Changes in pay, rules, or working conditions contrary to agreement or to section 156 forbidden**

No carrier, its officer, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, embodied in agreements, except in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. §152, Seventh.

The parties agree they exchanged notices of intent to change their entire agreement pursuant to Section 6. On its face, Section 6 only prohibits a carrier from making changes "until the controversy has finally been acted upon" by the NMB. Once the NMB has "acted upon" a controversy – *i.e.*, has released the parties to self-help – Section 6 and Section 2, Seventh are silent as to limitations on a carrier's ability to change terms and conditions of employment.

The Unions argue once the parties have been released to self-help, a carrier may only implement terms consistent with its final proposals during the negotiation/mediation process. However, to interpret the RLA in this manner would read into the statute a limitation on self-help that does not exist. In arguing this position, the Unions urge this Court to consider cases interpreting provisions of the National Labor Relations Act ("NLRA"). For example, in *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Intern.*, 861 F.2d 1546, 1550 (11th Cir. 1988), the Eleventh Circuit, in a case brought under the RLA, determined the issue of whether a contract had actually been entered into by an air carrier and its employees did "not involve problems of statutory interpretation unique to the plan of the RLA." Therefore, the court determined it was appropriate to "refer to the law developed over the last half-century "administering our most comprehensive national labor scheme, the National Labor Relations Act. . . " *Id.* at 1550.

However, in *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants* (*"IFFA"*), 489 U.S. 426, 439-40, 109 S.Ct. 1225, 1233-34 (1989), the Supreme Court cautioned against the wholesale importation of NLRA principles in interpreting the statutory framework of the RLA. In *IFFA*, the issue before the Court was whether a carrier's "crossover" policy with respect to the reinstatement rights of striking pilots violated the RLA. The Unions argued the RLA forbid such a policy, when the NLRA might not forbid such a policy. The *IFFA* Court noted:

> Although we have observed that the NLRA may provide useful analogies for interpreting the RLA, *we have also emphasized that the NLRA "cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes." Trainmen v. Jacksonville Terminal,* 394 U.S., at 383, 89 S.Ct., at 1118. Thus, in *Trainmen* itself we declined to examine the "panoply of detailed law developed" under the NLRA to determine what kind of secondary picketing in a railway dispute may be enjoined by state courts. **Rather, we held that Congress had entirely withdrawn such injunctive power from the States:** *[P]arties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute ... [may] employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." Id.,* at 391-392, 89 S.Ct., at 1123. Similarly, two Terms ago in *Burlington Northern R. Co. v. Maintenance of Way Employees,* 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), we declined to find in the RLA an implied limit on a union's resort to secondary activity by analogy to the NLRA. *These cases have read the RLA to provide greater avenues of self-help to parties that have exhausted the statute's "virtually endless," id., at 444, 107 S.Ct., at 1850, dispute resolution mechanisms than would be available under the NLRA. Nevertheless, they provide the backdrop for the Union's contention that, in this case, we should understand provisions of the RLA to limit "the full range of whatever peaceful economic power [the parties] can muster," Trainmen, supra,* 394 U.S., at 392, 89 S.Ct., at 1123, *beyond the limitations even imposed by the NLRA. This we decline to do.*

489 U.S. at 439-40 (emphasis added).

In light of the Supreme Court's recognition that the RLA provides "greater avenues of self-help to parties that have exhausted the statute's virtually endless dispute resolution mechanisms than would be available under the NLRA," this Court concludes when interpreting the narrow issue of the scope of self-help under the RLA – which scope is broader than the scheme of self-help under

26

the NLRA – the provisions of the NLRA should not be imported wholesale as a framework for analyzing violations of the RLA. Therefore, this Court declines to interpret the specific dispute between the parties in this matter pursuant to the policies and framework of the NLRA and finds the cases cited by the Unions that are governed by the NLRA are inapposite. Rather, this Court will focus on the language of the RLA itself, the U.S. Supreme Court's guidance on the issue. and what limited subsequent jurisprudence there is interpreting those provisions of the RLA.

The case of *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees, AFL-CIO v. Florida East Cost Railway Co.,* 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) ("*FEC*"), instructs that any terms of the CBA *which were not the subject of a Section 6 Notice and the RLA mediation provisions* remained binding on the parties unless abrogation of those terms were necessary for the company's continued operation. The Court, therefore, rejected the company's argument that upon the expiration of the cooling off period, *all provisions of the CBA terminated. Id.* at 485-91. Because terms not included in the Section 6 Notice and thus not subject to the RLA's mediation provisions survived the cooling off period, the company was not permitted to abrogate **those provisions of the parties' CBA that were not the subject of Section 6 Notices**.

