RECEIVED

JUL 3 0 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

PHI, INC.

CIVIL ACTION NO. 06-1469 (LEAD)
06-2243 (MEMBER)

VERSUS

JUDGE DOHERTY

OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION AND
OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION LOCAL 108

MAGISTRATE JUDGE HILL

**MEMORANDUM RULING**

Before the Court is "PHI, Inc.'s Motion to Dismiss the Unions' Claims in the Return to Work

Suit" [Doc. 463]. The motion is opposed by the Office and Professional Employees International

Union ("OPEIU) and OPEIU Local 108 ("Local 108" (OPEIU and Local 108 are collectively referred

to herein as "the Unions") [Doc. 466]. For the following reasons, PHI's motion is GRANTED.

**I.     Factual and Procedural Background**

The factual history of this case has been set forth in numerous rulings issued by the Court.

For the sake of clarity and for ease of consideration of the requests asserted in the instant motions,

this Court notes as follows:

PHI is a common carrier by air as defined in 45 U.S.C. § 181, and is a Federal Aviation

Administration-certificated air carrier under Part 135 of the Federal Aviation Regulations ('FARs"),

14 C.F.R. § 135, et seq. PHI is registered in Louisiana, and the company's business is providing

helicopter transportation and related services to the oil and gas industry, including PHI support for

companies operating drilling and production operations in the Gulf of Mexico, and to Air Medical

customers at locations throughout the country.  PHI currently employs approximately 2,500 employees.

OPEIU is an unincorporated association that does business as a labor organization and engages in business in this judicial district.  In March 2000, OPEIU was certified by the National Mediation Board ("NMB") as the collective bargaining representative of the flight deck crewmembers ("pilots") employed by PHI.  Shortly after the NMB certification, OPEIU entered into negotiations with PHI in an attempt to reach an initial collective bargaining agreement ("CBA").  As a result of these negotiations, a CBA was confected between PHI and the Unions on July 12, 2001, which was effective June 1, 2001 through May 31, 2004.

On or about February 19, 2004, negotiations between PHI and the Unions began in an effort to reach a successor CBA.  After approximately 39 days of direct bargaining and more than 38 additional bargaining sessions mediated by the NMB, no successor CBA was reached.  On July 28, 2006, the NMB issued a letter advising PHI and the Unions that as of 12:01 a.m. EDT on August 28, 2006, the parties would be free to engage in economic self-help.

On August 28, 2006, PHI filed suit in this court, seeking a declaratory judgment and permanent injunctive relief against the Unions under the Railway Labor Act, 45 U.S.C. §151, *et seq.* ("RLA"), on grounds the Unions violated Section 2, First of the RLA by bargaining in bad faith and failing to exert reasonable efforts to reach an agreement with the Company (the "Bad Faith Bargaining Case").[1]  On September 8, 2006, the Unions answered PHI's complaint and asserted counterclaims of their own, seeking equitable and injunctive relief.

The Unions went on strike on September 20, 2006, at the height of hurricane season in the

---

[1] PHI also sought prohibitory injunctive relief barring the Unions from engaging in further strikes or other self-help until the Unions satisfied their obligation to exert every reasonable effort to reach an agreement with PHI.

Gulf of Mexico, often the time of peak emergency operation for PHI. On November 10, 2006, at the traditional end of hurricane season, the Unions allegedly made an unconditional offer to end the strike and return striking pilots to work. PHI disputes that the offer to return to work was "unconditional." On November 27, 2006, the Unions filed a separate lawsuit against PHI, which became known as the Return to Work Case.[2] In the present incarnation of the Return to Work Case, the Unions allege PHI violated Section 2, Third[3] and Section 2, Fourth[4] of the RLA in the manner

_____

[2] The Return to Work Suit bears Civil Action No. 06-2243.

[3] Section 2, Third of the RLA states:

Third. Designation of representatives

Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

45 U.S.C. §152.

[4] Section 2, Fourth of the RLA states:

Fourth. Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by carrier forbidden; deduction of dues from wages forbidden

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: *Provided,* That nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

45 U.S.C. §152.

in which PHI responded to the Unions' ending of the strike and, generally, in the manner in which PHI conducted the return to work process.  After a lengthy and protracted motion practice, the Bad Faith Bargaining Case and the Return to Work Case were consolidated for trial purposes and set for trial.

While reviewing the pre-trial order and other materials submitted by the parties in preparation for the trial, which, at that time, was set to begin on July 6, 2010, this Court realized there remained several issues of law that had not been presented by the parties and remain, therefore, unresolved. After discussions with counsel at pre-trial meetings to address the status of the case, the parties moved to file out-of-time dispositive motions in the Bad Faith Bargaining Case, motions this Court granted in the interests of streamlining the issues for trial.  On July 9, 2010, this Court dismissed the majority of claims raised by PHI and the Unions in the Bad Faith Bargaining Case.[5]  Subsequently, the Court permitted PHI to file the instant out-of-time motion to dismiss the Unions' claims in the Return to Work Case for the same reasons as those cited by the Court in the Bad Faith Bargaining Case.  PHI's motion is now before the Court, and all issues are ripe for consideration.

