RECEIVED

SEP 2 4 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

PHI, INC.

VERSUS

OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION AND
OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION LOCAL 108

CIVIL ACTION NO. 06-1469
Consol. w/CA No. 06-2243

JUDGE DOHERTY

MAGISTRATE JUDGE HILL

## MEMORANDUM RULING

Before the Court is the Motion to Dismiss Count II of the Unions' and Individual Pilots' Fifth Amended Counterclaim [Doc. 482] filed by PHI, Inc. ("PHI"). The Office and Professional Employees International Union ("OPEIU), OPEIU Local 108 ("Local 108") and the Individual Pilots (collectively, "the Unions") oppose the motion [Doc. 484. For the following reasons, the motion is GRANTED.

## I.      Factual and Procedural Background

The factual history of this case has been set forth in numerous rulings issued by the Court. For the sake of clarity of the record, this Court notes as follows:

PHI is a common carrier by air as defined in 45 U.S.C. § 181, and is a Federal Aviation Administration-certificated air carrier under Part 135 of the Federal Aviation Regulations ('FARs"), 14 C.F.R. § 135, et seq. PHI is registered in Louisiana, and the company's business is providing helicopter transportation and related services to the oil and gas industry, including PHI support for

companies operating in the Gulf of Mexico, and to Air Medical customers at locations throughout the country.  PHI currently employs approximately 2,500 employees.

OPEIU is an unincorporated association that does business as a labor organization and engages in business in this judicial district.  In March 2000, OPEIU was certified by the National Mediation Board ("NMB") as the collective bargaining representative of the flight deck crewmembers ("pilots") employed by PHI.  Shortly after the NMB certification, OPEIU entered into negotiations with PHI in an attempt to reach an initial collective bargaining agreement ("CBA").  As a result of these negotiations, a CBA was confected between PHI and the Unions on July 12, 2001, which was effective June 1, 2001 through May 31, 2004.

On or about February 19, 2004, negotiations between PHI and the Unions began in an effort to reach a successor CBA.  After approximately 39 days of direct bargaining and more than 38 additional bargaining sessions mediated by the NMB, no successor CBA was reached.  On July 28, 2006, the NMB issued a letter advising PHI and the Unions that as of 12:01 a.m. EDT on August 28, 2006, the parties would be free to engage in economic self-help.

On August 28, 2006, litigation began between the parties, with PHI filing suit against the Unions, seeking a declaratory judgment and permanent injunctive relief under the Railway Labor Act, 45 U.S.C. §151, *et seq.* ("RLA"), on grounds the Unions violated Section 2, First of the RLA by bargaining in bad faith and failing to exert reasonable efforts to reach an agreement with the Company (the "Bad Faith Bargaining Case").[1]  On September 8, 2006, the Unions answered PHI's complaint and asserted counterclaims of their own.

The Unions went on strike on September 20, 2006, at the height of hurricane season in the

---

[1] The "Bad Faith Bargaining Case" bears Civil Action No. 06-1469.

2

Gulf of Mexico, often the time of peak emergency operation for PHI.  On November 10, 2006, at the traditional end of hurricane season, the Unions allegedly made an unconditional offer to end the strike and return striking pilots to work.  PHI disputes that the offer to return to work was "unconditional," however, on November 27, 2006, the Unions filed a separate lawsuit against PHI, in which the Unions complained about the manner in which PHI returned the pilots to work following the strike (the"Return to Work Case").[2]  The Bad Faith Bargaining Case and the Return to Work Case were consolidated for all purposes.

In July and August 2010, upon cross-motions to dismiss filed in the Bad Faith Bargaining Case, and upon motion of PHI in the Return to Work Case, this Court dismissed all claims asserted by the parties in the consolidated cases except the Wage Claims that comprise Count II of the Union's Fifth Amended Counterclaim in the Bad Faith Bargaining Case, which are the only remaining claims asserted by any party in the consolidated cases.[3]

In Count II of the Unions' Fifth Amended Counterclaim, the Unions present claims for wage reimbursement, penalty wages, and attorney's fees associated with deductions made from certain pilots' paychecks under La. Rev. Stat. §§23:631[4] and 632.[5]  PHI contends the deductions in question

---

[2] The Return to Work Suit bears Civil Action No. 06-2243.

[3] *See* "Unions' Answer to PHI's First Amended Complaint and Unions' Fifth Amended Counterclaim in Bad Faith Bargaining Suit," Doc. 340, ¶¶1-12, pp. 36.-39.

[4] La. Rev. Stat. §23:631 states:

A.     (1)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the

were made for the pilots' failure to return company-owned equipment at the time the pilots were

---

        employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.

        (2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment may be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed with the employee's or laborer's current address as shown in the employer's records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an official United States postmark or other official documentation from the United States Postal Service.

        (3) The provisions of this Subsection shall not apply when there is a collective bargaining agreement between the employer and the laborer or other employee which provides otherwise.

B. In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section. The employee shall have the right to file an action to enforce such a wage claim and proceed pursuant to Code of Civil Procedure Article 2592.

C. With respect to interstate common carriers by rail, a legal holiday shall not be considered in computing the fifteen-day period provided for in Subsection A of this Section.

D. (1) For purposes of this Section, vacation pay will be considered an amount then due only if, in accordance with the stated vacation policy of the person employing such laborer or other employee, both of the following apply:

        (a) The laborer or other employee is deemed eligible for and has accrued the right to take vacation time with pay.

        (b) The laborer or other employee has not taken or been compensated for the vacation time as of the date of the discharge or resignation.

(2) The provisions of this Subsection shall not be interpreted to allow the forfeiture of any vacation pay actually earned by an employee pursuant to the employer's policy.

La. Rev. Stat. §23:631 (West 2010).

    [5] La. Rev. Stat. §23:632 states:

Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.

La. Rev. Stat. §23:632 (West 2010).

discharged or resigned from PHI.[6]  PHI argues several provisions of the existing but expired CBA between PHI and the Unions, as well as past practice between the two parties with respect to deductions made from final paychecks for unreturned equipment, justifies the deductions that were made from pilots' paychecks.  The following provisions are contained within the CBA:

Article 18 of the CBA, entitled "Equipment," states:

1.    The Company shall make available to its pilots all equipment required to perform their duties.

2.    Pilots are responsible for all equipment assigned to them, and if they lose equipment, or damage equipment through negligence, the pilot will be required to reimburse the Employer for the cost of the replacement. ...

3.    The Company will provide each pilot with an individually assigned headset.  If the pilot loses or damages the headset, the pilot will be required to purchase a replacement....[7]

Furthermore, Article 34, entitled "Management Rights," provides:

1.    The employer reserves and retains, solely and exclusively, all of the rights, privileges and prerogatives which it had or possessed prior to the execution of this Agreement, regardless of the frequency or infrequency with which such rights have been exercised in the past, except to the extent that such rights, privileges and prerogatives are specifically abridged by the expressed provisions of this Agreement.