*FEC* is clearly distinguishable from the facts of the case *sub judice*. While only certain provisions of the parties' CBA in *FEC* were the subject of Section 6 Notices, the entirety of the CBA between the parties in the instant case was the subject of Section 6 Notices. Thus, to the extent *FEC* holds a carrier may not alter certain provisions of the CBA that were not the subject of Section 6 Notices, the case is distinguishable from the instant case. Nevertheless, the overriding principles of *FEC* are instructive in the instant case.

27

The facts of the instant case are similar to those in the district court case of *International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Varig Brazilian Airlines, Inc.*, 855 F.Supp. 1335, 1344 (E.D.N.Y.1994) ("*Varig*"), in which that Court addressed the issue of the scope of allowable self-help under the RLA after the parties have been released to self-help.[13] In *Varig*, the Union alleged an air carrier violated Sections 2, Seventh and 6 of the RLA by "'unilaterally changing fundamental conditions of employment' by failing to submit those changes to negotiation, arbitration or mediation, and by making changes which were not included in the Company's final offer." 855 F.Supp. at 1342. However, as in the instant case, it was undisputed the carrier did not implement any changes in rates of pay, rules, or working conditions that were not contained in the carrier's Section 6 Notice. Because of the foregoing, the court concluded, even if the Union's arguments were accepted as true, *as a matter of law*, the Union failed to state a cause of action under Sections 2, Seventh and 6 of the RLA. Citing *TWA II*, the district court noted:

> *Implementation of Varig's changes and elimination of the union security clause does not "strike a fundamental blow to union ... activity and the collective bargaining process itself"; does not "prevent[ ] the scheme of the RLA from working"; and is not a "measure ... inherently destructive of union ... activity" precisely because the Union was on notice that if the parties could not reach a meeting of the minds, these changes were possible.* The changes implemented by Varig do not impede the Union's ability to strike or attract new members, nor has it thwarted the RLA's mediation procedure; to the contrary, these changes are a direct result of the failure of the RLA's mediation procedure.

*Id.* at 1345 (emphasis added).

With respect to the Union's argument that only those changes which were contained in the carrier's final offer are permissible during the period of self-help – an argument advanced by the Unions in the instant matter – the *Varig* court noted:

---

[13] This Court recognizes it is not bound by the decisions of other district courts, however in the absence of controlling jurisprudence in the Fifth Circuit, this Court finds discussion of the issue by other courts enlightening.

Here, it is undisputed that the Union was provided with an extensive section 6 notice, thus putting it on notice that a myriad number of issues were on the table and that, should the RLA's mediation provisions prove unsuccessful, self-help would be available. *There is nothing in either the statute or the cases interpreting the statute which posits that only those issues which were specifically discussed or which were included in the company's final offer are candidates for self-help following the end of the cooling off period. Nor should that be the case.* The RLA is concerned with balancing, on the one hand, the desire to have the carrier settle its disputes with the union via mediation . . . and, on the other hand, providing the carrier with the option of making those changes it deems necessary, within certain limits, if the mandatory system of mediation has failed . . . If the Union's position is accepted, then Varig must return to the mediation table after more than one year of protracted negotiations thus defeating one of the purposes of the RLA's statutory scheme ( *i.e.,* a resort to self-help following the cooling off period). "Such an extravagant interpretation would delay indefinitely the company's right to self-help and 'would result in an endless revolving door process.' " *IUFA,* 624 F.Supp. 64, 67 (E.D.N.Y.1985) (quoting *REA Express, Inc. v. Brotherhood of Ry., Airline and Steamship Clerks,* 358 F.Supp. 760, 770 (S.D.N.Y.1973)). *The balance articulated above is best struck by the rule announced in TWA and affirmed by an equally divided Court: A carrier may make any change during the self-help period so long as those changes were included in the carrier's section 6 notice and the parties proceeded through the RLA's mediation procedure.* This is in accord with the previous statement by the Court that a party, following the cooling off period, may access *"the full range of whatever peaceful economic power [the parties] can muster [.]"* *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 392, 89 S.Ct. 1109, 1123, 22 L.Ed.2d 344 (1969) (emphasis added). **As noted earlier, it is often the availability of self-help which creates an incentive for settling disputes without judicial interference.** *Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employees,* 481 U.S. 429, 451-52, 107 S.Ct. 1841, 1854-55, 95 L.Ed.2d 381 (1987). This incentive takes on an even greater role if self-help is available as to all items embraced in a party's section 6 notice. This conclusion, of course, does not leave the Union without recourse; pursuant to the statutory framework, it is also free to engage in peaceful self-help following the termination of the thirty-day cooling off period.