## II.      Legal Analysis

### 1.      Legal Standard

PHI raises its motion pursuant to Rule 12(c), 12(h)(2) and Rule 12(h)(3) of the Federal Rules of Civil Procedure.  Generally, a party waives any defense listed in Rule 12(b)(2) - (5) of the Federal Rules of Civil Procedure by omitting these defenses in a timely-filed motion or by failing to include

---

[5] Not all claims were dismissed in the Bad Faith Bargaining Suit; the Unions' claims alleged under the Louisiana Wage Statute remain pending and are the subject of a separate motion to dismiss filed by PHI.  See Doc. 468.

such defenses in a responsive pleading or amendment. *See* Fed. R. Civ. P. 12(h)(1).[6] However, the defense of failure to state a claim is not thereby waived, pursuant to Rule 12(h)(2). Additionally, the subject matter jurisdiction of the Court can be raised at any time. To wit, Rules 12(h)(2) and 12(h)(3) state:

> **(h) Waiving and Preserving Certain Defenses**
>
>> **(2)** *When to Raise Others.* Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:
>>
>>> **(A)** in any pleading allowed or ordered under Rule 7(a);
>>>
>>> **(B)** by a motion under Rule 12(c); or
>>>
>>> **(C)** at trial.
>>
>> **(3)** *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

Fed. R. Civ. P. 12(h)(2) & 12(h)(3).

This Court concludes PHI's motion is properly considered pursuant to Rule 12(h)(2) and/or

---

[6] Rule 12(h)(1) states:

**(h) Waiving and Preserving Certain Defenses.**

> **(1)** *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)-(5) by:
>
>> **(A)** omitting it from a motion in the circumstances described in Rule 12(g)(2); or
>>
>> **(B)** failing to either:
>>> **(I)** make it by motion under this rule; or
>>>
>>> **(ii)** include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

Fed. R. Civ P. 12(h)(1).

Rule 12(c).[7] The Fifth Circuit applies the same standard for a motion to dismiss under Rule 12(c) as it does for a motion to dismiss under 12(b)(6) of the Federal Rules of Civil Procedure. *Oakville Community Action Group v. Industrial Pipe, Inc.*, 2003 WL 22990719, 1 (E.D. La. 2003), *citing Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.,* 208 F.Supp.2d 719, 725 (S.D. Tex. 2002), *quoting Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999) (relying upon cases that provide the standard for a Rule 12(b)(6) motion in stating the applicable standard for a Rule 12(c) motion)).

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007) (internal quotations omitted), *quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir.2004). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Breaches Litig.*, 495 F.3d at 205, *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id., quoting Bell Atl.*, 127 S.Ct. at 1965. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need *detailed* factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl.*, 127 S.Ct. at 1964-65 (citations, quotation marks, and brackets omitted) (emphasis added). *See*

---

[7] Rule 12(c) states:

> **(c) Motion for Judgment on the Pleadings.** After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings.

Fed.R.Civ.P. 12(c).

*also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).

Determining whether a complaint states a plausible claim for relief is, therefore, a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Ashcroft*, 129 S.Ct. at 1950. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *Id.* at 1950. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.*

**2.      Analysis of PHI's Motion to Dismiss**

In the Return to Work Case, the Unions allege PHI violated Section 2, Third and Section 2, Fourth of the RLA in the manner in which PHI responded to the Unions' ending of the strike and, generally, in the manner in which PHI conducted the return to work process. The Unions seek the following remedies in connection with the foregoing alleged violations of the RLA:

1.      Pursuant to the Court's equitable power to remedy violations of the RLA under *United Indus. Workers of Seafarers Intern. Union of North America, Atlantic, Gulf, Lakes and Inland Waters Dist., Marine Allied Workers Division, AFL-CIO v. Board of Trustees of Galveston Wharves*, 400 F.2d 320, 323 (5th Cir. 1968) (*"Galveston Wharves"*), the Unions seek the following **sanctions** against PHI for violations of Sections 2, Third and Fourth of the RLA:

      a.      An award to the Unions in an amount equal to all payments the Unions made to the pilots whose return to work was either refused or delayed by PHI;

      b.      An award to the Unions and the pilots for their costs and reasonable attorneys' fees in prosecuting this action and pre- and post-judgment interest on all amounts awarded;

      c.      An award to the Unions and pilots for all further relief as the Court deems just and proper.

2.      **Injunctive relief** in the form of an order to PHI to immediately reinstate to employment, retroactive to a date to be determined at trial, all pilots represented by the Unions who have not been returned to work by PHI.

In the instant motion, PHI seeks dismissal of the Unions' claims in the Return to Work Case on grounds the Unions' claims "involv[e] or grow[] out of a labor dispute" with PHI, during the course of which the Unions rejected the National Mediation Board's ("NMB") proffer of voluntary arbitration, thus, the Unions' claims are barred by Sections 1 and 8 of the Norris LaGuardia Act, 29 U.S.C. §§101 and 108. Alternatively, PHI argues the Unions' claims of "post-certification" misconduct by PHI do not rise to the level requiring judicial intervention under Section 2, Third or Section 2, Fourth of the RLA, and accordingly, the Unions state no claims against PHI under Sections 2, Third or Fourth. In urging the instant motion, PHI emphasizes the only relief the Unions seek in the Return to Work Case is equitable and/or injunctive relief.