2.    Without limiting the generality of the foregoing, the sole and exclusive rights of management which are not abridged by this Agreement include, but are not confined to, the full and exclusive control, direction and supervision of the workforce;...[and] the right to make, amend and enforce work and safety rules and regulations....[8]

Additionally, PHI argues it has promulgated various rules and policies that impact both PHI's rights and employees' responsibilities with respect to equipment issued to pilots consistent with

---

[6] In a prior ruling, this Court held pilots who returned to work after the September 20, 2006 strike have no cause of action under La. Rev. Stat. §§23:631 or 632, because those pilots were not discharged by, or did not resign their employment with, PHI.  *See* Doc. 277.

[7] *See* PHI's motion to dismiss, Doc. 482, Exhibit 1.

[8] *Id.* at Exhibit 2.

PHI's managerial "rights, privileges and prerogatives" reserved under the CBA.  These rules include the following:

- Rule 9.7, the "Headquarters Security Provisions," providing that "Employees who do not return their PHI ID Badge when they terminate employment...are subject to a $15 fee being withheld from their paycheck;"[9]

- Rule 9.9, the "PassPoint System Access Procedures for Corporate Facilities," providing that "An employee...who is issued a PassPoint access card and...who transfers/terminates such that an access card is no longer required, and fails to return the access card to PHI, will be charged a fee of $15.00;"[10]

- Rule 10.1, the "Terminations" rule, providing that "Prior to termination, employees must return all Company equipment and property as evidenced by a completed Clearance Form. Failure to return any Company equipment or property will result in appropriate deductions from the final paycheck;"[11]

- Rule 11.6, the "Fuel Keys" rule, providing that "Should an employee not immediately return their key if they terminate their employment with PHI, the employee will be charged a $100.00 fee for the loss of the key;"[12]

- The "General Headset Policy," providing that "Pilots who terminate employment within two years of receiving the headset will be required to reimburse PHI the cost of the headset;"[13]

- The "Uniform Policy," providing that "In the event you resign prior to the end of your probationary period..., you will be subject to repay the Company for the purchase, and will result in a deduction from your final paycheck;"[14]

- The "Switlik Vest Policy," providing that "The cost of replacement of the vest, EPIRB, strobe, or other contents of the vest due to loss or negligent damage will be

---

[9] *Id.* at Exhibit 3.

[10] *Id.* at Exhibit 4.

[11] *Id.* at Exhibit 5.

[12] *Id.* at Exhibit 6.

[13] *Id.* at Exhibit 7.

[14] *Id.* at Exhibit 8.

born[e] by the person to whom the vest is assigned."[15]

In addition to the foregoing, PHI contends since the beginning of its relationship with the Unions, PHI has taken equipment deductions from departing pilots' paychecks on at least 66 occasions prior to the Unions' September 20, 2006 strike.[16] Moreover, in the sixteen months before the September 20, 2006 strike, PHI argues it made deductions from the paychecks of 18 pilots for the same type of unreturned equipment as those at issue in the pending wage claims.[17] Ergo, PHI contends payroll deductions for unreturned equipment has been "the unquestioned practice" for many years at PHI.

In Count II of the Unions' Fifth Amended Counterclaim in the Bad Faith Bargaining Suit, the Unions allege the following:

3.  On or shortly after September 20, 2006, PHI transmitted what PHI called the "final" and/or "last" paycheck to pilots deemed permanently replaced by PHI.

4.  These paychecks included deductions for equipment allegedly in the pilots' possession.

5.  These deductions were not authorized or agreed to by the pilots.

6.  These deductions were made: (i) for equipment never in the pilots' possession; (ii) for equipment previously returned to pilots; and/or (iii) without conducting an inventory to determine which equipment was actually in the pilots' possession.

7.  The Unions made three requests to PHI asking PHI to advise the Unions of procedures the pilots should use to return the equipment in the pilots' possession.  PHI did not respond to the Unions' requests.

8.  The Unions made amicable demand to PHI on behalf of the affected pilots

---

[15] *Id.* at Exhibit 9.

[16] *Id.* at Exhibit 10.

[17] *Id.* at Exhibit 11.

requesting that the deductions be rescinded and that the pilots be paid the full amount due to them.

9.      Despite the Unions' amicable demand, PHI failed and refused to pay the pilots the amounts due to them.

10.     PHI's failure to pay the pilots the amounts due to the pilots is arbitrary and not in good faith. As a result, PHI is liable for the penalty wages provided for in Louisiana Revised Statute §23:632.

11.     Subsequent to the Unions' amicable demand to PHI that it rescind the deductions and that the pilots be paid in fill the amounts due them and PHI's failure to do so, certain of the affected pilots returned to work at PHI.  Upon these pilots' return to work, PHI reimbursed certain of these pilots for the deductions. . . .

12.     The failure of PHI to timely make payments to the pilots of the amounts owed despite amicable demand, is in violation of La. R.S. §23:631, and because PHI's actions are not in good faith, the pilots are entitled to penalty wages pursuant to La. R.S. §23:632.

In the instant motion to dismiss, PHI contends this Court lacks subject matter jurisdiction over the foregoing wage claims, because the wage claims are preempted by the RLA, which requires that minor disputes proceed before a System Board of Adjustment and not in federal court.  The Unions argue the wage claims are not preempted, and that the Unions and pilots have valid claims under state law that are independent of the CBA and, hence, this court has subject matter jurisdiction over the instant claims.  Therefore, the issue before the court is not the merits of the Unions' wage claims; rather, the issue before the Court at this time is limited to the threshold issue of whether this Court has *subject matter jurisdiction* over the wage claims.  All issues concerning this jurisdictional dispute have been briefed and are ripe for consideration.

## II.     Legal Analysis

### 1.      Legal Standard

PHI raises its motion pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure.

8

Generally, a party waives any defense listed in Rule 12(b)(2) - (5) of the Federal Rules of Civil Procedure by omitting these defenses in a timely-filed motion or by failing to include such defenses in a responsive pleading or amendment. *See* Fed. R. Civ. P. 12(h)(1).[18] However, the lack of subject matter jurisdiction is never waived and can be raised by the Court at any time, to wit:

> **(h) Waiving and Preserving Certain Defenses**
>
> > **(3)** *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

Fed. R. Civ. P. 12(h)(3).

Because PHI's motion raises the issue of this Court's subject matter jurisdiction, Rule 12(h)(c) mandates that this Court consider the jurisdiction of the Court and dismiss Count II of the Union's Fifth Amended Counterclaim if this Court determines it does not have subject matter jurisdiction over the Unions' claims.