*Id.* at 1348-49 (emphasis added) (certain internal citations omitted).

Thus, the well-reasoned analysis of the Court from New York recognizes exhaustion of the RLA's mandatory negotiation, mediation, and "cooling off" procedures leads to "the ultimate right of the disputants to resort to self-help," a state of affairs earlier likened to "economic warfare." *Bhd. of Ry. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378-79 (1969) ("*Trainmen*"). In fact,

29

the Supreme Court, itself, in *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 379, 89 S.Ct. 1109, 1116 (1969), noted "[b]oth before and after enactment of the RLA, as well as during congressional debates on the bill itself, proposals were advanced for replacing this final resort to economic warfare with compulsory arbitration and antistrike laws. But although Congress and the Executive have taken emergency ad hoc measures to compel the resolution of particular controversies, no such general provisions have ever been enacted." Consequently, once the period of self-help begins, the parties are free to "employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." *IFFA*, 489 at 426. Beyond requiring that self-help be "peaceful" and that it must not conflict with other obligations imposed by federal law, the RLA is "wholly inexplicit about the scope of allowable self-help." *Id.* at 442 (*quoting, Trainmen*, 394 U.S. at 391). It is well-settled, by the U.S. Supreme Court, however,

> this silence does not amount to a congressional *imprimatur* on all forms of postnegotiation self-help. It does, however, indicate that we should hesitate to imply limitations on ***all but those forms of self-help that strike a fundamental blow to union or employer activity and the collective bargaining process itself.***

*IFFA*, 489 U.S. at 442 (emphasis added).

The Court finds the foregoing analysis by the New York Court consistent with the policy considerations of the RLA and guidance provided by the U.S. Supreme Court. As the Court stated in *IFFA*: "The effectiveness of [the RLA's] private dispute resolution process <u>depends upon</u> . . . the subsequent assurance that <u>neither party will be able to enlist the courts to further its own partisan ends</u>." *Id.* at 441 (emphasis added). Hard-bargaining parties will have no incentive to compromise their position if, after impasse, "governmental power should. . . be added to the scales in favor of [one] party and thus compel the other to agree to the aided party's terms." *Id. See also, Burlington*

*Northern v. BMWE*, 481 U.S. 429, 451-52 (1987) ("*Burlington Northern*") (refusing to read a prohibition of secondary boycotts into the RLA where no statutory prohibition exists; "the availability of...self-help measures...may increase the effectiveness of the RLA in settling major disputes by creating an incentive for the parties to settle prior to exhaustion of the statutory procedures").

Considering the foregoing, this Court concludes it is undisputed the entirety of the parties' CBA was open to negotiation and the subject of a Section 6 Notice; as of 12:01 a.m. EDT on August 28, 2006, the parties were released to self-help; because the entire CBA had been opened for modification pursuant to the parties' Section 6 Notices, PHI was free, as of 12:01 a.m. EDT on August 28, 2006, to implement changes to any articles of the previous CBA, without regard to any business necessity justifying such changes; as of 12:01 a.m. EDT on August 28, 2006, PHI was free to implement any change to the terms and conditions of employment specified by the previous CBA so long as such implementation neither conflicted with any other obligation imposed by federal law, nor struck a fundamental blow to union activity and the collective bargaining process itself; and PHI's right to the foregoing existed before, during, and after the Unions' strike.[14]

Consequently, this Court must now determine whether PHI's actions "struck a fundamental blow to union activity and the collective bargaining process itself." Specifically, the Unions allege PHI violated the RLA by paying Air Medical pilots at rates not offered to the Unions during negotiations or mediation, by placing some Air Medical pilots on higher Oil & Gas pay scales, and by implementing the new pilot pay scales retroactive to August 21, 2006, the beginning of the pay

_____

[14] As noted in *Toledo*, 321 U.S. at 61, n.18 this pre-supposes the parties engaged in the process in good faith. However, had the Unions believed PHI had not engaged in good faith, they could have sought interim injunctive relief at that time to prohibit PHI from changing the status quo or engaging in self-help, until and if such a violation of the RLA were proved. However, as noted, that was not the Unions' chose within this matter.

period encompassing the date of the release to self-help. After consideration of the arguments of the parties, this Court concludes implementation of the complained of PHI's changes does not as a matter of law, "strike a fundamental blow to union ... activity and the collective bargaining process itself;" does not "prevent[ ] the scheme of the RLA from working;" and is not a "measure ... inherently destructive of union ... activity." Here, pay rates were not changed across-the-board. Rather, only Air Medical pilots saw changes to their rates in pay, and although the pay date was made retroactive to August 21, 2006 – one week before the self-help period began – this Court does not find such action strikes a fundamental blow to union activity. The pay period for these select pilots was actually effective the week before self-help was available to the parties; the post self-help change was made retroactive for only that one week. When considering the overall policy of the RLA scheme, this Court does not find the limited foregoing changes were so extreme as "to strike a fundamental blow" to union activity.