**The RLA and the NLGA**

The parties are referred to pages 10-16 of this Court's Memorandum Ruling on the parties' claims in the Bad Faith Bargaining Case [Doc. 461] for a comprehensive discussion of the policy considerations and legal parameters of the RLA and the NLGA, as well as the interplay between the two Acts, and that portion of the Court's ruling is adopted as if set forth herein *in toto*. In a nutshell, the RLA, enacted in 1926 to regulate labor relations on the nation's railroads and airlines and amended in 1934, principally seeks to prevent interruptions of service on these vital organs of interstate commerce. *See Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 726, 65 S.Ct. 1282, 1291, 89 L.Ed. 1886, 1896 (1945), *cited in International Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America (Airline Div.) v. Texas Intern. Airlines, Inc.,* 717 F.2d 157, 158 (5th Cir. 1983). Indeed, in 1937, the Supreme Court stated the principal aim of the RLA is to "*secur[e] settlement* of labor disputes by *inducing* collective bargaining with the true representative of the employees and by preventing such bargaining with any who do not represent them." *Virginian Ry.*

8

*v. System Federation,* 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937) (emphasis added).

*See also Air Line Pilots Ass'n, Intern. v. United Air Lines, Inc.*, 802 F.2d 886 (7th Cir. 1986) ("[t]he

RLA was enacted to encourage collective bargaining by the parties 'in order to prevent, if possible,

wasteful strikes and interruptions of interstate commerce,' especially in cases where major disputes

are involved.").  Thus, the primary emphasis of the RLA is on informal, cooperative methods of

dispute resolution such as conciliation, mediation, and negotiation; Congress specifically prescribed

only a narrow role for the courts.  *Texas Intern. Airlines, Inc.*, 717 at 158, *citing Elgin*, 325 U.S. at

727, 65 S.Ct. at 1291, 89 L.Ed. at 1896.

The NLGA was adopted March 23, 1932.  "The oft-stated congressional policy of that act

was to *prevent injunctive interference* in labor disputes and to allow such controversies *to be settled*

*through negotiation* and the *free play of economic forces*."  *Brotherhood of Locomotive Firemen*

*and Enginemen v. Florida East Coast Ry. Co.*, 346 F.2d 673, 675 (5th Cir.1965)(emphasis added).

Both Sections 1 and 8 of the NLGA are consistent with the foregoing stated policy.  Section

1 of the NLGA states:

> **No court** of the United States, as defined in this chapter, ***shall have jurisdiction*** to
> issue any restraining order or temporary or permanent injunction ***in a case involving***
> ***or growing out of a labor dispute***, except in a strict conformity with the provisions
> of this chapter; nor shall any such restraining order or temporary or permanent
> injunction be issued ***contrary to the public policy*** declared in this chapter.

29 U.S.C. §101 (emphasis added).

Section 8 of the NLGA states:

> No restraining order or injunctive relief shall be granted to any complainant ***who has***
> ***failed to comply with any obligation imposed by law*** which is involved in the labor
> dispute in question, or ***who has failed to make every reasonable effort*** to settle such
> dispute either by negotiation or with the aid of any available governmental machinery
> of mediation or ***voluntary arbitration***.

29 U.S.C. §108 (emphasis added).

In *Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27, v. Toledo, P. & W. R. R.* *("Toledo")*, 321 U.S. 50, 58-59, 64 S.Ct. 413, 418 (1944), the United States Supreme Court discussed the interrelation of the two Acts and reconciled the Acts' purposes. In *Toledo*, the Court stated:

> The policy of the Railway Labor Act was **to encourage use of the nonjudicial processes of negotiation, mediation and arbitration** for the adjustment of labor disputes. The over-all policy of the **Norris-LaGuardia Act was the same**. The latter did not entirely abolish judicial power to impose **previous restraint** in labor controversies. But *its prime purpose was to restrict the federal equity power in such matters within greatly narrower limits than it had come to occupy.* **It sought to make injunction a last line of defense, available not only after other legally required methods, but after all reasonable methods as well, have been tried and found wanting**. This purpose runs throughout the Act's provisions. It is dominant and explicit in Section 8. *In short, the intent evidenced both by words and by policy was to gear the section's requirements squarely into the methods and procedures prescribed by the Railway Labor Act.*

321 U.S. at 58-59 (emphasis added).[8] After a discussion concerning the interplay between the RLA and the NLGA, the Court in *Toledo* held a party's steadfast *refusal* to accept the NMB's proffer of arbitration deprives a federal court of the power to afford that party injunctive relief. *Id.* at 56 (emphasis added). This principle was an underlying foundation for this Court's dismissal of the parties' RLA-based claims in the Bad Faith Bargaining Suit.