PHI asserts because it attaches materials outside the pleading to the instant motion, Rule 56 provides the appropriate standard of review for adjudication of the issues raised therein, relying on

---

[18] Rule 12(h)(1) states:

**(h) Waiving and Preserving Certain Defenses.**

> **(1)** *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)-(5) by:
>
> > **(A)** omitting it from a motion in the circumstances described in Rule 12(g)(2); or
> >
> > **(B)** failing to either:
> > **(I)** make it by motion under this rule; or
> >
> > > **(ii)** include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

Fed. R. Civ P. 12(h)(1).

Thus, the lack of subject matter jurisdiction, which is contained in Rule 12(b)(1), is specifically exempted from the waiver provision of Rule 12(h)(1).

Rule 12(d) of the Federal Rules of Civil Procedure.[19]  PHI's argument is misplaced.  Rule 12(d) states:

### (d) Result of Presenting Matters Outside the Pleadings

If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be give a reasonable opportunity to present all the material that is pertinent to the motion.

Fed R. Civ. P. 12(d).

However, the instant motion before the Court is properly sought pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, not pursuant to Rule 12(b)(6) or Rule 12(c).  Additionally, in the Fifth Circuit, it is well-settled that subject matter jurisdiction determinations, unlike summary judgment decisions, may be made using any one of the following bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also Barrett Computer Services, Inc. v. PDA, Inc.*, 884 F.2d 214, 220 (5th Cir. 1989), *citing Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981); *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *see also Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1298 (5th Cir.1985) (identical standards applied to assess subject matter jurisdiction issues, even outside of the context of a Fed.R.Civ.P. 12(b)(1) motion to dismiss).

Thus, in a preliminary hearing on a jurisdictional issue, the district court is given greater latitude and discretion than in a summary judgment proceeding where the district court must give

---

[19] Specifically, PHI has attached to its motion a document entitled "Articles of Agreement between Petroleum Helicopters, Inc. & Office & Professional Employees International Union and its Local 108."  The foregoing document is the CBA between the parties, "effective June 1, 2001 through May 31, 2004, Revision July 12, 2001."  PHI also attaches copies of various corporate policies and rules.

deference on fact questions to the non-movant.  In examining a Rule 12(b)(1) motion, the district

court is empowered to consider matters of fact which may be in dispute.  *Ramming*, 281 F.3d at 161,

*citing Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981).  Ultimately, a motion to dismiss for

lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot

prove any set of facts in support of his claim that would entitle plaintiff to relief.  *Ramming*, 281 F.3d

at 161, *citing Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th

Cir.1998).

        Finally, the burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting

jurisdiction.  *Ramming*, 281 F.3d at 161.  Accordingly, the plaintiff constantly bears the burden of

proof that jurisdiction does in fact exist.  *Ramming*, 281 F.3d at 161, *citing Menchaca v. Chrysler

Credit Corp.,* 613 F.2d 507, 511 (5th Cir.1980).

        Considering the foregoing, this Court concludes PHI's motion is properly considered under

the standards enunciated in this circuit for motions pursuant to Rule 12(b)(1) of the Federal Rules

of Civil Procedure, and in ruling on the instant motion, this Court may consider matters of fact which

may be in dispute between the parties.

        **2.      Law**

        PHI contends the Unions' Louisiana-based wage claims are minor disputes pursuant to

*Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299 (1989) ("*Conrail*"), that

the disputes are preempted by the RLA, and, therefore, this Court does not have subject matter

jurisdiction over the claims.

        This Court has previously set forth the history and purpose of the RLA in prior rulings.

Succinctly, this Court notes one of the goals of the RLA is to provide prompt and orderly settlement

of disputes arising out of grievances or out of the interpretation or application of a CBA covering rates of pay, rules, or working conditions. *Kollar v. United Transp. Union*, 83 F.3d 124, 125 (5th Cir. 1996), *citing Hirras v. National R.R. Passenger Corp.*, 44 F.3d 278, 280-81 (5th Cir.1995).

In *Conrail*, the Supreme Court explained minor disputes

> contemplate[] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, *e.g.*, claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

491 U.S. at 303, *citing Elgin, Joliet & E. Ry. Co. v. Burley ("Burley")*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289-90.

Pursuant to Section 3, First (i) of the RLA, minor disputes must proceed before conference and compulsory arbitration proceedings, to wit:

> **(i)** The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

45 U.S.C. §153, Section 3, First (i). As the Supreme Court stated in *Conrail*:

> A minor dispute in the railroad industry is subject to compulsory and binding arbitration before the National Railroad Adjustment Board, § 3, or before an adjustment board established by the employer and the unions representing the employees. The Board (as we shall refer to any adjustment board under the RLA) has exclusive jurisdiction over minor disputes. Judicial review of the arbitral decision is limited. See § 3 First (q); *Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

491 U.S. at 303-04, 109 S.Ct. at 2481.

In *Conrail*, the Court recognized whether a dispute is classified as major or minor is largely a matter of pleading, noting "[t]he party who initiates a dispute takes the first step toward categorizing the dispute when it chooses whether to assert an existing contractual right to take or to resist the action in question." *Id.* at 305-06, 109 S.Ct. at 2482. However, *Conrail* notes the dangers in leaving the characterization of the dispute solely in the hands of one party and notes the courts of appeal "uniformly have established some variant" of the following standard for determining whether a labor dispute is a minor dispute:

> [I]f the disputed action of one of the parties can "arguably" be justified by the existing agreement or, in somewhat different statement, *if the contention that the labor contract sanctions the disputed action is not "obviously insubstantial"*, the controversy is a [minor dispute] within the exclusive province of the National Railroad Adjustment Board.

*Id.* at 306, 109 S.Ct. at 2482 (emphasis added). The burden under the foregoing standard is light. *Id.* at 307, 109 S.Ct. at 2482.