Furthermore, and perhaps more importantly, **this Court concludes the Unions were on notice that if the parties could not reach a meeting of the minds, changes in rates of pay were possible**, thus making those very changes in pay retroactive by only one week, cannot, itself, be seen as striking "a fundamental blow" to Union activity. Indeed, it was this very tension and uncertainty that the Unions embraced when they rejected arbitration as a means of attempting to settle the dispute concerning wages and elected to enter self-help. The Unions cannot now argue they were somehow surprised by the particular changes made. Additionally, this Court notes the Unions are not, in fact, requesting the complained of wages of the pilots be decreased, retroactively or prospectively, at this time, some four years after their implementation, a fact illustrating the futility of the Unions' request for, in effect, retroactive relief.

32

Considering the foregoing, this Court concludes, that, even if this Court were to accept the Unions' post-self-help factual allegations as to Sections 2, Seventh and 6 of the RLA as true, *as a matter of law*, the Unions fail to state of claim upon which relief can be granted under these specific provisions of the RLA. Therefore, PHI's motion to dismiss these claims is GRANTED.

**B.    The Unions' Motion to Dismiss [Doc. 455]**

**1.    Legal Standard**

The Unions do not identify a legal standard under which this Court should decide their motion to dismiss. However, as with PHI's motion, this Court concludes the Unions' motion is properly considered pursuant to Rule 12(h)(2) and/or Rule 12(c). The Fifth Circuit applies the same standard for a motion to dismiss under Rules 12(c) as it does for a motion to dismiss under 12(b)(6) of the Federal Rules of Civil Procedure. *Oakville Community Action Group v. Industrial Pipe, Inc.*, 2003 WL 22990719, 1 (E.D. La. 2003), *citing Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.,* 208 F.Supp.2d 719, 725 (S.D. Tex. 2002), *quoting Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir.1999) (relying upon cases that provide the standard for a Rule 12(b)(6) motion in stating the applicable standard for a Rule 12(c) motion)).

**2.    Analysis of the Unions' Motion to Dismiss**

In their main demand in the Bad Faith Bargaining Suit, PHI asserts a single cause of action against the Unions, alleging the Unions violated Section 2, First of the RLA by bargaining in bad faith and failing to exert every reasonable effort to reach an agreement with PHI. PHI seeks only two remedies for the Unions' alleged violations of the RLA:

> (1) a declaration that the Unions have failed to exert every reasonable effort to make and maintain an agreement with PHI; and

> (2) prohibitory injunctive relief barring the Unions from engaging in further strikes

33

or other self-help until they have satisfied their obligation to exert every reasonable effort to reach an agreement with PHI.

In their instant motion, the Unions contend PHI is not entitled to either remedy. With respect to PHI's request for injunctive relief, the Unions argue such request for injunctive relief is barred by Section 8 of the NLGA. With respect to PHI's request for a declaratory judgment, the Unions contend PHI is not entitled to such equitable relief as a matter of law.

### a.    PHI's request for injunctive relief

The parties are referred to this Court's discussion of the interplay between the RLA and the NLGA at pages 10-17 of this Ruling. As this Court noted in connection with PHI's motion, voluntary arbitration was a method of settlement "both reasonable and available" to PHI, as it was offered by the NMB prior to the parties' release to self-help. In *Toledo*, the Supreme Court stated:

> ***Arbitration under the Railway Labor Act was available, afforded a method for settlement Congress itself has provided, and until respondent <u>accepted</u> this method it had not made 'every reasonable effort to settle' the dispute, as Section 8 requires.***

*Id.* at 64-65 (emphasis added).

In the instant case, the Unions refused arbitration; PHI, however, remained silent. It is undisputed PHI has never responded to the NMB's proffer of arbitration, and the Unions rejected the NMB's offer. The question before this Court is whether PHI's ambiguity of conduct – *i.e.*, PHI's silence on the issue of arbitration throughout the NMB process – constitutes "an acceptance" of the NMB's offer such that the provisions of Section 8 of the NLGA do not apply, or a "steadfast refusal" of the NMB's offer, such that the provisions of Section 8 of the NLGA apply, or neither.