In the instant case, PHI contends this Court lacks jurisdiction to award the Unions the equitable and/or injunctive relief they seek, because the Unions failed to meet the requirements of Section 8 of the NLGA.  PHI goes on to argue this Court correctly and properly dismissed the Unions' claims that PHI violated Sections 2, First and Seventh and Section 6 of the RLA in the Bad Faith Bargaining Case, because the Unions rejected the NMB's proffer of arbitration. PHI contends

---

[8] See this Court's Memorandum Ruling, Doc. 461, for a complete discussion of the *Toledo* case.

the Unions' Sections 2, Third and Fourth claims for equitable and/or injunctive relief in the Return to Work Case fail for the same reason, as they involve and grow out of the same "labor dispute" in which the Unions rejected arbitration.

While acknowledging the issues raised in the Return to Work Case "involve[] a labor dispute" pursuant to the NLGA, the Unions challenge PHI's characterization of the Return to Work Case as the "same labor dispute" as the Bad Faith Bargaining Case and go to great lengths to define and distinguish the two disputes between the parties as *separate* labor disputes. This Court concludes the distinction is immaterial, as the NLGA itself does not require that the two disputes between the parties be the same dispute in order for the NLGA's prohibition against injunctive relief to operate. Rather, Section 1 of the NLGA states:

> No court of the United States, as defined in this chapter, ***shall have jurisdiction*** to issue any restraining order or temporary or permanent injunction ***in a case involving or growing out of a labor dispute***, ***except*** in a ***strict*** conformity with ***the provisions of this chapter***; ***nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter***.

29 U.S.C. §101 (emphasis added).

The NLGA itself defines "labor dispute" as follows:

> **(a)** A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

11

29 U.S.C. §113(a).

The Supreme Court has made clear the definition of "labor dispute" as per the NLGA is "broad," to wit:

> First, we have long recognized that "Congress made the definition [of "labor dispute"] broad because it wanted it to be broad.... Congress attempted to write its bill in unmistakable language **because it believed previous measures looking toward the same policy against nonjudicial intervention in labor disputes had been given unduly limited constructions by the Courts."**

*Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 441, 107 S.Ct. 1841, 1849 (1987) (citation omitted) (emphasis added).

Notwithstanding the arguable lack of a statutory requirement that the Bad Faith Bargaining Case and the Return to Work Case comprise the same "labor dispute," it is worth noting PHI defines the present dispute between the parties as one existing on a continuum, with the dispute "beginning" with the exchange of Section 6 Notices between the parties – signaling the desire of the parties to begin bargaining over the collective bargaining agreement ("CBA") – meandering through the bargaining and mediation process, then through the thirty-day "cooling-off" period, and finally continuing to self-help, a recognized stage within the RLA process, the period in which PHI argues the parties remain to this day. The Unions, in fact, do not appear to challenge PHI's assertion that the parties remain in self-help.

However, the Unions contend there are two separate and distinct "labor disputes" between the parties: Labor Dispute #1 (involving the parties' efforts to reach a successor CBA, which led to the filing of the Bad Faith Bargaining Suit) and Labor Dispute #2 (the dispute arising out of the Unions' strike and PHI's alleged refusal to return pilots to work after the Unions' alleged

unconditional offer to return to work). The Unions contend both disputes are ongoing. [9] As an example of the separateness of the labor disputes in question, the Unions argue if Labor Dispute #1 had resulted in an agreement as to a successor CBA, Labor Dispute # 1 would have ended, but would not have resulted in a resolution of Labor Dispute #2, which would remain ongoing.

The Unions' argument misses the point. Had Labor Dispute # 1 been resolved at any point with the formation of a CBA that was agreeable to both parties, *the Unions would not have gone on strike, Labor Dispute #2 would not have arisen, and there would be no Return to Work Case*. More specifically, if a successor CBA had been reached, the parties would not have been released to self-help, the Unions would not have gone on strike, and there would have been no need to return any pilots to work after a strike. Indeed, this Court notes the Unions have presented this Court with no jurisprudence to suggest the various stages of a labor dispute between an employer and its employees actually constitute separate and distinct "labor disputes."

The Unions further argue the prohibition on injunctive relief contained in Section 8 of the NLGA only applies if a party has failed to "make very reasonable effort" to settle disputes. The Unions argue the NLGA prohibition on injunctive relief does not apply in the Return to Work Case, because the Unions attempted to resolve the "labor dispute" leading to the Return to Work Case through negotiation between Melvin Schwarzwald, counsel for the Unions, and Scott Kiefer, counsel for PHI on how the pilots would, post-strike, return to work. The Unions additionally argue it cannot be shown the Unions failed to use "any available governmental machinery of mediation or voluntary arbitration" to settle Labor Dispute #2, because there was no such governmental machinery in Labor

---

[9] To the extent the majority of claims in the Bad Faith Bargaining Suit have been resolved by this Court, only the Unions' Louisiana Wage Claims remain unaddressed by the parties and, thus, this Court, in the Unions' "Labor Dispute # 1."

Dispute #2.[10]

Again, this Court suggests the Unions' arguments are unpersuasive. First, the Unions cite no jurisprudence supporting their argument that the NLGA prohibition on injunctive relief **only** applies if a party has failed to make very reasonable effort to settle disputes. On their face, Section 1 and Section 8 state, respectively:

> No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; **nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.** (emphasis added).
>
> * * * *
>
> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration. (emphasis added).