*Conrail* also instructs for a dispute to be "arguably justified" by an existing CBA, there need not be an express provision of the CBA that governs the issue. As *Conrail* notes:

> Neither party relies on any express provision of the agreement; indeed, the agreement is not part of the record before us. *As the parties acknowledge, however, collective-bargaining agreements may include implied, as well as express, terms. Furthermore, it is well established that the parties' "practice, usage and custom" is of significance in interpreting their agreement.* This Court has observed: "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. '... [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... *The collective agreement covers the whole employment relationship. It calls into being a new common law-the common law of a particular industry or of a particular plant.*'

13

*Id.* at 311-12, 109 S.Ct. at 2485 (emphasis added) (internal citations omitted).[20]

Thus, pursuant to *Conrail*, a contractual claim can rest solely on implied contractual terms as interpreted in light of past practice. *Id.* at 312.[21]

Although PHI has correctly provided the standard for determining whether a claim is a minor dispute and has framed the issue in this case as one involving a determination as to whether the wage claims in dispute in the instant case are, indeed, minor disputes, *Conrail* does not end the inquiry. Indeed, *Conrail*, as instructive as it is on the differences between major and minor disputes, does not alone govern the facts of this case, because the question before the Court is not solely whether the actions taken by PHI were "arguably justified" by the existing by expired CBA between the parties. Rather, because the Unions have based their wage claims on La. Rev. Stat. §§23:631 and 632, the question before the Court is one of *preemption.*

---

[20]  Indeed, the Fifth Circuit has described the nature of a CBA as follows:

> . . . a CBA is not merely a simple, written contract.  Although [plaintiff] attempts to narrow the scope of how a CBA is defined to bolster his argument that his suit does not require CBA interpretation, a CBA encompasses more than its explicit, written provisions. The Supreme Court has held that a CBA includes not only written terms, but a broad range of implied, unwritten terms *"arising from 'practice, usage and custom.'* "  A CBA may encompass, for example, "a norm that the parties have created but have omitted from the CBA's *explicit* language" or a working " 'condition [that] is satisfactorily tolerable to both sides' " and so " 'is often *omitted* from the agreement ....' " According to the Court, a CBA is "more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." The CBA "covers the whole employment relationship." Inasmuch as a CBA incorporates by reference more than just the content of its black-letter terminology, both disputes over explicit written provisions and disputes over implicit, non-written provisions of the agreement may qualify as minor and be precluded by the RLA.

*Carmona v. Southwest Airlines Co.*, 536 F.3d 344, 348-49 (5th Cir. 2008) (internal footnotes and citations omitted) (emphasis added).

[21]  The question before the Court in *Conrail* was whether the employer's drug-testing policy constituted an attempt to add a new term to the existing CBA, making it a major dispute subject to a "protracted process" of bargaining and mediation, or whether the testing reflected the employer's interpretation and application of an implied term of the existing contract, "producing a minor dispute subject to a less onerous process of arbitration." *See HAL*, 512 U.S. at 265, *citing Conrail*, 491 U.S. at 303, 305.  In *Conrail*, the Court concluded the dispute was a minor dispute, finding the dispute could be conclusively resolved by interpreting the existing CBA.

The framework of *Hawaiian Airlines, Inc. v. Finazzo*, 512 U.S. 246, 114 S.Ct. 2239 (1994) ("*HAL*") controls the analysis in the instant case. In *HAL*, the Supreme Court addressed the scope of federal preemption under the RLA. The question before the Court was whether an aircraft mechanic who claimed he was discharged for refusing to certify the safety of a plane he considered unsafe and for reporting his safety concerns to the FAA could pursue available state-law remedies for wrongful discharge, or whether he was required to seek redress only through the RLA's arbitral mechanism.[22]

The Court began its analysis by pointing out "[w]hether federal law pre-empts a state law establishing a cause of action is a question of congressional intent," and "[p]re-emption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred.'" *HAL*, 512 U.S. at 252, *citing Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1909, 85 L.Ed.2d 206 (1985). The Court went on to note "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *HAL*, 512 U.S. at 252, *citing Atchison, T. & S.F.R. Co. v. Buell*, 480 U.S. 557, 562, 107 S.Ct. 1410, 1414, 94 L.Ed.2d 563 (1987). To realize this goal, the RLA establishes a mandatory arbitral mechanism for "the prompt and orderly settlement" of two classes of disputes, to wit, major and minor disputes. *Id.* at 252.

---

[22] When a plaintiff's claims are based on federal statutes, the employer's challenge to the court's jurisdiction is more properly characterized as one of *preclusion*, whereas when the claims are based on state statutes, the issue is properly characterized as one of *preemption*. *See Carmona v. Southwest Airlines Co.*, 536 F.3d 344, 347 n.2, *citing HAL*, 512 U.S.at 259 n.6.

Specifically, the plaintiff brought his state law claims alleging violation of the public policy expressed in the Federal Aviation Act and in violation of Hawaii's Whistleblower Protection Act. The Hawaii Whistlelower Protection Act forbids an employer to "discharge, threaten, or otherwise discriminate against an employee . . .because . . .. [t]he employee . . . . reports or is about to report to a public body . . . a violation or a suspected violation of a law or rule adopted pursuant to the law of this State, a political subdivision of this State, or the United States, unless the employee knows that the report is false." The Act allows an employee to file a civil action seeking injunctive relief and actual damages. *See HAL*, 512 U.S. at 250, n.2.

To address the scope of minor disputes, the Court turned to the statute itself, and specifically that portion of the statute requiring that "disputes . . . growing out of grievances[,] *or* out of the interpretation or application of [CBAs]. . . " proceed before an adjustment board. Because of the disjunctive language employed within the statute, the employer argued the statute should be interpreted to mean that "grievances" should be read to mean *all* employment-related disputes, including those based on statutory or common law. The Court rejected this argument, concluding "grievances" refers to "disagreements over how to give effect to bargained-for agreements," or, stated differently, grievances is a "synonym for disputes involving the application or interpretation of a CBA." 512 U.S. at 254-55. In so concluding, the Court instructed "no proposed interpretation [of the statute] demonstrates a clear and manifest congressional purpose to create a regime that broadly preempts substantive protections extended by the States, independent of any negotiated labor agreement." *Id.* at 255-56.

The Court then enunciated the standard for federal preemption under the RLA: A state-law cause of action is not preempted by the RLA if it involves rights and obligations that exist independent of the CBA. In reconciling its decision in *HAL* with its previous decision in *Conrail*, the Court stated:

> *Conrail*, like *Burley*, involved no pre-emption analysis. The parties agreed that the dispute-a workers' challenge to the railroad's drug-testing policies-was governed by the RLA, because Conrail's policy of conducting physical examinations was an implied term of the CBA. 491 U.S., at 301, 109 S.Ct., at 2479. The only question before the Court was whether the employer's drug-testing policy constituted an attempt to add a new term to the existing agreement, making it a major dispute subject to a "protracted process" of bargaining and mediation, *id.,* at 303, 109 S.Ct., at 2480, or whether the testing reflected the employer's interpretation and application of an implied term of the existing contract, producing a minor dispute subject to a less onerous process of arbitration. We concluded that the dispute was minor, stating that "[t]he distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA]." *Id.,* at 305, 109 S.Ct., at

16

2482, citing Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L.J. 567, 568, 576 (1937). *Obviously, to say that a minor dispute can be "conclusively resolved" by interpreting the CBA is another way of saying that the dispute does not involve rights that exist independent of the CBA.*