Clearly, *Toledo* contemplates a *refusal to agree to* **or** *an acceptance of* arbitration. The facts of *Toledo* illustrate the dynamic and fluid nature of the process instituted under the RLA as parties change their minds with respect to arbitration and alter and change their positions as the process

evolves. Indeed, one might argue a change of mind regarding arbitration is contemplated – and even encouraged – by the negotiating process of the RLA. *Toledo* recognizes this fluid dynamic and, in fact, holds a party's failure to *accept* arbitration – in any manner – prohibits that party from later seeking injunctive relief in federal court. 321 U.S. at 64-65.

In the instant case, PHI argues it did not reject arbitration; however PHI admits it did not accept the offer to arbitrate; rather, PHI argues it was silent on the subject. However, silence, by its very nature, is ambiguous. Indeed, when one is silent, he or she is not "agreeing" or "accepting," nor is she or he "disagreeing" or "rejecting." Rather, one has neither accepted nor rejected and thus is leaving one's position deliberately open to interpretation and deliberately embracing ambiguity for whatever reason. Clearly, ambiguity of conduct by way of silence does not serve the purpose of the RLA scheme, which has as its central purpose the facilitation of settlement of labor disputes. Nor does ambiguity of conduct by way of silence serve the purpose of the NLGA, which limits the relief a party can obtain when it fails to make "every reasonable effort" to settle a labor dispute.

This Court concludes *Toledo* makes clear a party must not be allowed to remain silent with respect to the issue of arbitration if the policy underlying the RLA is to be supported. To so allow would, as has been the case in this matter, foster argument over the ambiguity and, thus act to thwart the clarity of purpose contemplated by the RLA, and that clarity of purpose and position which is required for the operation of good faith bargaining. One cannot be said to "have made every reasonable effort" when one declines to either accept or reject the offer made. Indeed, the facts in *Toledo* argue for the proposition that each disputant in a labor dispute must "go on the record," so to speak, regarding either its acceptance or rejection of the offer to arbitrate made by the NMB, granting the needed clarity of purpose and position necessitated by the process Congress instituted

within the RLA and thereby affording the opportunity for the process to operate and positions to shift. Indeed, *Toledo* declares it a "compulsory choice."[15] The fluid and dynamic process contemplated by the RLA allows for each party's position to change during the give and take of the process, as was illustrated in *Toledo*. If a party were to be allowed not to chose, to simply remain silent, that silence is *a failure to chose* which introduces deliberate ambiguity and thus, undercuts the purpose of the Act by interjecting a lack of clarity of position and consequence that acts to retard the process of resolution. Therefore, whether couched in terms of "accepting" arbitration; "refusing" arbitration; or "refusing to agree" to arbitration, or merely "refusing to chose" *Toledo* makes clear to allow a party to deliberately remain silent on the issue of arbitration and then seek injunctive relief from the courts when its silence has not reaped the desired result, would be violative of the policies of both the RLA and NLGA.

In the instant case, when presented with the NMB's offer to arbitrate, PHI remained silent after the Unions rejected arbitration. By maintaining its silence, PHI did not "agree to" or "accept" arbitration, it, in effect, chose not to chose. This Court concludes it is not enough for PHI to argue it would have been fruitless to openly express its position concerning arbitration, in light of the Unions' clear rejection of it. Clearly, the Unions could have changed their minds, or PHI could have changed its mind, thus signaling, as in *Toledo*, the introduction of a shift in position and opening for additional negotiation, or the added pressure of the specter of possible injunctive relief, thus again changing the dynamic of the process at hand – at which point the position of PHI would have been salient and the risks adherent to the Unions' refusal under those circumstances made clear. Had PHI accepted arbitration at any point, the Unions would have been forced to re-evaluate their position in

---

[15]*See Toledo*, 321 U.S. at 62-63.

light of PHI's acceptance, and thus the opportunity for resolution of the dispute could have lived on yet another day, and the purposes of both the RLA and the NLGA would have been served. What is clear and undisputed is that PHI chose to hide within its silence and thereby cloak itself in ambiguity; PHI did not accept the offer to arbitrate, rather, never made the necessary "compulsory choice" – but rather, made no choice at all. Consequently, the Court finds Section 8 of the NLGA applies to PHI's request for injunctive relief.[16]

However, the finding of this Court that Section 8 of NLGA applies to PHI does not end the inquiry. As discussed above, certain exceptions apply to Section 8's application. Consequently, this Court must determine what specific type of injunctive relief PHI is asking for, and determine whether, notwithstanding the NLGA's prohibition on injunctive relief, the specific injunctive relief sought should be permitted. The injunctive relief requested, under these facts, must be the "only practical, effective" remedy" available to cure a specific alleged violation of the RLA. *Chicago & North Western,*, 91 S.Ct. 1731.