29 U.S.C. §§ 101, 108. Thus, under the express language of Section 8, injunctive relief is prohibited **either** when a complainant fails to comply with any obligation imposed by law **or** when a complainant fails to make every reasonable effort to settle a dispute, and Section 1 notes no "... injunction" can be issued which would be "contrary to the public policy declared ...".[11]

More importantly, when combined with the Unions' argument concerning the Schwarzwald-

---

[10] This Court notes on July 28, 2006, the NMB notified the parties it was terminating its services as to the "original labor dispute."

[11] Thus, the Unions' argument seems to present internal inconsistencies. Either the dispute giving rise to the strike and the return to work process (what the Unions refer to as Labor Dispute #2) is part of the overall labor dispute between the parties which has been submitted to the RLA process, or "Dispute #2" is a separate labor dispute which *should have been* submitted to the RLA process. However, none of the parties has indicated any provision of the RLA which would apply to this narrow factual scenario, perhaps exactly because it is a part of the original labor dispute.

Kiefer negotiations, it becomes clear the Unions' argument pre-supposes this Court will conclude

the overall labor dispute between the Unions and PHI should be divided into separate labor disputes,

and the injunctive relief would, if granted, not be contrary to the declared public policy. This Court

declines to find either. In that vein, the Unions appear to be arguing that although they rejected

arbitration in what they define as Labor Dispute # 1 (the labor dispute the Unions argue is limited

to the pre-strike period), and thereby may have failed to make every reasonable effort to settle *that*

dispute, they did not fail to make every reasonable effort to settle Labor Dispute # 2 (the labor

dispute the Unions argue is limited to the post strike period), as they negotiated, *vis-a-vis*

Schwarzwald, in that "labor dispute"– at a point when, the Unions tend to overlook, either, both

parties were in self-help, and engaged in the anticipated "economic warfare" of self-help,[12] or had

not yet complied with the RLA within the second labor dispute, or that to grant the required

injunctive relief would not be contrary to the public policy underlying the RLA and NLGA.

After consideration of the arguments of the parties, and recognizing the statutes themselves

do not so require, this Court concludes there is but one "labor dispute" between PHI and the Unions,

and that labor dispute began with the Section 6 Notice and remains ongoing. The dispute began with

the exchange of Section 6 Notices and made its way through direct negotiation and mediation under

the auspices of the NMB to the offer of arbitration, the rejection of that offer, to the release to self-

help, the thirty-day "cooling-off" period, and the release into the free operation of "economic

warfare," where the dispute remains. The Unions rejected arbitration that was proferred by the

---

[12] *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 379-80, 89 S.Ct. 1109,
1116 (1969) (likening the period of self-help to "economic warfare").

NMB; PHI was silent on the issue of arbitration.[13] Upon release of the parties to self-help, the parties began the thirty-day "cooling-off" period. Once that thirty-day "cooling-off" period expired, the parties were thereafter free to engage in self-help, which ultimately, each did, and now both engage in the anticipated "economic warfare" of self-help. The Unions went on strike; PHI took certain actions, including increasing the wages of certain pilots. Once the Unions conveyed their offer to return to work and terminate the strike, PHI began its process of returning pilots to work. Thus, *the return to work process is a direct result and consequence of the strike of the pilot employees, which is a direct result and consequence of the inability of the parties to reach an agreement as to a successor CBA*, all falling within the statutory scheme of the RLA. To separate the continuum into *separate* and independent labor disputes at each phase, seems, to this Court, to be incongruous, particularly when it is clear self-help is a considered phase within the RLA and the threat of the "economic warfare" of self-help is contemplated to act as a pressure upon the parties to reach equitable resolution within the process.[14] Rather, each action taken by the parties has been predicated upon the prior actions of that party, as well as the actions of the other, all within the statutory scheme of the RLA, as a whole, leading both sides to the situation they face now – a continuing period of self-help with its economic pressures being brought to bear on each as a motivation to reach equitable resolution. That Mr. Schwarzwald and Mr. Kiefer might have negotiated at some point during the post-strike period of dispute on a discrete issue or issues is not determinative of the issue at hand. The Unions unambiguously rejected arbitration before engaging

---

[13] The parties are referred to the Court's July 9, 2010 Memorandum Ruling for a full discussion of the parties' respective positions with respect to arbitration and this Court's interpretation of those positions and their effect on the litigation *vis-a-vis* the caselaw.

[14] *See, e.g., Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 452, 107 S.Ct. 1841, 1854 (1987).

in self-help, and thereby failed to "make every reasonable effort to settle" their dispute with PHI, leading to the release to "self-help" and its pressures brought to bear within "economic warfare." The parties are still within self-help, and the operation of the anticipated "economic warfare" self-help invokes is still in play, bringing to bear its pressures upon the parties, all as contemplated by the RLA.