Petitioners, however, pin their hopes on the observation that "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is *arguably justified* by the terms of the parties' collective-bargaining agreement." 491 U.S., at 307, 109 S.Ct., at 2483 (emphasis added). They argue that this action involves a minor dispute because the termination of respondent was "arguably justified" by the CBA's provision permitting termination for "just cause." *This "arguably justified" standard, however, was employed only for policing the line between major and minor disputes.* Recognizing that accepting a party's characterization of a dispute as "minor" ran the risk of undercutting the RLA's prohibition "against unilateral imposition of new contractual terms," *id.,* at 306, 109 S.Ct., at 2482, the Court held that *a dispute would be deemed minor only if there was a sincere, nonfrivolous argument that it turned on the application of the existing agreement, that is, if it was "arguably justified" by that agreement. Obviously, this test said nothing about the threshold question whether the dispute was subject to the RLA in the first place.*

512 U.S. at 265-66 (some emphasis added).

In *HAL*, the Court concluded the plaintiff's state law wrongful discharge claim was not preempted, where the issue to be decided – whether the employer's actions made out the elements of discharge under Hawaii law – *was a purely factual question that required no interpretation of the CBA.* Therefore, the Court concluded the employee's state law claims were not preempted by the RLA. *HAL*, 512 U.S. at 266.[23]

_____

[23] In *HAL*, the Supreme Court relied heavily on its prior decision in *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), in which the issue before the Court was whether the plaintiff employee's state law retaliatory discharge claim was preempted by Section 301 of the Labor Management Relations Act ("LMRA"). Section 301(a) of the LMRA provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

In *Lingle*, the Court recognized where resolution of a state law claim depends on an interpretation of the

Thus, pursuant to *HAL*, the question of whether a state law claim is preempted under federal law is a highly nuanced, fact-specific inquiry that turns on the specific claims alleged, the scope of the applicable state law, and the actual provisions of the CBA at issue.  The Fifth Circuit has had occasion to address the issue of preemption – under various factual scenarios – several times.

In *Baker v. Farmers Electric Cooperative, Inc.*, 34 F.3d 274 (5th Cir. 1994), plaintiff Baker filed a state court action against his employer, Farmers Electric Cooperative, for intentional infliction of emotional distress arising from a job re-assignment.  Specifically, Baker alleged he was re-classified from a journeyman lineman to a maintenance position in retaliation for participating in an arbitration against Farmers.  The state court action was removed to federal court by Baker on grounds resolution of Baker's state tort claim required interpretation of the CBA and thus the case involved a federal question arising under the National Labor Relations Act ("NLRA") and the Labor Management Relations Act ("LMRA").  Baker moved to remand the case to state court, which motion was denied, and the district court dismissed Baker's state tort claim as preempted by the NLRA and LMRA.

In affirming the district court, the Fifth Circuit noted:

> Baker must prove, as an element of his claim of intentional infliction of emotional distress, that the defendants' actions in reassigning him were extreme and outrageous. The terms of the CBA are relevant to this issue, because the CBA expressly grants management rights over the business of Farmers and its employees which could be interpreted to include the right to reassign an employee's duties.

---

CBA, the claim is preempted. However, the Court noted whether the employee stated a retaliatory discharge claim turned on "purely factual questions" about the employee's conduct and the motivation of the employer, which did not require the court to interpret any term of a CBA.  As no interpretation of the CBA was required in *Lingle*, the Court held the employee's retaliatory discharge claim was not preempted by Section 301 of the LMRA.

Although *Lingle* addressed preemption under the LMRA, in *HAL*, the Court concluded "*Lingle* provides an appropriate framework for addressing pre-emption under the RLA, and we adopt the *Lingle* standard to resolve claims of RLA pre-emption." 512 U.S. at 263.

[ . . . ]

Because construction and understanding of the terms of the CBA, particularly those governing Farmers' rights to reassign its employees, *are unavoidably and inextricably intertwined with resolution of the question whether defendants' conduct in reassigning Baker was extreme and outrageous*, a necessary element of Baker's state law claim, the district court properly held that his state tort claim was preempted by section 301.

*Baker*, 34 F.3d at 280 (emphasis added), *citing Brown v. Southwestern Bell Tel. Co.,* 901 F.2d 1250 (5th Cir.1990) (Fifth Circuit upheld finding of preemption under LMRA and affirmed summary judgment for Southwestern Bell where emotional distress claim turned on circumstances under which Southwestern Bell could or could not discharge an employee);[24] *Strachan v. Union Oil Co.,* 768 F.2d 703, 705 (5th Cir.1985) (Fifth Circuit affirmed preemption under NLRA of state tort claims arising from suspension and drug testing of two employees who were later restored to full employment following negative testing results where employer had power under CBA to require medical examinations when there was concern regarding physical condition of employees); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485, 487 (5th Cir. 1996) (employee's state law race discrimination claims were preempted under LMRA where claims "turn[ed] on questions of promotion, seniority, an assignment to training programs," all of which were "provided for" in the CBA; and employee's intentional infliction of emotional distress claim was preempted where

---

[24] In noting the facts in *Baker* and *Brown* differ slightly, the court nevertheless stated "at issue in each case is the authority of the employer, as set forth in a CBA, to take certain actions affecting the plaintiff's job. Because the terms of the CBA are relevant to the resolution of the state tort claim, section 301 preempts those state tort claims." *Baker*, 34 F.3d at 281.

In *Baker*, the court noted in cases addressing preemption of intentional infliction of emotional distress claims under Section 301 of the LMRA, courts tend to follow one of two trends. Where the allegedly tortious conduct could not have been sanctioned by the CBA – for example in cases concerning assault and battery or sexual harassment – no preemption occurs. However, where the conduct reasonably may be deemed covered by the CBA – for example, if the conduct is an assignment of duties or representation by a Union – Section 301 does preempt state tort claims. *See Baker*, 34 F.3d at 281.

resolution of the claims – particularly whether the employer's conduct was "outrageous" – required

interpretation of the CBA); *Kollar v. United Transp. Union*, 83 F.3d 124, 126 (5th Cir. 1996)

(although employees couched lawsuit in terms of fraud under state law, court noted relevant

underlying issue was seniority, which was controlled by the CBA and modifying agreements; court

found resolution of plaintiffs' claim required interpretation of CBA, and, therefore, claim was

preempted by CBA).[25]

Four months later, in *Hirras v. National Railroad Passenger Corp.*, 44 F.3d 278 (5th Cir.