PHI seeks prohibitory injunctive relief barring the Unions from engaging in further strikes or other self-help until they have satisfied their obligation to exert every reasonable effort to reach an agreement with PHI. The Court concludes such injunctive relief, by its very nature, would be an equitable remedy, whether perhaps, by way of sanction for past conduct, or by request to prohibit the Union from exercising its legal rights while in the self-help period.

The Supreme Court has made clear the "clean hands" requirements of the NLGA limits equitable relief to those parties who have clean hands. *See Toledo,* 321 U.S. at 66. Additionally,

---

[16] The Unions also argue PHI's failure to accept the NMB's offer to resume public interest conferences further bars its request for injunctive relief. Because it concludes PHI's silence with respect to arbitration is sufficient to determine the policies of the NLGA apply, this court need not address PHI's failure to "accept" the NMB's offer to resume public interest conferences.

*Toledo* makes clear:

> [a party] is free to arbitrate or not, as it chooses. But if it refuses, it loses the legal right to have an injunction issued by a federal court or, to put the matter more accurately, it fails to perfect the right to such relief. This is not compulsory arbitration. **It is *compulsory choice* between the right to decline arbitration and the right to have the aid of equity in a federal court**".

321 U.S. at 63. *See also Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 794 (5th Cir. 1999) ("It is old hat that a court called upon to do equity should always consider whether the petitioning part has acted … with unclean hands" … "this consideration is rooted in the maxim that "he who comes into equity must come with clean hands."). PHI did not accept or reject the NMB's offer to arbitrate, therefore, PHI does not come to this court now seeking injunctive relief with "clean hands," thus, Section 8 applies, and PHI is not entitled to the equitable remedy it now seeks.

Furthermore, just as the Unions had the opportunity to afford themselves of the possibility of interim injunctive relief when they were first aware of the now-complained-of violation of the RLA, PHI had that same opportunity to request interim injunctive relief against the Unions to prohibit the Unions from engaging in self-help or an illegal strike alleging violation of the RLA by way of the Unions' failure to make every reasonable effort and thereby enjoin the strike until the justiciable issue of violation of the RLA could have been determined. However, PHI did not chose to do so, rather PHI, also, elected to move into self-help, and thus at this juncture, some four years into self-help, neither party presents this Court with a justiciable issue to be determined. Both PHI and the Unions **have already engaged in the complained of self-help, the parties are no longer bargaining, rather each has been within self-help for almost four years**, and as eluded to in *Burlington Northern*, this Court cannot easily, if at all, "undo" what has already been done, nor

would it in the fact of the prohibition of the NLGA[17]

Moreover, the conduct of the Unions which PHI only now complains of *preceded the Unions' strike*, thus affording PHI the opportunity to request interim injunctive relief prohibiting the strike until judicial determination could be made as to whether the RLA had been violated, at that time, when remedy might have been afforded. Therefore, in now seeking an injunction that the Unions cannot strike *again* – while undisputably within the self-help period – until they bargain in good faith, PHI is essentially asking this Court to engage in a peremptive action during the period of self-help, based on past alleged bad conduct, when to strike is the primary weapon afforded to a Union during the period of self-help. Furthermore, whether one couches the request as a sanction or some other equitable remedy, it remains a remedy grounded in equity when the undisputed facts show neither party comes to their respective requests with clean hands. Should the parties choose to resume negotiations at some point in the future, the Unions, in theory, could engage in good faith negotiations from that point forward and were this Court to grant PHI's request for an injunction prohibiting the Unions from striking until someone other than the Unions were to declare they have negotiated in good faith, the Unions could, in effect, be prohibited from striking – a protected activity under the RLA – based only upon their past behavior. Such relief given by a Court is not appropriate under the RLA and Congress' clear intent that the Court's role be limited and one of last resort, and would do violence to the policy underpinning the "clean hands" doctrine as well as the clear policies of the RLA and NLGA to encourage operation within the provision of the Act. To the extent the relief requested were to be argued as a sanction pursuant to the policy expressed by the Fifth Circuit in *United Indus. Workers of Seafarers Intern. Union of North America, Atlantic, Gulf,*

---

[17] 286 F.3d at 808.