For this reason, the Unions' argument that they have clean hands because they promptly sought injunctive relief upon PHI's failure to return striking pilots to work fails. Had the Unions availed themselves of the proferred arbitration during negotiations, such arbitration might well have resolved the dispute between the parties. Under that scenario, there would have been no strike, and no return to work process, hence no need to seek injunctive relief during a return to work process that could have been avoided. If arbitration, for whatever reason, had not resolved the matter, the Unions would have satisfied all methods of settlement contemplated by the RLA and could, potentially, be entitled to relief, injunctive or otherwise. Thus, the request for injunctive relief at the late stage of post-strike self-help does not cure the failure of the Unions not to "make every reasonable effort to settle" its dispute with PHI before being released to self-help. The focus of the RLA is to *prevent* strikes, not permit parties to reject settlement methods offered during the RLA process and then obtain injunctive relief during self-help to lessen or eliminate the very pressures of "economic warfare" that could force the parties back to the bargaining table in good faith.

Against this backdrop, the Unions seek equitable and/or injunctive relief for PHI's actions taken during the period of "self-help" and its resultant "economic warfare." The Unions seek such relief pursuant to, *inter alia*, *Galveston Wharves*. In short, the Unions are asking this Court to "make them whole" for alleged violations of the RLA *during the self-help period* after the Unions have

17

opted not to use every method available to it to settle its disputes with PHI and avoid the very economic pressures of which they now complain; the Unions **chose to place themselves into self-help;** they **chose "economic warfare"** and **now complain of its impact** and the expected consequence of that choice.  A close reading of *Galveston Wharves* shows sanctions were awarded in that case to Union employees *in a scenario in which the Union itself had clean hands and the employer, solely, had unclean hands, during the bargaining period.  See Galveston Wharves,* 400 F.2d at 324 ("But for the <u>unilateral change of 'working conditions' by the Carrier</u> through the leasing of the elevator facilities, the Carrier-employee relationship would have continued <u>throughout the bargaining period</u>.").  As noted, *Galveston Wharves* does not involve actions of the employer that took place during the period of self-help; rather, the employer in *Galveston Wharves* made a unilateral change in the *status quo* **during the bargaining period**, to address actions of the employer that did violence to the RLA's statutory scheme.   The sanction imposed in *Galveston Wharves* was tied to the particular violation of the RLA – a violation of Section 6 (a unilateral change in the *status quo* during *the bargaining period* ) – in a manner that gave force and effect to that particular provision of the Act that had been violated, and provided equitable remedy to the Unions     *who presented with clean hands*, during *the bargaining period*.[15]

In the instant case, as set forth in explicit detail in this Court's Memorandum Ruling in the Bad Faith Bargaining Suit [Doc. 461], *the Unions have **unclean** hands*, having *rejected the NMB's proffer of arbitration, and having chosen self-help, and its subsequent "economic warfare"* which is wholly distinguishable from the facts of *Galveston Wharves*.  Thus, to award a sanction to the

_____

[15] That is, in *Galveston Wharves*, the court determined the <u>only way</u> to "make whole" the employees who had been "permanently laid off" by the lease of the elevator – rather than to "unscramble" the lease, a result the court did not favor – was to award backpay to the discharged employees for the time period between their discharge and commencement of bargaining over a successor CBA.  400 F.2d at 324-25.

Unions in a situation where the Unions rejected the offer of arbitration, chose to opt for self-help, engaged in economic warfare themselves, by going on strike, and thus, have unclean hands, would not only *not* give force and effect to the RLA, rather, it would *do violence* to the Act by allowing the Unions to avoid the consequence of having in effect, "thumbed their nose" at a proferred opportunity to settle their disputes with PHI by the offered arbitration.  Furthermore, to grant the requested relief under these facts would be contrary to the stated policy of both the RLA and NLGA as explained above.  Although the Unions had every right to reject arbitration, move into self-help, declare and engage in a strike, they cannot now come to this Court and obtain sanctions or an injunction against PHI for having done the same – after the fact, urging relief from the very consequence of their choice to exercise those rights rather than accept the offered arbitration.  Sections 1 and 8 of the NLGA are clear, they do not permit a party to forgo the last method of settlement offered by the RLA and then obtain injunctive relief from the courts to lessen or eliminate the economic consequence of that choice.

At noted, in requesting **equitable relief** in the Return to Work Case, the Unions request this Court ameliorate the very pressures that are anticipated by the RLA, and are expected to be brought to bear on parties that opt for self-help.  In this case, **both parties lack clean hands**, the Unions having rejected the NMB's proffer to arbitrate, and PHI having remained silent on the issue, and, therefore, having failed to exercise what *Toledo* has defined a "compulsory choice" with respect to proferred arbitration.  321 U.S. at 62-63.  With that, the parties were released to self-help, which, as noted, has been likened to "economic warfare," *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 379-80, 89 S.Ct. 1109, 1116 (1969), **a period during which the parties may "employ the full range of whatever peaceful economic power they can muster, so**

19

long as its use conflicts with no other obligation imposed by federal law." *Trainmen*, 394 U.S. at 392 (emphasis added).   This period of self-help contemplates pressure and uncertainty brought to bear on both parties, pressure and uncertainty which Congress believed gives each party an incentive to settle their disputes without resort to judicial intervention.[16]   Indeed, the RLA itself puts no limits on the scope of actions the parties may take during self-help, a deliberate choice on the part of Congress.   Rather, and of particular note, when addressing claims made pursuant to Section 2, Third and Fourth, courts should intervene to prohibit only "those forms of self-help that strike a fundamental blow to union or employer activity and the collective bargaining process itself." *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants ("IFFA")*, 489 U.S. 426, 442, 109 S.Ct. 1225, 1233-34 (1989).[17]