1995), the Fifth Circuit addressed the issue of preemption again. In *Hirras*, an employee filed suit

against her employer for both Title VII violations and state law intentional infliction of emotional

distress. The district court held both claims were preempted by the RLA, and the employee

appealed. On appeal, the Fifth Circuit originally affirmed the decision of the district court, but in

light of *HAL*, on reconsideration, reversed the findings of the district court. In interpreting the

standard set forth in *HAL*, the court noted:

> a claim is preempted by the RLA only if it relies on the interpretation of a provision
> of the CBA; if the claim is brought under state law *without any reference to the*
> *CBA*, then it is not preempted. Thus, where an employer has a state-law obligation
> "wholly apart from any provision of the CBA," claims brought to enforce the state-
> law obligation are not preempted by the RLA. *A state-law claim is independent*
> *"even if dispute resolution pursuant to a collective-bargaining agreement, on the*
> *one hand, and state law, on the other, would require addressing precisely the same*
> *set of facts, <u>as long as the state-law claim can be resolved without interpreting the</u>*
> *<u>agreement itself</u>....*"

*Hirras*, 44 F.3d at 282 (emphasis added) (internal citations omitted). Noting the CBA contained no

provision related to sexual harassment, the court concluded the plaintiff's intentional infliction of

---

[25] Specifically, the court noted "[t]o prove the falsity of the representations [made by the employer],
[p]laintiffs would have to show that the relevant seniority provisions of the CBA, the transfer agreement, and
modifying letter agreement, differ from the representations made by the Union. This requires interpretation of the
CBA left appropriately to procedures established under the RLA." *Kollar*, 83 F.3d at 126.

emotional distress claim did not depend on an interpretation of the CBA and was, therefore, "independent of the CBA." *Id.* at 283-84.

More recently, in *Carmona v. Southwest Airlines Co.*, 536 F.3d 344, 246 (5th Cir. 2008), plaintiff Carmona was terminated from his position as a flight attendant for Southwest Airlines for excessive absenteeism. The CBA between the parties set forth rules for leaves of absence, medical and sick leave, attendance, discipline and termination, and grievance procedures. Under the attendance provision, any employee who exceeded 12 attendance "points" within a rolling 16-month period was subject to termination. Carmona sued Southwest, his employer, in federal court alleging sex discrimination under Title VII of the Civil Rights Act, disability discrimination and failure to accommodate under the Americans with Disabilities Act "(ADA"), and retaliation in violation of the Family Medical Leave Act ("FMLA"). The district court granted summary judgment in favor of Southwest, concluding plaintiff's claims were precluded by the RLA and dismissing plaintiff's complaint for lack of subject matter jurisdiction. 536 F.3d at 346-47. Carmona appealed.

On appeal, the Fifth Circuit concluded Carmona's claims under Title VII and his ADA disability discrimination claims could not be resolved through an "interpretation" of the CBA – and therefore, the rights at issue did not exist independently of the CBA – and therefore, plaintiff's claims were not precluded by the RLA. *Id.* at 347. The court reasoned:

> ***As provisions of the CBA are relevant to, but not dispositive of, the resolution of Carmona's claims, his claims do not constitute a minor dispute under the RLA.*** Even though a court would have to *refer to* the CBA to consider fully each of the alleged acts of disparate treatment, ***there is no disagreement about how to interpret these provisions of the CBA*** that detail Southwest's procedures for assessing attendance, leave, discipline, and termination. Carmona's factual allegations that unexcused absences by female flight attendants went unpunished, that remarks of his supervisors regarding male employees were discriminatory, and that his chronic illnesses were the real reason he was fired, ***do not bring the meaning of any CBA provisions into dispute***. He alleges that CBA procedures were *applied* in a

21

discriminatory manner, not that CBA procedures were fundamentally discriminatory. Thus, consideration of the CBA *as applied to Title VII and the ADA*-not interpretation of the CBA itself-is what is required to resolve Carmona's claims.

*Carmona*, 536 F.3d at 349-50 (emphasis added).[26]

The issue of whether wage claims are preempted by the RLA has been addressed by the courts in far fewer instances. In *Livadas v. Bradshaw*, 512 U.S. 107, 114 S.Ct. 2068 (1994), decided one week before *HAL*, the Supreme Court further explained and honed the doctrine of federal preemption under *Lingle*. In *Livadas*, plaintiff employee was discharged from her job as a grocery clerk. At the time of her discharge, the plaintiff was subject to a CBA between her employer and the union of which she was a member. Additionally, California labor law provided if an employer discharged an employee, the wages earned and unpaid at the time of discharge were due and payable immediately. Livadas demanded her wages immediately upon being fired, but her employer stated her wage check would have to be mailed from a central corporate payroll office. Three days later, plaintiff received a check in the full amount owed for her work through the day she was discharged. Nevertheless, the plaintiff filed a claim with the California Division of Labor Standards Enforcement asserting she was entitled to a sum equal to three days' wages as a penalty for the delay between discharge and the date when payment was in fact received. *Livadas*, 512 U.S. at 111.

Although the issues on appeal to the Supreme Court were not the same as those before this Court, the Supreme Court had occasion to address the issue of preemption of the plaintiff's claim

---

[26] The Fifth Circuit noted the plaintiff in *Carmona* abandoned his ADA failure to accommodate claim on appeal. 536 F.3d at 347.

Although the Unions cite and rely on *CareFlite v. Office and Professional Employees Union, AFL-CIO*, 2010 WL 2745813 (5th Cir. 2010), this Court concludes the *CareFlite* case, while instructive to some degree, is factually distinguishable from the instant case. First, the *CareFlite* case addresses the scope of a particular grievance procedure set forth in a particular CBA between a Union and an employer. Specifically, in *CareFlite*, the Union was arguing two grievances were arbitrable based on specific language contained in the CBA that does not exist in the instant case. Therefore, this Cort concludes the *CareFlite* case is inapposite.

under the LMRA.   Citing *Lingle*, the Court stressed "it is the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement . .. that decides whether a state cause of action may go forward." *Livadas*, 512 U.S. at 123-24.  The Court went on:

> Finally, we were clear that when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished. . . .
>
> [ . . . ]
>
> As the District Court aptly observed, the primary text for deciding whether Livadas was entitled to a penalty was not the Food Store Contract, but a calendar. The only issue raised by Livadas's claim, whether Safeway "willfully fail[ed] to pay" her wages promptly upon severance, *was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer. There is no indication that there was a "dispute" in this case over the amount of the penalty to which Livadas would be entitled*, and *Lingle* makes plain in so many words that when liability is governed by independent state law, the mere need to "look to" the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301.
>
> [ . . . ]
>
> Beyond the simple need to refer to bargained-for wage rates in computing the penalty, the collective-bargaining agreement is irrelevant to the dispute (if any) between Livadas and Safeway.

*Id.* at 124-25 (emphasis added).