*Lakes and Inland Waters Dist., Marine Allied Workers Division, AFL-CIO v. Board of Trustees of Galveston Wharves*, 400 F.2d 320, 323 (5th Cir. 1968) (*"Galveston Wharves"*) (concluding district court has authority to require payment of backpay as a sanction for a carrier's violation of Section 6 of the RLA), given the unclean hands of PHI, this Court finds no such sanction could be due for the reasons outlined above.

Considering the foregoing, this Court concludes PHI is not entitled to the injunctive relief it seeks.

### b.      PHI's request for a declaratory judgment

The final remedy requested by PHI is a declaration that the Unions have failed to exert every reasonable effort to make and maintain an agreement with PHI. The Unions contend PHI is not entitled to such relief.

PHI's request for declaratory relief is governed by the Declaratory Judgment Act, 28 U.S.C. 2201(a), which states in pertinent part:

> In a *case of actual controversy* within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, *may declare the rights and other legal relations of any interested party seeking such declaration*, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. §2201(a) (emphasis added).

The Act offers the court an opportunity to afford a plaintiff equitable relief when legal relief is **not yet** available to him, so as **to avoid inequities** which **might result from a delay in assessing the parties' legal obligations**. *Venator Group Specialty, Inc. v. Matthew/Muniot Family, LLC.*, 322 F.3d 835, 839-40 (5th Cir. 2003). It is well-settled a suit for declaratory judgment is essentially an equitable cause of action. *See Samuels v. Mackell*, 401 U.S. 66, 70 (1971). In *Eccles v. Peoples*

*Bank of Lakewood Village, Cal.*, 333 U.S. 426, 431 (1947), the Supreme Court stated: "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest."

The Unions contend PHI's request for declaratory relief is improper because it does not seek a declaration regarding the "rights or legal interests" of either of the parties. The Unions also contend PHI is not entitled to a declaratory judgment for the same reasons it is not entitled to any other form of equitable relief, *i.e.*, PHI has unclean hands because it failed to accept the NMB's offer of arbitration. On this point, with certain addition noted below, this Court agrees.

In *North American Airlines, Inc. v. International Broth. of Teamsters, AFL-CIO*, 2005 WL 646350, 7-8 (S.D.N.Y. 2005) (*"North American Airlines"*),[18] the district court engaged in a well reasoned discussion of the Declaratory Judgment Act and articulated the following jurisprudential gloss which has been given to cases brought under the Declaratory Judgment Act:

> The Declaratory Judgment Act provides that in "a case of actual controversy," a court "may declare the rights and other legal relations of any interested party seeking such declaration." As such, the Act provides no independent basis for subject matter jurisdiction. Instead, the Act, "in its limitation to 'case of actual controversy,' manifestly has regard to the constitutional provision [Article III, § 2] and is operative only in respect to controversies which are such in the constitutional sense." "If no actual case or controversy exists between the parties regarding the subject on which declaratory judgment is sought, the court lacks subject matter jurisdiction."

(Internal citations omitted).

In *North American Airlines*, the district court in its discussion noted that [g]enerally, the presence of an "actual controversy" under the statute hinges on "whether the facts alleged, under all the circumstances, show that there *is a substantial controversy, between parties having adverse legal*

---

[18]This Court recognizes it is not bound by the decisions of other district courts, however in the absence of controlling jurisprudence in the Fifth Circuit, this Court finds discussion of the issue by other courts enlightening.

*interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.*"

2005 WL 646350 at 7-8 (emphasis added).  In *North American Airlines*, the district court cited

*Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952),

in which the Supreme Court emphasized:

> "The disagreement must not be nebulous or contingent but must have taken a *fixed and final shape* so that a court can see what legal issues it is deciding, **what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them**."

(emphasis added)

In *North American Airlines*, the court also cited another district court case – *Gen. Comm. of*

*Adjustment, GO-386 v. Burlington N. and Santa Fe Ry. Co. ("GO-368")*, 295 F.3d 1337, 1341 (D.C.

Cir.2002) [19] – wherein that court stated:

> [I]n actions for declaratory judgment invoking the RLA, jurisdiction of the court is limited by general declaratory judgment law, and that a dispute appropriate for resolution under the declaratory judgment act 'must not be nebulous or contingent, but must have taken on fixed and final shape.  While these principles are clear, their application is less precise. "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." Accordingly, there is no bright line rule for determining whether a dispute presents "an actual controversy," and the question is one determined on a case by case basis.
>
> The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."  This is true of declaratory judgment actions as well.