The economic and business pressures brought to bear on the parties in this matter were pressures contemplated by Congress in enacting the RLA. *See, e.g., Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 452, 107 S.Ct. 1841, 1854 (1987) (**"Underlying the entire statutory framework is the pressure born of the knowledge that in the**

---

[16]*Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 452, 107 S.Ct. 1841, 1854 (1987)

[17] In *IFFA*, the Court was faced with whether a carrier's policy of refusing to displace pre-strike employees who were working as of the date of the Union's unconditional offer to return to work ("cross-over" employees) violated the RLA.   In holding the policy *did not violate the RLA*, the Court noted the parties had complied with all required dispute resolution procedures of the RLA, including direct negotiation, mediation and the final 30-day cooling off period before the Union employees went on strike.   489 U.S. at 429.   In *IFFA*, there is no mention of either arbitration or the NLGA. This Court can only assume the prohibitions under the NLGA did not apply by way of one of the multiple scenarios that can occur to allow this situation, for instance, the NMB offered arbitration and the Union accepted but the employer rejected, or arbitration was not offered at all by the NMB.   Similarly, in *Galveston Wharves*, arbitration is not mentioned by the Courts as being at issue as the violation occurred within the bargaining process which precedes the offer of arbitration.   However, in *Galveston Wharves*, as in *IFFA*, the possibility existed for equitable relief on behalf of the Unions, **because, arguably, the Unions had clean hands in both cases**, and more importantly, **to grant the equitable relief served the policy considerations of the RLA**.   In the instant case, equitable and/or injunctive relief is not possible for the Unions, because the Unions do not have clean hands, having specifically chosen to reject the offered arbitration and deliberately move into self-help and its resultant "economic warfare," and to grant equitable relief in this instance would not bolster but undercut the policies of the RLA and the NLGA.

**final instance traditional self-help economic pressure may be brought to bear if the statutory mechanism does not produce agreement.... As the statutory machinery nears termination without achieving settlement, the threat of economic self-help and the pressures of informed public opinion create new impetus toward compromise and agreement."),** *citing Chicago & N. W. Ry. Co. v. United Transp. Union,* 402 U.S. 570, 597-98, 91 S.Ct. 1731, 1745 (1971) (Brennan, J., dissenting)(emphasis added). For its part, PHI faced the pressure, uncertainty and business interruption of a strike. On the other hand, the Unions faced the uncertainty, pressure and economic impact of the return to work process. The scheme of the RLA is deliberately drawn out so that parties will reach agreements. Once in the self-help period, there is little the courts can do to remedy perceived injustices, for Congress has specifically decided the threat of self-help is desirable as an incentive to avoid the national business disruption of a strike, a principle focus of the RLA.

Here, the Unions chose to bypass a method of settlement offered by the NMB – arbitration– and opted, instead, to go straight to self-help and thereafter a strike, at a time PHI cries as foul – peak hurricane season – in order to attain their desired goal. However, the Unions now, cry foul, and complain of the manner in which PHI handled the return to work process following the strike and seek equitable and/or injunctive relief to remedy the Unions' perceived losses which flowed as a result of the strike. To award the Unions the equitable relief they seek would undercut the very purpose and scheme of the RLA, inasmuch as it would reward the Unions for rejecting the opportunity to settle its disputes with PHI and yet, protect the Union from the very economic consequence the statute envisions the threat of as an incentive for equitable resolution of disputes within the RLA.  It is the pain, uncertainty, and economic pressure of self-help that Congress intended to serve as incentives to settle disputes within the scheme established by the RLA, to

21

remove that threat would do disservice to the statutory scheme created by Congress.  This Court believes it cannot now reward the Unions for rejecting arbitration by ameliorating that pain, pressure, and uncertainty which resulted from their own choice to step outside the RLA protection by rejecting the proffered arbitration.

This conclusion, however, does not fully end the inquiry.  As this Court made clear in its Memorandum Ruling in the Bad Faith Bargaining Case, "the [NLGA] does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 445-46, 107 S.Ct. 1841, 1851 (1987), *citing Virginian R. Co. v. [Railway Employees],* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); *Chicago & N.W. R. Co. v. Transportation Union,* 402 U.S. 570, 581-82, 91 S.Ct. 1731, 1737-38, 29 L.Ed.2d 187 (1971).  Thus, although injunctive relief is generally not available to those who have rejected a proffered method of settlement, there is a narrow exception, and this Court must consider whether such exception exists in this case.  As the Supreme Court has noted: "This exception is necessarily a limited one. Even when a violation of a specific mandate of the RLA is shown, "[c]ourts should hesitate to fix upon the injunctive remedy ... **unless that remedy alone can effectively guard the plaintiff's right** ." *Burlington Northern*, 481 U.S. at 445-46; *Chicago & North Western,*, 91 S.Ct. 1731 (emphasis added).

After consideration of the law and arguments of the parties, this Court concludes the remedies requested by the Unions in the Return to Work Case not only are not a "remedy alone [which] can effectively guard the plaintiff's right[s]," but indeed the requested remedies will not effectively guard the Unions' "rights" in any fashion.  The Unions request *sanctions* in the nature of *Galveston Wharves* sanctions, and *injunctive relief* in the form of an order to requiring PHI to

22

immediately reinstate to employment, retroactive to a date to be determined at trial, all pilots represented by the Unions who have not been returned to work by PHI. As this Court has already noted, sanctions in the nature of *Galveston Wharves* are not proper in the instant case given the unclean hands of the Unions and the negative impact such relief would have on the policy underlying the RLA, the NLGA, and the interplay between the RLA and NLGA, as explained above. The request for injunctive relief by the Unions is equally misplaced, as the majority of the striking pilots have already been returned to work or have sought employment elsewhere and, again, to remove the uncertainty and economic impact of the consequence of the Unions' choice would do violence to the statutory scheme created and contemplated by Congress. An order to reinstate pilots who do not need to be reinstated does not serve the purpose of the RLA or "effectively guard" the Unions' rights and, again, any such relief under the facts herein would not "serve the purpose of RLA" – rather, it would do disservice to the RLA, and the Unions have no right for the requested relief on its face, by operation of the NLGA.

This Court concludes to grant the Unions request for relief at this juncture of the RLA process would, in effect, add a whole new level to the RLA process that is, this Court believes, not contemplated or allowed by the RLA, NLGA or their interplay. The motivation and incentive to settle disputes during the negotiation stage would be lessened -- if not removed altogether -- if, once the parties have chosen to be released to self-help, a party may simply run to the courthouse to remedy an uncomfortable or uncertain circumstance that arises during self-help. Once in self-help – a state likened to "*economic warfare*" by the Supreme Court, and the threat of which is expected to motivate parties to settle within the framework provided – the parties must live and die by their choices and the consequences of their actions, unless there has been a specific violation of the RLA

23

that an injunction is the "remedy alone [which] can effectively guard" the right so violated. No such

circumstances exist in this case. Indeed, the majority of the pilots who went on strike have already

returned to work at PHI; the rest have moved on for reasons of their own. Thus, this Court can offer

no *injunctive* remedy that would cure an alleged *continuing* violation of the RLA. Nor does this

Court believe Congress intended for this "second layer," of judicial referee and employment, to

operate under the RLA. Indeed, Section 1 of the NLGA contains the following highlighted, express

directive:

> **No court of the United States**, as defined in this chapter, **shall have jurisdiction
> to issue any restraining order or temporary or permanent injunction in a case
> involving or growing out of a labor dispute, except in a strict conformity with
> the provisions** of this chapter; *nor shall any such restraining order or temporary
> or permanent injunction be issued contrary to the <u>public policy</u> declared in this
> chapter.*

29 U.S.C. §101 (emphasis added).

The overriding policy of the NLGA is *the prevention of injunctive interference* in labor

disputes and encouragement of the *settlement* of labor controversies through *negotiation* and **the** *free*

*play of economic forces. See Brotherhood of Locomotive Firemen and Enginemen v. Florida East*

*Coast Ry. Co.*, 346 F.2d 673, 675 (5th Cir.1965)(emphasis added). This Court must give full force

and effect to the foregoing stated policies. To award the Unions the relief they seek in the Return

to Work Case would not only thwart the foregoing policies, but do true violence to them under the

facts and circumstances of this case. The parties chose to reject arbitration and to embrace the

"economic warfare" of self-help, to remove the consequence of that choice would remove the

pressure Congress intended to come to bear upon parties under those circumstances.

Considering the foregoing, this Court concludes the NLGA bars the Unions' requests for

equitable and/or injunctive relief in the Return to Work Case, and this Court lacks jurisdiction to

award such relief to the Unions.  Accordingly, PHI Inc.'s Motion to Dismiss the Unions' Claims in the Return to Work Suit" [Doc. 463] is GRANTED in its entirety, and all claims alleged by the Unions in the Return to Work Case are DENIED AND DISMISSED WITH PREJUDICE.

Given this Court's ruling, the Court need not address the alternative grounds for dismissal contained within PHI's motion.  Indeed, because this Court concludes *it lacks jurisdiction* to award equitable and/or injunctive relief to the Unions in the Return to Work Case, this Court finds it would be improper to address the merits of the alternative grounds alleged in PHI's motion at this juncture.[18]

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___30___ day of July, 2010.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[18] This Court does note, however, its abiding concern voiced throughout the course of this litigation that the Unions fail to state a claim under Section 2, Third of the RLA, inasmuch as the Unions have failed to allege interference by PHI with the Unions' choice of representative.  The Unions' briefing in connection with the instant motion does not assuage the Court's concerns.  This Court notes almost all of the cases relied upon by the Unions with respect to the merits of their Section 2, Third claim involve alleged interference by a carrier with *an actual union representative*.  In this case, this Court is aware of no individual union *representatives* who were allegedly targeted in connection with actions taken by PHI during the return to work process.  Therefore, although the Court makes no ruling on the merits of the Unions' Section 2, Third claim, this Court notes its continuing, overriding concern regarding the efficacy of this claim in light of the facts alleged.

25