The First Circuit has also addressed preemption of wage claims.  In *Adames v. Executive Airlines, Inc.*, 258 F.3d 7 (1st Cir. 2001), plaintiff employee sued her employer for violation of various Puerto Rican labor laws addressing wages, overtime pay, maternity benefits, meal periods, days off, vacation, bonuses, and sick leave.  Plaintiff argued her right to these benefits existed independently of the terms of the CBA with her employer.  In response, the airline argued the claims under the state labor laws were preempted by the RLA because the claims could not be resolved

without interpreting the CBA.  The district court agreed, and the First Circuit affirmed on appeal.

*Adames*, 258 F.3d at 9-10.

> In affirming the district court, the court in *Adames* noted:

> This suit inescapably involves the relationship between various labor laws of the Commonwealth and certain terms of the CBA addressing the same subject as the Commonwealth laws.  For example, Puerto Rico law relies on conventional pay mechanisms, such as hourly wages, which may not reflect methods of remuneration in the airline industry.  The peculiarities of industry-specific wage and benefit structures are apparent in the collective bargaining agreement between the flight attendants and Executive.

*Id.* at 12-13.

After examining each claim separately, the Court concluded the factual predicate triggering application of the relevant Commonwealth labor law for each and every claim required interpretation of the CBA.  Therefore, the court concluded all of the plaintiff's Commonwealth-based labor claims were preempted by the RLA.

### 3.    Analysis of the Unions' Wage Claims

In the instant case, PHI argues, pursuant to *HAL*, the Unions' wage claims are "substantially dependent" on the terms of the CBA and the past practices between the parties.  Furthermore, PHI argues the CBA is the "only source" of the employee's rights with respect to the wage claims.

The primary claim brought in Count II is for unpaid wages pursuant to the Louisiana Wage Payment Act, La. Rev. Stat. §23:631, which states:

> A. (1)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay **the amount then due under the terms of employment**, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

> (b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay **the**

> **amount then due under the terms of employment**, whether the employment is by
> the hour, day, week, or month, on or before the next regular payday for the pay cycle
> during which the employee was working at the time of separation or no later than
> fifteen days following the date of resignation, whichever occurs first.

La. Rev. Stat. §23:631 (West 2010).[27]

The elements of a Louisiana wage claim pursuant to La. Rev. §Stat. 23:631 are as follows: (1) the wages were due and owing; (2) a demand for payment was made at the place where the employee was usually paid; and (3) the employer failed to pay following demand. *See, e.g., Jackson v. Housing Authority for Parish of St. James*, 926 So.2d 606, 611 (La. App. 5th Cir. 2006). PHI contends the "terms of employment" as referenced in the statute are unquestionably set by the CBA, and a determination of whether the plaintiff satisfies a specific element of the statute – that the amount claimed by the pilots was "*an amount then due under the terms of employment*" -- cannot be made without an interpretation of the CBA. In so arguing, PHI contends this is not a case where the Court would only have to refer to the CBA for damage computation, but rather, the Court would have to *interpret* the CBA to decide whether PHI had the right to make deductions from pilots' paychecks for improperly retained equipment. PHI argues the right to deduct these amounts is hotly disputed, and whether the deductions can be made is a true question of contract interpretation, not one of mere contract consultation.

---

[27] The Unions also seek penalty wages and attorney's fees pursuant to La. Rev. Stat. §23:632, which states:

> Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to
> the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages
> from the time the employee's demand for payment is made until the employer shall pay or tender
> the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty
> wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall
> be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages
> whatsoever be filed by the laborer or employee after three days shall have elapsed from time of
> making the first demand following discharge or resignation.

La. Rev. Stat. §23:632 (West 2010).

After consideration of the arguments of the parties and the applicable law, this Court, guided by the rulings of the United States Supreme Court and the Fifth Circuit, concludes the Unions' wage claims are preempted by the RLA. In *Baker*, the Fifth Circuit noted two basic trends with respect to preemption of state law claims for intentional infliction of emotional distress under Section 301 of the LMRA, explaining where the allegedly tortious conduct could not have been sanctioned by the CBA – for example, in cases concerning assault and battery or sexual harassment – no preemption occurs. However, where the conduct reasonably may be deemed covered by the CBA – for example, if the conduct is an assignment of duties or representation by a Union – Section 301 does preempt state tort claims.   *See Baker*, 34 F.3d at 281.

Here, the challenged conduct is the deduction of certain amounts from pilots' paychecks for unreturned equipment. First, as a general matter, this Court notes the overall scheme of wages and benefits is a "covered" area within the CBA, as the CBA contains provisions for the payment of pilots. Second, specifically, both the express and implied terms of the CBA, in this case, address allowable deductions from paychecks for failure to return equipment once a pilot's employment with PHI ceases. Because the CBA addresses both wages and deductions for failure to return company equipment, the rights of the employees to wages once terminated is not solely governed by the Louisiana Wage Payment Act. Indeed, a critical element of a claim under the Act – the "amount[s] then due and owing under the terms of employment" – cannot be determined without interpretation or application of the CBA provisions. Stated another way, this Court concludes while the discharged and/or resigned pilots have a right to be paid wages they are due, the question of *whether they are due, in the first place*, is one which requires interpretation of the CBA, thus, the pilots' right to be fully compensated does not exist independent of the CBA. Rather, the CBA governs that

determination as the CBA defines, in part, the amounts the pilots are due, based upon the peculiarities of the airline industry's wage and benefits structure and more particularly, financial responsibility for issued equipment. Thus, payment for services rendered is not a mere matter of paying a pilot for the hours he has worked. Unlike, for example, a cashier, who simply works a number of hours in a store, a pilot's wages under this CBA can be, and in this instance is, dependent on other things, such as whether the pilot has returned access cards or flight equipment.

The crux of the question in the instant case – as in all preemption cases – is whether an *interpretation* of the CBA is required to resolve the wage claims, as PHI argues, or whether mere *reference* to the CBA is sufficient to resolve the claims, as argued by the Unions. This Court finds the Unions' argument that the CBA need only be referenced unpersuasive. Notably, in the instant case – unlike *Carmona* – there is a disagreement as to how to interpret the provisions of the CBA that address PHI's procedures for deducting wages from paychecks for unreturned equipment. In *Carmona*, the court held there was no such disagreement, but rather, the CBA procedures were merely being *applied* in a discriminatory manner. This Court has reviewed the entirety of Count II, which sets forth Unions' wage claims, and the allegations do not claim discriminatory application of the wage/unreturned equipment provisions of the CBA. Rather, the Unions simply allege:

3.     On or shortly after September 20, 2006, PHI transmitted what PHI called the "final" and/or "last" paycheck to pilots deemed permanently replaced by PHI.

4.     These paychecks included deductions for equipment allegedly in the pilots' possession.

5.     These deductions were not authorized or agreed to by the pilots.

6.     These deductions were made: (i) for equipment never in the pilots' possession; (ii) for equipment previously returned to pilots; and/or (iii) without conducting an inventory to determine which equipment was actually in the pilots' possession.

Count II goes on to allege despite amicable demand, the wages were not paid.  Therefore, the

Unions do not allege mere discriminatory application of certain provisions of the CBA, but rather,

allege the deductions were not "authorized" under the CBA, thereby disputing PHI's right to deduct

amounts for the equipment.

This Court's conclusion that the Unions contest PHI's rights under the CBA to make the

deductions is further bolstered by certain arguments made by the Unions in their response to PHI's

motion to dismiss.  Discussing *reference to* – rather than *interpretation of* – the CBA in this case,

the Unions argue:

> In seeking to rebut the claim that wages were due and owing the pilot, PHI will rely
> on Articles 18 and 34 of the CBA, various Corporate Rules and policies and past
> practices regarding equipment deductions.  However, Carmona precludes PHI from
> converting the non-CBA based Wage Claims into minor disputes by asserting these
> CBA based defenses.  Moreover, when PHI does rely on these CBA provisions and
> related policies and practices in its defense, that reliance will only require a
> mechanical application of them and not an interpretation.  *For example, the Court
> will have to determine whether Article 18, "Equipment" applies to the facts of the
> Wage Claims given that this CBA provision provides that if a pilot loses equipment
> or damages it through negligence "the pilot will be required to reimburse [PHI'
> for the costs of the replacement . . ." Similarly, the court will need to determine
> whether Rule 11.6 applies to the facts of the Wage Claims given that it provides
> that employees "will be charged a $100.00 fee for the loss of the [fuel] key. . . .*[28]

Although the Unions attempt to argue interpretation of the CBA will not be required in order

to resolve the pilots' wage claims – and that mere application of, or reference to, the CBA is all that

is required – the Unions' argument above is to the contrary.  Indeed, as evidenced by its argument,

the Unions are contesting that PHI *had the right to deduct certain amounts from the pilots'

paychecks pursuant to the CBA.*  As PHI argues in its motion, PHI's right "to make deductions from

pilots' paychecks for improperly retained equipment" is "hotly contested" and begins with a genuine

---

[28] *See* Unions' response brief, Doc. 484, p. 12 (emphasis added) (internal citations omitted)].

question of contract interpretation. Therefore, this case is easily distinguished from *Carmona*, in which the court correctly held the actual provisions of the CBA were not in dispute.

The fact that the instant case involves an actual dispute concerning the terms and provisions of the CBA also distinguishes the instant case from *Livadas*. In *Livadas*, the parties did not dispute *the amount* that was to be paid to the employee or that it was owed, but rather, disputed only the *timing of when* the wages were to be paid. Therefore, the court held "the primary text for deciding whether Livadas was entitled to a penalty was not the [CBA], but a calendar." *Livadas*, 512 U.S. at 124-25. As explained by this Court, however, in the instant case, the threshold issue of whether amounts can be withheld by PHI for failure to return equipment, is argued by PHI to be addressed by the CBA, argued by the Unions not to be fairly within the provisions of the CBA. Thus, the parties dispute whether the fair interpretation of the provisions of the CBA address deductions for the equipment alleged not to have been returned. Therefore, unlike in *Livadas*, the matter of the amount of wages to be paid a pilot upon discharge or resignation is not merely a matter of consulting a calendar, but a matter of interpreting the CBA to determine if amounts can be withheld and under what circumstances. Had PHI merely refused to pay a pilot wages all agreed were due and owing under the CBA, and had the pilots sued under the Louisiana wage statutes, the fact that the CBA might have to be consulted to determine the amount owed would not, perhaps, necessarily, demand preemption. However, in the instant case, *whether PHI has the right to withhold amounts for unreturned equipment is a question that cannot be answered without interpreting the CBA.*

This Court notes although the Unions do not directly challenge the authority of PHI to make deductions from pilots' paychecks for unreturned equipment, in their brief, the Unions admit reference to the CBA will be necessary to resolve the wage claims, to wit:

In seeking to rebut the claim that wages were due and owing the pilot, PHI will rely on Articles 18 and 34 of the CBA, various Corporate Rules and policies and past practices regarding equipment deductions.  However, *Carmona* precludes PHI from concerting the non-CBA based Wage Claims into minor disputes by asserting these CBA based defenses.[29]

This Court agrees *Carmona* clearly holds an employer "cannot ensure the [preemption] of an employee's claim merely by asserting certain CBA-based defenses to what is essentially a non-CBA-based claim, or by arguing that the action challenged by the [employee] is arguably justified by the terms of the CBA."  However, in *Carmona*, the court distinguished between *reference to* the CBA and *reliance* on it.  *Id.* at 349.  Here, this Court concludes to decide the wage claims, this Court must *interpret and rely* on the express and implied terms of the CBA to determine whether PHI had the right to withhold the wages for certain equipment.  Whether PHI had this right is a necessary and integral component of determining the "amount then due and owing under the terms of employment" for each affected pilot.  Indeed, PHI argues both the express provisions of the CBA and the past practice between the parties justifies the paycheck deductions for unreturned equipment.  The CBA lays out in detail the kinds of equipment the pilots are issued and which pieces of equipment must be returned to PHI once employment is terminated; failure to return equipment or reimburse PHI for the cost of that equipment can result in deductions being made from a pilot's paycheck.  The kinds of equipment that can trigger such deductions, as well as the amounts that can be deducted, are set forth in the CBA.  Thus, while in *Carmona*, the provisions of the CBA were *relevant to, but not dispositve of*, the resolution of the claims, in the instant case, the express and implied terms of the CBA are *dispositive* of the claims under the Louisiana statutes.[30]

---

[29] *See* Unions response, Doc. 484, p. 12.

[30] This Court concludes the case of *Golden, et al. v. PHI, Inc.*, Civil Action #07CV1554, decided by the Superior Court of California, County of Shasta on August 20, 2009 and relied upon, in part by the Unions, is factually inapposite.  In *Golden*, three PHI pilots involved in the September 20, 2006 strike had deductions made

### III.   Conclusion

Considering the foregoing, PHI's Motion to Dismiss Count II of the Unions' and Individual Pilots' Fifth Amended Counterclaim [Doc. 482] is GRANTED, and the Unions' wage claims contained in Count II of the Unions' and Individual Pilots' Fifth Amended Counterclaim are DENIED AND DISMISSED WITHOUT PREJUDICE.

The instant ruling resolves all remaining claims and disputes between the parties in the two consolidated cases.  Now that this Court has dismissed all claims raised by the parties in the consolidated cases, IT IS ORDERED that the parties shall submit a Final Judgment, approved as to form, as to each and/or both consolidated cases pending before this Court, within ten (10) days of the date of this Ruling.

THUS DONE AND SIGNED in Lafayette, Louisiana, this _____24_____ day of September, 2010.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

32