2005 WL 646350 at *7-8 (internal citations omitted) (*citing GO-386,* 295 F.3d at 1341).

Considering the foregoing, this Court must be mindful that, "The disagreement must not be

nebulous or contingent but must have taken a *fixed and final shape* so that a court can see **what legal**

---

[19] This Court notes it cites the district court opinions referenced herein because the Court finds the discussions of the Declaratory judgment Act succinct and well-reasoned.  However, to the extent this Court is relying on jurisprudence in rendering its ruling herein, it is relying on the decisions of the United States Supreme Court.

issues it is deciding, what effect its decision will have on the adversaries and some useful purpose to be achieved in deciding them." *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952) (emphasis added). This Court concludes no substantial *legal* controversy exists at this time between PHI and the Unions that would argue for the requested declaration and no useful purpose would be achieved in deciding some four years into self-help and some four years <u>after</u> the complained of conduct occurred, whether the conduct did or did not constitute a failure to exert every reasonable effort to maintain and make an agreement before the parties were released to self-help. Additionally, this Court finds to grant this equitable remedy, at this time, when PHI had full opportunity to pursue a judicial determination of pre self-help conduct, before PHI chose to enter self-help, would have the effect of placing PHI in a position of advantage as to the Unions – a position due neither PHI nor the Unions, under the undisputed facts of this case. Neither PHI nor the Unions chose to afford themselves of the opportunity to seek the very relief they now seek, some four years earlier, rather, each made the separate and deliberate choice to enter self-help – to now afford either an advantage one over the other in their chosen "economic warfare" by use of the Courts would undercut the stated policies of the RLA and the NLGA, as well as the doctrine of clean hands.

Both PHI and the Unions made a deliberate choice to go to war, and now to allow either to ameliorate the consequences of that choice or to gain advantage, one over the other, at the hands of the Court for alleged past bad conduct, offends the judicial purpose of equity, the Congressional intent to limit the roles of the Court in this highly regulated arena and undercuts the clear Congressional intent and policies of the RLA and NLGA to encourage resolution of disputes within the structures of the RLA.

The parties chose to end their negotiations nearly four years ago, and each party chose to then engage in self-help for almost four years.  To wit, the Unions went on strike, and PHI implemented wage increases for certain pilots. The strike, clearly, cannot be undone at this juncture, and the Unions are not asking this Court to retroactively lower the wages of any pilots.  The entire CBA was contained within the respective Section 6 notice; PHI was on notice the Unions could strike; the Unions were on notice PHI could change wages and conditions.  Both chose to accept that risk, to allow either, through operation of an argued equitable relief to gain advantage one over the other does harm to the discussed policy concerns specifically protected by Congress in the language of the NLGA.   Additionally, this Court notes the Unions have since adopted the "Green Book" arguing it should be the CBA between the parties, illustrating the operation of the pressures brought to bear within self-help and the argued lack of a true legal controversy.  The RLA and NLGA contemplate the operation of those very pressures now complained of, when in self-help, and  the Acts interplay makes it clear Congress intended to severely limit the Court's involvement in ameliorating those pressures.

Moreover, the Unions' acceptance of the "Green Book" – which is what PHI put forth unilaterally – argues, in part, that PHI's request for declaratory relief at this juncture is again not reflective of a case of actual controversy and, therefore, such a declaration would be improper.

Finally, this Court notes again, the request for a declaratory judgment is a request for equitable relief.  For all the reasons that have been discussed at length herein, this Court does not find PHI to have "clean hands" and thus is not entitled to equitable relief.

For the foregoing reasons, the Unions' motion to dismiss PHI's request for declaratory relief is GRANTED.

44

For the foregoing reasons, this Court has concluded neither party is entitled to any of the relief either seeks in the Bad Faith Bargaining Suit.  Therefore, *as a matter of law*, this Court GRANTS "PHI, Inc.'s Motion to Dismiss the Unions' RLA-Based Counterclaims in the Bargaining Suit" [Doc. 456] and the "Unions' Motion to Dismiss PHI, Inc.'s First Amended Complaint for Declaratory Judgment and Permanent Injunctive Relief in the Bargaining Suit" [Doc. 455] and DISMISSES WITH PREJUDICE all claims alleged by PHI in the Bad Faith Bargaining Suit, and all counterclaims asserted by the Unions' in the Bad Faith Bargaining Suit.

THUS DONE AND SIGNED in Lafayette, Louisiana, this _____9_____ day of July, 2010.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE